APPEAL NO. 22-16936

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

**ANDREW SABLAN SALAS**,

Plaintiff-Appellant,

vs.

**UNITED STATES OF AMERICA,**

Defendant-Appellee.

_____

Appeal from the District Court for the Northern Mariana Islands
District Court No. 1:22-cv-00008

_____

## APPELLANT'S OPENING BRIEF

_____

JOSEPH E. HOREY
BANES HOREY BERMAN & MILLER, LLC
200 Marianas Business Plaza, Susupe, Saipan
Commonwealth of the Northern Mariana Islands
PO Box 501969, Saipan MP 96950
Telephone: (670) 234-5684
Fax No. (670) 234-5683

# TABLE OF CONTENTS

INTRODUCTION           1

STATEMENT OF JURISDICTION       2

STATEMENT OF ISSUES PRESENTED FOR REVIEW      3

STATEMENT OF THE CASE       5

    Nature of the Case      5

    Course of Proceedings and Disposition Below      5

STATEMENT OF THE FACTS       5

SUMMARY OF ARGUMENT       10

ARGUMENT       11

    A. Section 12616 Does Not Apply via Either of the Covenant's Two Textual Formulae for Prima Facie Application of Federal Law      11

       1. Section 12616 Does Not Apply to the CNMI via Covenant § 105      14

       2. Section 12616 Does Not Apply to the CNMI via Covenant § 502(a)(2)      14

         a. 7 U.S.C. § 2156 Was Not Applicable to Guam in 1978      14

         b. 7 U.S.C. § 2156 Was Not of General Application to the Several States in 1978      18

    B. Plaintiff Stated a Claim that Application of Section 12616 Would Violate CNMI Self-Government, and Therefore It Does Not Apply.      20

CONCLUSION       29

STATEMENT OF RELATED CASES                                    31

CERTIFICATION OF COMPLIANCE PURSUANT TO
NINTH CIRCUIT RULE 32(a)(7)(C)                               32

## TABLE OF AUTHORITIES

**US-CNMI Covenant**
(reprinted in U.S. Pub. L. 94-241 (March 24, 1976), 90 Stat. 263)
(also available online at https://cnmilaw.org)

| | |
|---|---|
| Preamble | 25 |
| Section 101 | 5 |
| Section 103 | 1, 4, 5, 20, 21 |
| Section 105 | *passim* |
| Section 501 | 4 |
| Section 502 | *passim* |
| Section 503 | 17, 18 |
| Section 606 | 4 |
| Section 801 | 4 |
| Section 903 | 2 |

**US Statutes**

| | |
|---|---|
| 7 U.S.C. § 2132 | 9, 13, 14 |
| 7 U.S.C. § 2156 | 8, 9, 13 |
| 28 U.S.C. § 1291 | 3 |
| 28 U.S.C. § 1294 | 3 |
| 33 U.S.C. § 901 | 21 |
| 48 U.S.C. § 1821 | 2, 3 |

48 U.S.C. § 1822 — 2

48 U.S.C. § 1824 — 3

U.S. Pub. Law No. 80-204 (July 18, 1947), 61 Stat. 397
(approving Trusteeship Agreement) — 25

U.S. Pub. L. 89-544 (August 24, 1966), 80 Stat. 350
(Animal Welfare Act (subsequently so named)) — 13

U.S. Pub. L. 94-241 (March 24, 1976), 90 Stat. 263
(approval of Covenant) — 1

U.S. Pub. L. 94-279 (April 22, 1976), 90 Stat. 421
(patchwork cockfight prohibition) — 8, 15, 18

U.S. Pub. L. 99-198 (December 23, 1985), 99 Stat. 1354
(amendment to Animal Welfare Act) — 13

U.S. Pub. L. 101-624 (November 28, 1990), 104 Stat. 3359
(amendment to Animal Welfare Act) — 13

U.S. Pub. L. 107–171 (May 13, 2002), 116 Stat. 134
(amendment to patchwork colckfight prohibiton) — 19

U.S. Pub. L. 115-334 (December 20, 2018), 132 Stat. 4490
(Agriculture Improvement Act) — *passim*

**CNMI Statutes**
(available online at https://cnmilaw.org)

6 CMC § 3197 — 23

10 CMC § 1401 — 7

10 CMC § 2411 — 7

10 CMC § 3601 — 7

**Old Guam Statutes**

Guam Pub. L. 01-034 (1951)     16

Guam Pub. L. 03-023 (1955)     16

**Current Guam Statutes**
(available online at
https://law.justia.com/codes/guam/2019/title-22/division-3/chapter-39/)

22 G.C.A. § 39110     16

22 G.C.A. §§ 39101-18     16

**Cases**

A&E Pacific Construction Co. v. Saipan Stevedore Co.,
888 F.2d 68 (9th Cir. 1989)     1

Aldan v. Kaipat, 794 F.2d 1371 (9th Cir. 1986)     5

Ashcroft v. Iqbal, 556 U.S. 662 (2009)     28

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)     28

Boyle v. Anderson, 68 F.3d 1093 (8th Cir. 1995)     19

Commonwealth of the Northern Mariana Islands v. Atalig,
723 F.2d 682 (9th Cir. 1984)     30

Commonwealth of the Northern Mariana Islands v. United States,
279 F.3d 1070 (9th Cir. 2002) (CNMI I)     4, 8

Commonwealth of the Northern Mariana Islands v. United States,
399 F.3d 1057 (9th Cir. 2005) (CNMI II)     4, 5, 11

Commonwealth of the Northern Mariana Islands v. United States,
670 F. Supp. 2d 65 (D.D.C. 2009) (CNMI III)     1, 2, 24

Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048 (9th Cir. 2003)     3

Estate of Rangamar, 4 N.M.I. 72 (1993)     27

Fang Lin Ai v. United States, 809 F.3d 503 (9th Cir. 2015)     4, 5

Figueroa v. People of Puerto Rico, 232 F.2d 615 (1st Cir. 1956)     31

Fournier v. Sebelius, 718 F.3d 1110 (9th Cir. 2013)     4

Hernandez-Gotay v. United States, 985 F.3d 71 (1st Cir. 2021)     11

Hillblom v. United States, 896 F.2d 426 (9th Cir. 1990)     11

In re Great Plains Royalty Corp., 471 F.2d 1261 (8th Cir. 1973)     19

In re Griggs, 965 F.2d 54 (6th Cir. 1992)     19

Klamath Water Users Protective Assn. v. Patterson,
204 F.3d 1206 (9th Cir. 1999)     4

Linsangan v. United States, 2021 WL 6103047 (9th Cir. 2021)     11, 16, 29, 30

Mtoched v. Lynch, 786 F.3d 1210 (9th Cir. 2015)     1

Olopai v. Guerrero, 1993 WL 384960 (D.N.M.I. 1993)     2

Parents for Privacy v. Barr, 949 F.3d 1210 (9th Cir. 2020)     19

People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90 (9th Cir. 1974)     4

Sabangan v. Powell, 375 F.3d 818 (9th Cir. 2004)     4

Sagana v. Tenorio, 384 F.3d 731 (9th Cir. 2004)     11, 29

Saipan Stevedore Co, Inc. v. Director, Ofc. of Workers' Comp. Programs,
133 F.3d 717 (9th Cir. 1998)     2

United States v. Cabaccang, 332 F.3d 622 (9th Cir. 2003)     4

United States v. Chang Da Liu, 538 F.3d 1078 (9th Cir. 2008)     1, 2, 24

United States v. Lawson, 677 F.3d 629 (4th Cir. 2012)     19

United States *ex rel.* Richards v. Deleon Guerrero,
4 F.3d 749 (9th Cir. 1993)     *passim*

**Rules**

Fed. R. App. P. 4(a)(1)(B)(i)     4

**Covenant History**

Marianas Political Status Commission,
Section-by-Section Analysis of the Covenant     16

Presidential Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 3, 1986)     25

Security Council Res. 683, U.N. SCOR, 45th Sess., 2972d mtg. at 29,
U.N. Doc. S/INF/46 (1990)     25

Final Report of Northern Mariana Islands Commission on
Federal Laws to United States Congress     22

**International Law**

United Nations Charter     25

International Convention for the Suppression of the Traffic in Women and
Children (League of Nations; Geneva 1921)     24

(General Assembly Resolutions available online at
https://research.un.org/en/docs/ga/quick/regular/77)

Convention for the Suppression of the Traffic in Persons
and of the Exploitation of the Prostitution of Others,
A/RES/317(IV) (U.N. Gen. Assem. 1949)     24

Resolution No. 742, A/RES/742(VIII) (U.N. Gen. Assem. 1953)     25

Resolution No. 1541, A/RES/1541(XV) (U.N. Gen. Assem. 1960)     25

Resolution No. 2621, A/RES/2621(XXV) (U.N. Gen. Assem. 1970)          26

Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially
Women and Children (Annex II to U.N. Convention against Transnational
Organized Crime, A/RES/50/25 (U.N. Gen. Assem. 2000))          24

United Nations Declaration on the Rights of Indigenous Peoples,
A/RES/61/295 (U.N. Gen. Assem. 2007)          26

## Articles

Janet M. Davis, "Cockfight Nationalism: Blood Sport and the Moral
Politics of American Empire and Nation Building,"
AMER. QUARTERLY (September 2013)          6

Clifford Geertz, "Deep Play: Notes on the Balinese Cockfight,"
DAEDALUS (Winter 1972, reprinted Fall 2005)          22

## History

Hermann H.L.W. Costenoble, The Marianas (1905)          7

Don A. Farrell, History of the Northern Mariana Islands (1991)          7

Robert F. Rogers, Destiny's Landfall: A History of Guam (1995)          6, 7

## Other

New Webster's Dictionary          18

Roget's Thesaurus          18

# **INTRODUCTION**

In the Covenant establishing the Commonwealth of the Northern Mariana Islands (CNMI) and setting out the terms of its union with the United States,[1] the people of the Northern Marianas are guaranteed the right of self-government as to their internal affairs.[2]  This Court, and other federal courts, have expressly held that this guarantee imposes substantive limits on Congress' legislative power over the CNMI that it may not lawfully exceed.[3]  Nevertheless, no federal court has ever found Congress to have actually exceeded those limits.[4]  This time, however, with

---

[1]     Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, *approved by and reprinted in* U.S. Pub. L. 94-241 (March 24, 1976), 90 Stat. 263 (hereinafter COVENANT).

[2]     *See* COVENANT § 103 ("The people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption.").  *See also, e.g.*, United States v. Chang Da Liu, 538 F.3d 1078, 1082 (9th Cir. 2008) ("The Covenant gives the people of the CNMI the right to local self-government[.]").

[3]     *See, e.g.*, Chang Da Liu, *supra*, 538 F.3d at 1084 ("[T]he Covenant does limit Congress's legislative power."); Commonwealth of the Northern Mariana Islands v. United States, 670 F. Supp. 2d 65, 85 (D.D.C. 2009) (CNMI III) ("Sections 103 and 105 of the Covenant impose substantive limits on Congress' authority to legislate with respect to the CNMI in order to protect the Commonwealth's right to govern itself with regard to internal affairs."); Mtoched v. Lynch, 786 F.3d 1210, 1214 (9th Cir. 2015) ("We agree with that decision [CNMI III] and adopt its reasoning.").

[4]     *See* A&E Pacific Construction Co. v. Saipan Stevedore Co., 888 F.2d 68, 71 fn. 3 (9th Cir. 1989) ("[N]othing in the [Shipping] Act [of 1984] interferes with [the] CNMI's right of self-government[.]"); United States *ex rel.* Richards v. Deleon

1

the enactment of Section 12616 of the Agriculture Improvement Act of 2018, Congress clearly did so, by prohibiting and criminalizing the centuries-old custom of cockfighting in the CNMI, without any substantive federal interest at stake whatsoever, but only the lawmakers' subjective moral distaste for a native cultural practice they deemed "barbaric." The district court upheld the law without even a hearing on the cultural significance of the practice.

## **STATEMENT OF JURISDICTION**

This case presents a controversy arising under the US-NMI Covenant. The district court therefore had jurisdiction to adjudicate the case pursuant to Section 903 of the Covenant[5] and 48 U.S.C. §§ 1821-22.[6] This Court has jurisdiction to review

---

Guerrero, 4 F.3d 749, 753-55 (9th Cir. 1993) (Insular Areas Act does not "conflict[] with the self-governance provisions of the Covenant"); Saipan Stevedore Co, Inc. v. Director, Office of Workers' Comp. Programs, 133 F.3d 717 (9th Cir. 1998) ("[T]here is nothing in the [Longshore and Harbor Workers' Compensation] Act . . . that conflicts with the Commonwealth's right of self-government over local and internal matters."); Chang Da Liu, *supra*, 528 F.3d at 1084 ("[T]he federal government's significant interest in combating international sex trafficking . . . outweighs the intrusion into the CNMI's local affairs."); CNMI III, *supra*, 670 F. Supp. 2d at 85-86 (act federalizing immigration into the CNMI "does not transgress those limits").

[5] *See* COVENANT § 903 (cases or controversies arising under the Covenant will be justiciable in courts established by the constitution or laws of the United States).

[6] *See* 48 U.S.C. §§ 1821-22 (establishing the District Court for the NMI and granting it "the jurisdiction of a District Court of the United States").

the judgment of the district court pursuant to 48 U.S.C. § 1824,[7] 28 U.S.C. § 1291,[8] 48 U.S.C. § 1821(a),[9] and 28 U.S.C. § 1294.[10]

The judgment in this case was entered November 17, 2022, and was a final judgment disposing of all claims of all parties in the case. *See* ER-4. The Notice of Appeal was filed December 16, 2022, *see* ER-203, and was timely, having been filed within sixty days after the entry of judgment, as provided in Fed. R. App. P. 4(a)(1)(B)(i).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issue presented for review is whether the district court erred in dismissing the complaint without leave to amend. That is a question of law, reviewed *de novo*. Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.").

The district court's dismissal order was based on its construction of the Covenant, raising the central issue of whether that construction was correct. This

---

[7]     *See* 48 U.S.C. § 1824 (those portions of Title 28 of the U.S. Code which apply to the District Court of Guam shall apply to the District Court for the NMI).

[8]     *See* 28 U.S.C. § 1291 (establishing appellate jurisdiction of the courts of appeals over final orders of the District Court of Guam).

[9]     *See* 48 U.S.C. § 1821(a) (placing the NMI in same judicial circuit as Guam).

[10]     *See* 28 U.S.C. § 1294 (placing Guam in the Ninth Circuit).

issue is also reviewed de novo.[11]  The Court has stated that "[t]he Covenant is best viewed as a congressionally approved compact that is both a contract and a statute[,]"[12] and it is also the fundamental constitutional document of the US-CNMI political union.[13]   Under any of these characterizations, de novo review is appropriate.[14]   In conducting such review, "resort to extrinsic evidence of the Covenant's negotiations is entirely appropriate." Fang Lin Ai, *supra*, 809 F.3d at 507 fn. 4 (internal punctuation omitted).  *See also, e.g.,* CNMI II, *supra*, 399 F.3d at

---

[11]     This Court has regularly reviewed interpretations of the Covenant de novo, although not always saying so or saying why. *See, e.g.,* Fang Lin Ai, *supra,* 809 F.3d at 506 (de novo interpretation of COVENANT § 606); Commonwealth of the Northern Mariana Islands v. United States, 399 F.3d 1057, 1063-66 (9th Cir. 2005) (CNMI II) (de novo interpretation of COVENANT § 801); Sabangan v. Powell, 375 F.3d 818 (9th Cir. 2004) (de novo interpretation of COVENANT § 501); Commonwealth of the Northern Mariana Islands v. United States, 279 F.3d 1070 (9th Cir. 2002) (CNMI I) (de novo interpretation of COVENANT § 502); Richards, *supra*, 4 F.3d at 753-55 (de novo interpretation of COVENANT §§ 103 & 105).

[12]     Fang Lin Ai, *supra*, 809 F.3d at 507 fn. 4 (internal punctuation omitted).

[13]     *Cf.* People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90, 98 (9th Cir. 1974) ("[T]he Trusteeship Agreement constitutes the plaintiffs' basic constitutional document.").

[14]     *See, e.g.,* Klamath Water Users Protective Assn. v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999) ("The interpretation of a contract is a mixed question of law and fact subject to de novo review."); United States v. Cabaccang, 332 F.3d 622, 624-25 (9th Cir. 2003) ("The construction or interpretation of a statute is a question of law that we review de novo."). Fournier v. Sebelius, 718 F.3d 1110, 1117 (9th Cir. 2013) ("We review de novo a district court's constitutional rulings[.]").

1064 (considering "the expansive records of the Covenant's negotiation and history to extract the agreement's meaning").

## STATEMENT OF THE CASE

### Nature of the Case

This is an action challenging the lawfulness, under the Covenant, of the federal prohibition of cockfighting as it has historically been practiced in the CNMI, and seeking an injunction against its application or enforcement there.

### Course of Proceedings and Disposition Below

On May 25, 2022, Plaintiff filed his Complaint. ER-197.

On July 26, 2022, the Defendant moved to dismiss the Complaint, and the motion came before the district court for hearing on October 13, 2022.

On November 17, 2022, the district court granted the motion and dismissed the Complaint with prejudice. ER-18. This appeal ensued.

## STATEMENT OF THE FACTS

"For over three hundred years, the Northern Marianas and Guam were Spanish colonies sharing common languages, religion, and culture." Richards, *supra*, 4 F.3d at 751. This Chamorro culture has been described as "a Hispanicized Oceanic hybrid." Aldan v. Kaipat, 794 F.2d 1371, 1371 fn. 1 (9th Cir. 1986) (*quoting* Alexander Spoehr, Saipan: The Ethnography of a War-Devastated Island (1954) at 24-25). As part of this culture, Chamorro men were described by visitors as early as

1772 as "passionately fond of cockfighting."  Robert F. Rogers, <u>Destiny's Landfall:</u> <u>A History of Guam</u> (1995), ER-137.

"The political ties between the Northern Marianas and Guam were eventually broken by the Spanish-American War of 1898, with Guam becoming a territory of the United States and the Northern Marianas coming under German, and then Japanese, rule."  <u>Richards</u>, *supra*, 4 F.3d at 751.  The official treatment of cockfighting diverged as a result.

The first American governor of Guam, Richard Leary, issued an order in 1900 (Order No. 21) which forbade cockfighting, "the main sport on Guam and dearly beloved by the men of the island."  Rogers, *supra*, ER-141.  This was not an isolated order, but part of a sustained pattern by the new American administration to "change local customs." *Id*., ER-138.[15]  Similar efforts to by American authorities to suppress cockfighting also occurred in other territories acquired in the Spanish-American War, such as Puerto Rico and the Philippines.  *See* Janet M. Davis, "Cockfight Nationalism: Blood Sport and the Moral Politics of American Empire and Nation Building," AMER. QUARTERLY (September 2013), ER-108 *ff.*

---

[15]    Other such attempts included the suppression of Catholic religious processions (Order No. 4), "living together out of the bounds of wedlock" (Order No. 5), and appearing "nude" in public (directed to the Carolinian village of Maria Cristina) (Order No. 21). *See generally id*. at ER-138-40

In the German Northern Marianas, by contrast, Governor Georg Fritz was "more sensitive to indigenous customs[.]" Rogers, *supra*, ER-139. According to Governor Fritz's own account, "[c]ockfights were held on Sunday afternoons and holidays. The cockpit was just a roped-off area, and a defeated bird often ran away. The losing bird became dinner for the winner's master." Don A. Farrell, History of the Northern Mariana Islands (1991), ER-155 (*quoting* Georg Fritz, *Die Chamorro* (1904)). Another German settler on Saipan at the time wrote: "Everyone has to be back in the village on Sunday to watch the cockfights, popular since Spanish times." Hermann H.L.W. Costenoble, The Marianas (1905), ER-148.

Andrew Sablan Salas was born on Saipan in 1956. ER-198. He has been regularly and actively involved in cockfighting since childhood. He has raised hundreds of roosters for cockfighting purposes, and regularly entered such roosters in competitive cockfights in the CNMI for many years prior to 2019. *Id.* At that time, cockfighting was lawful and regulated in the CNMI, pursuant to, *inter alia*, the Saipan Cockfighting Act (10 CMC § 3601 *ff.*), the Tinian Cockfighting Act (10 CMC § 2411 *ff.*), and the Rota Cockfighting Act (10 CMC § 1401 *ff.*).

It was subject to no federal prohibition prior to 2019. A 1976 federal statutory provision making it "unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture" applied only in patchwork fashion, and it did not apply to "fighting ventures involving live birds in a State where it would not be

in violation of the law."  Former 7 U.S.C. § 2156(a)(1), (d).  Thus, the federal law was that, on the subject of cockfights, state law controlled.  If there was no state law prohibiting the practice, then there was no federal law doing so either.  The same was true in the CNMI, since, under the Covenant, the CNMI is treated as a constructive state for purposes of the application of federal law.[16]  Cockfights lawful under CNMI law were therefore lawful under federal law as well.

However, the CNMI was the last actual or constructive state where cockfighting remained legal under federal law.  Cockfighting has been prohibited by state law in all the actual states since 2008, when it was prohibited in Louisiana, the last state where it had been legal.  ER-199.  It was therefore also prohibited in each of those states by federal law.  However, its federal prohibition had come into effect, in each case prior to the CNMI, as the result of state action.

Cockfighting also remained legal in the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa.  Although not categorically treated as states by any generally applicable principle of law, all of these jurisdictions were included in the statutory definitions of "State" used for purposes of 7 U.S.C. § 2156.[17]

---

[16]    *See, e.g.*, <u>CNMI I</u>, *supra*, 279 F.3d at 1074 (under Covenant § 502(a)(2), "we must treat the CNMI as if it were a State").

[17]    *See* 7 U.S.C. § 2156(f)(3) ("In this section[,] the term 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico,

Then, on December 20, 2018, U.S. Public Law 115-334, the Agriculture Improvement Act of 2018 was signed into law by President Trump. Section 12616 of this Act amended 7 U.S.C. § 2156 by deleting the language which had set out the aforesaid exception to its application in "States" where cockfighting was legal.

The language of Section 12616 is opaque on its face, providing as follows:

Section 26 of the Animal Welfare Act (7 U.S.C. 2156) is amended –

(1) in subsection (a) –

>> (A) in paragraph (1), by striking "Except as provided in paragraph (3), it" and inserting "It"; and

>> (B) by striking paragraph (3);

(2) by striking subsection (d); and

(3) by redesignating subsections (e), (f), (g), (h), (i), and (j) as subsections (d), (e), (f), (g), (h), and (i), respectively.

U.S. Pub. L. 115-334 § 12616(a), 132 Stat. 4490, 5015-16 (December 20, 2018).

What this meant in practical effect is that the law, which had been,

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture [*except*] fighting ventures involving live birds in a State where it would not be in violation of the law,

now was,

---

and any territory or possession of the United States[.]"); 7 U.S.C. § 2132(d) ("In this chapter[,] [t]he term 'State' means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, or any other territory or possession of the United States.").

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, *including* fighting ventures involving live birds in a State where it would not be in violation of the law.

The purpose of the change was clearly stated: "Extending [the] prohibition on animal fighting to the territories." 132 Stat. at 5015.

Section 12616 went into effect on December 20, 2019. Mr. Salas was thereupon in danger of prosecution for "knowingly sponsor[ing] . . . an animal in an animal fighting venture," in the event he were to continuing raising roosters for cockfighting purposes, and entering such roosters in competitive cockfights in the CNMI. A law-abiding man,[18] Mr. Salas brought this action seeking a declaration that Section 12616 did not lawfully apply on the CNMI, and an injunction against its application there.

## SUMMARY OF ARGUMENT

The Covenant does not allow for the application of Section 12616 in the CNMI. It does not apply even *prima facie*, via either of the Covenant's two textual methods for determining the application of federal law in the Commonwealth. Furthermore, and regardless of whether it applies *prima facie*, the Covenant requires that it not infringe on the people's right of self-government. The district court erred

---

[18] Mr. Salas served in the House of Representatives in the Thirteenth CNMI Legislature, and he was CNMI Secretary of Commerce from 2004 to 2006. ER-198.

in dismissing the action without at least affording a hearing into the extent of the intrusion into local matters.

## ARGUMENT

"The Covenant has created a unique relationship between the United States and the CNMI, and its provisions alone define the boundaries of those relations." Richards, *supra*, 4 F.3d at 754 (internal quotation marks omitted). "[T]he authority of the United States towards the CNMI arises solely under the Covenant." Hillblom v. United States, 896 F.2d 426, 429 (9th Cir. 1990). *See also* Richards, *supra*, 4 F.3d at 754; Sagana v. Tenorio, 384 F.3d 731, 734 (9th Cir. 2004); CNMI II, 399 F.3d at 1062-63 (same). For this reason, cases upholding the application of Section 12616 to jurisdictions without the Covenant, such as Linsangan v. United States, 2021 WL 6103047 (9th Cir. 2021) (Guam), and Hernandez-Gotay v. United States, 985 F.3d 71, 80 fn. 7 (1st Cir. 2021) (Puerto Rico), do not control here.

### A.  SECTION 12616 DOES NOT APPLY VIA EITHER OF THE COVENANT'S TWO TEXTUAL FORMULAE FOR PRIMA FACIE APPLICATION OF FEDERAL LAW

The Covenant provides two textual methods of determining whether a federal law applies *prima facie* in the CNMI. The first appears in Section 105, which provides that:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically

named therein for it to become effective in the Northern Mariana Islands.

COVENANT § 105. The second appears at Section 502, which provides that:

The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:
. . .

those laws [with certain exceptions] which are applicable to Guam and which are of general application to the several States as they are applicable to the several States[.]

COVENANT § 502(a)(2).

This Court has held that "Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978, and . . . Section 105 governs the application of federal laws enacted after that date." Richards, *supra*, 4 F.3d at 756. This passage should not be understood, however, as setting up a strict either-or dichotomy in every case.[19] "Subsequent amendments" evaluated under Section 502 also constitute "legislation" evaluated under Section 105, since the term "legislation" includes both "laws" and "amendments." *Cf. id.* at 754 ("Congress' legislative authority over the Commonwealth derives from Section 105."). Section 502 also includes the important caveat "except as otherwise provided in this

---

[19]    The district court so understood it. *See* ER-9 ("To determine whether a federal statute applies in the CNMI, the Court looks to *either* Section 502(a)(2) *or* 105 of the Covenant.") (emphasis added, internal brackets omitted).

Covenant," which necessarily means, among other things, except as provided in Section 105. To be applicable in the CNMI, therefore, "subsequent amendments" must meet the qualifications of *both* Section 105 and Section 502. Otherwise, the application of Section 105 to a given piece of new legislation could depend on the mere fortuity of whether it is termed an "amendment."[20] In this case, Section 12616 does not apply under any *either* of the Covenant's formulae for applicability.

---

[20] The history of the Animal Welfare Act illustrates the folly lurking in such formalism. The 1976 act was styled an amendment of an original 1966 act, but the 1966 act had not dealt with the subject of animal fighting at all, but rather with animals used in medical experimentation. *See* U.S. Pub. L. 89-544 (August 24, 1966), 80 Stat. 350. The 1976 act was labeled "Section 26" of the 1966 act, but it was, in substance, something entirely new. It did not even define "animal" in the same way as the rest of the act. 7 U.S.C. § 2156(f)(4) ("In this section . . . the term 'animal' means any live bird, or any live mammal, except man."). *Cf.* 7 U.S.C. § 2132(g) ("The term 'animal' means any live or dead dog, cat, monkey . . . guinea pig, hamster [or] rabbit[,]" but not "birds, rats . . . mice . . . horses . . . [and] other farm animals").

Additional sections 27, 28 and 29 were then added to the Animal Welfare Act by "subsequent amendments," and appear as 7 U.S.C. §§ 2157-59. *See* U.S. Pub. L. 99-198 § 1754 (December 23, 1985), 99 Stat. 1354, 1649; U.S. Pub. L. 101-624 §§ 2503(2) (November 28, 1990), 104 Stat. 3359, 4066-7. From 1976 to 2018, the term "Animal Welfare Act" was synonymous with Chapter 54 of Title 7. However, one additional section was added to Chapter 54 by the Agriculture Improvement Act in 2018, prohibiting the slaughter of dogs or cats for human consumption, but for some reason this was not designated as a section of, or amendment to, the Animal Welfare Act, although it has as much to do with animal welfare as any of the preceding 29 sections. *See* U.S. Pub. L. 115-334 § 12515 (December 20, 2018), 132 Stat. 4490, 5000 (*codified at* 7 U.S.C. § 2160).

These examples show clearly that the choice of whether or not to formally characterize a given piece of legislation an "amendment" to an earlier law is often arbitrary, and ought not to serve as the sole determinant of whether or how that law applies in the CNMI or anywhere.

13

## 1. Section 12616 Does Not Apply to the CNMI via Covenant § 105

Section 12616 does not apply via Covenant §105, because, first of all, it could not have been made applicable to the several states. At the time it was enacted, there were no states in which "fighting ventures involving live birds . . . would not be in violation of the law." Since there were no such states, legislation that changed the law only for such states, such as Section 12616, could be made applicable to no states. Furthermore, Section 12616 did not specifically name the CNMI. It did not specifically name any jurisdictions at all, leaving the only indication of its geographic scope in the definition of the term "State" already present in the 1976 law. There were two such definitions, neither of which specifically names the CNMI, and which indeed seem to go out of their way to avoid it:

> In this section[,] the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States[.]

7 U.S.C. § 2156(f)(3).

> In this chapter[,] [t]he term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, or any other territory or possession of the United States.

7 U.S.C. § 2132(d).

## 2. Section 12616 Does Not Apply to the CNMI via Covenant § 502(a)(2)

### a. 7 U.S.C. § 2156 Was Not Applicable to Guam in 1978

Section 12616 was not made applicable by Covenant § 502(a)(2), as a

14

"subsequent amendment" to the original 1976 patchwork cockfight prohibition, because that prohibition was not applicable to Guam on the key date, January 9, 1978. Section 12616 was, on its face, a "subsequent amendment" of 7 U.S.C. § 2156.[21] 7 U.S.C. § 2156 itself had existed since April 22, 1976. On January 9, 1978, it provided in pertinent part as follows:

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce.

U.S. Pub. L. 94–279 (April 22, 1976), 90 Stat 417, at § 17(a). Was that applicable on Guam? Not if the animals were birds:

> (d) Notwithstanding the provisions of subsections (a), (b), or (c) of this section, the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.
> . . .
>
> (g) For purposes of this section –
>
> > . . .
> >
> > (4) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

*Id.* at § 17(d), (g).

---

[21]    *See* Agriculture Improvement Act § 12616(a) ("Section 26 of the Animal Welfare Act (7 U.S.C. 2156) is amended[,] in subsection (a)[,] in paragraph (1), by striking 'Except as provided in paragraph (3), it' and inserting 'It'. . .[.]").

By the express terms of subsection (d), the prohibition in subject (a), to the extent it applied to "live birds," did not apply to Guam or to its residents.[22] It was not applicable anywhere that cockfighting was legal by state or territorial law, and (notwithstanding events of the early American administration) cockfighting was legal on Guam in 1978. *See* Guam Pub. L. 01-034 (1951) and Guam Pub. L. 03-023 (1955) (ER-23-30). *See also* 22 G.C.A. § 39110(a) ("Cockfights may be held on Sundays, legal holidays or church holidays."). *See generally id*. at §§ 39101-18 (Guam statutes regulating cockfighting). It was not prohibited there again until a new federal prohibition was imposed by Section 12616 itself. *See generally* Linsangan, *supra*, 2021 WL 6103047 (upholding Section 12616's application on Guam).

The district court found that "Plaintiff's argument that § 2156 was not applicable to Guam is very similar to the government's unsuccessful argument that the Quiet Title Act was not applicable to Guam in [CNMI I]" ER-11. The district court misconstrued the issue in CNMI I. In CNMI I, the United States had not argued that the original pre-1978 Quiet Title Act itself was not applicable to Guam, only that a certain amendment to it was not. This Court held, correctly, that, in order for

---

[22]     *See* Marianas Political Status Commission, Section-by-Section Analysis of the Covenant, ER 171 ("The phrases used throughout Subsection (a) 'applicable to Guam' or 'applicable to the Trust Territory of the Pacific Islands' are used in the sense of 'applicable within or with respect to' the geographic areas mentioned or the people who reside in or who are citizens of those geographic areas.").

a law to be applicable in the Northern Mariana Islands via Covenant § 502(a)(2), applicability to Guam is a necessary quality for the 1978 version of the law, but not for its subsequent amendments. *Id.* at 1073 ("Because the 1986 amendments became part of the Quiet Title Act, which itself is 'applicable within' Guam, the Quiet Title Act's amendments are also 'applicable within' Guam. "). The pre-1978 Quiet Title Act had applied to Guam and to the States, therefore both that law itself and its subsequent amendments were applicable to the CNMI, whether the subsequent amendments were independently applicable to Guam or not. The question here, by contrast, is whether or not the pre-1978 law was applicable to Guam in the first place. That issue was not disputed in <u>CNMI I</u>, and that case does not resolve or control it.

The district court also wrote that "this carve-out of a particular section of a statute of the larger AIA, is unprecedented." ER-8. It is no such thing. The Covenant is replete with provisions for the application, or non-application, to Guam and/or to the CNMI, of particular sections of larger statutes. It provides for the application to the CNMI of "Section 228 of Title II and Title XVI of the Social Security Act," COVENANT § 502(a)(1), which are, of course, only particular sections of the larger Social Security Act. It provides for the non-application of "the minimum wage provisions of Section 6, Act of June 25, 1938, 52 Stat. 1062, as amended," *id.* at § 503(c), which is only one section of the larger Fair Labor Standards Act. It provides repeatedly for the application or non-application of laws

17

by general substantive category of subject matter, such as "the federal banking laws," "the immigration and naturalization laws," or "the coastwise laws," without any requirement that entire public laws, or even entire sections, either apply or not apply. *See id.* at §§ 502-3. Descriptions of applicable and non-applicable laws in the Covenant can be as broad as "those laws which provide federal services and financial assistance programs," *id.* at § 502(a)(1), and as narrow as "any prohibition in the laws of the United States against foreign vessels landing fish or unfinished fish products in the United States." *Id.* at § 503(b). It is therefore not an "unprecedented carve-out," but rather entirely consistent with the Covenant, to argue for the non-application of "any prohibition in the laws of the United States against animal fighting ventures involving live birds, as traditionally practiced in the Northern Mariana Islands."

### b. 7 U.S.C. § 2156 Was Not of General Application to the Several States in 1978.

Furthermore, the original 1976 patchwork prohibition was not "of general application to the several states," as required by COVENANT § 502(a)(2). By its own terms, it was applicable to the states only variably and selectively. *See* U.S. Pub. L. 94-279 (April 22, 1976), 90 Stat. 241, at § 17. "General" means "pertaining to a whole class or order . . . embracing the whole, not local or partial." NEW WEBSTER'S DICTIONARY. Synonyms include "to a man," "one and all," and "without exception." ROGET'S THESAURUS (No. 78). "General application," as repeatedly interpreted by

18

the courts, means *equal and uniform* application.[23]

On January 9, 1978, the cockfight ban imposed by 7 U.S.C. § 2156(a) was not of general application to the several states.  On the contrary, as provided in 7 U.S.C. § 2156(d), it distinguished sharply among them, treating them entirely differently depending on whether cockfighting was or was not already prohibited by their own laws.  Indeed, for several years, the subsection imposing the distinction was expressly titled "SPECIAL RULE FOR CERTAIN STATES," the very antithesis of "general application."[24]  *See also, e.g.*, United States v. Lawson, 677 F.3d 629, 638 (4th Cir. 2012) (noting the "disparate treatment" of cockfighting depending on the state).  It was therefore not *generally* applicable to them.  7 U.S.C. § 2156(a) therefore does not meet the second prong of COVENANT § 502(a)(2), and was not thereby made applicable to the Northern Mariana Islands.  Since the original 1976

---

[23]    *See, e.g.*, Parents for Privacy v. Barr, 949 F.3d 1210, 1235 (9th Cir. 2020) ("[T]he question of general applicability addresses whether a law treats religious observers unequally."); Boyle v. Anderson, 68 F.3d 1093, 1101 (8th Cir. 1995) ("'[T]he Court must determine whether the statute is 'of general application.'  A law of general applicability is one that does not treat ERISA plans differently from non-ERISA plans."); In re Griggs, 965 F.2d 54, 58 (6th Cir. 1992) ("Because section 186A.197(1) applies uniformly, not only in bankruptcy cases, it is a generally applicable law under § 546(b)"); In re Great Plains Royalty Corp., 471 F.2d 1261, 1264 (8th Cir. 1973) (a company's policy distinguishing between the death of an individual and the dissolution of a corporation violates "the bylaw requirement that such refunds be administered according to 'policies of general application.'").

[24]    *See* U.S. Pub. L. 107–171 (May 13, 2002), 116 Stat. 134, at § 10302(a) (§ 2156(a)(2)).

patchwork prohibition does not meet the criteria of Covenant § 502(a)(2), it never became applicable in the CNMI, nor could "subsequent amendments" to it.

Thus, Section 12616 was not made applicable to the CNMI by either Section 105 or Section 502 of the Covenant.

## PLAINTIFF STATED A CLAIM THAT SECTION 12616 VIOLATED CNMI SELF-GOVERNMENT, AND THEREFORE DID NOT APPLY.

Even if a federal law is *prima facie* applicable in the CNMI, that law still must not violate CNMI self-government in order for it to have effect there.  There is, in the Covenant, a built-in tension between the guarantee to "[t]he people of the Northern Mariana Islands the right [to] govern themselves with respect to internal affairs," COVENANT § 103, and the methodology-for-application sections, which provide for application to the CNMI of laws not enacted, and not necessarily approved of, by "[t]he people . . . themselves[.]"  This tension has been resolved by this Court by the use of a balancing test:

> To give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105, we think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI.

Richards, *supra*, 4 F.3d at 755.  The district court took the view that only laws applicable to the CNMI via Section 105 of the Covenant require the application of this test, not those applicable via Section 502.  *See* ER-14 ("[T]he Richards balancing test is unnecessary for statutes enacted before the Covenant's 1978 effective date;

rather, the test should only be used for legislation enacted after the Covenant's effective date."). As noted above, however, a "subsequent amendment" covered by Section 502 is also "legislation" covered by Section 105. Furthermore, Section 502, at least insofar as it allows for the application of "subsequent amendments," is just as much in tension with self-government as is Section 105, and just as much in need of some form of reconciliation with Section 103. Appropriately, therefore, this Court has weighed local interests against the application of federal law in Section 502 cases as well. For example, in Saipan Stevedore, *supra*, a case questioning the application to the CNMI of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.*, a statute first enacted in 1927, with various "subsequent amendments," the Court wrote:

> American "rule" over the Commonwealth of the Northern Mariana Islands derives its legitimacy from the consent of the Northern Mariana people and from our national respect for *the unique customs and values that have developed over hundreds of years*. As a result, to the extent not expressly covered by the Covenant, *the interpretation and application of federal laws under Covenant § 502 must take into account these historical and cultural considerations*.

Saipan Stevedore, *supra*, 133 F.3d at 721 (emphasis added). The Court considered whether application of the law would be "inconsistent with the purposes of the trusteeship agreement or the Covenant," *id*. at 722, "incompatible with the history or culture of the Commonwealth," *id*., or if would "conflict[] with the Commonwealth's right of self-government over local and internal matters." *Id*. at

725.  Such analysis is consistent with the text of Section 502, which includes the important caveat "except as otherwise provided in this Covenant," meaning, among other things, except as provided in Section 103.[25]

Both the strength of the federal interest and the degree of intrusion inherently depend on the nature of the conduct regulated and the reason for regulating it.  The conduct regulated in this instance is cultural.  Whether one approves of it or not, cockfighting is undeniably one part of the cultural and social milieu in the societies where it is practiced.  It is a significant enough cultural practice to have been the subject of a classic analysis by anthropologist Clifford Geertz, "Deep Play: Notes on the Balinese Cockfight," DAEDALUS (Winter 1972, reprinted Fall 2005), ER-77 *ff*.  Due to its cultural significance, it has been exempted from the CNMI's own recent law proscribing cruelty to animals, which provides:

The following conduct is exempt from prosecution under this article:

(a) The conduct was an accepted veterinary practice performed by a veterinarian licensed to practice in the Commonwealth in accordance with the American Veterinary Medical Association standards;

(b) The conduct was *consistent with traditional customs or cultural practices* or an accepted farming or husbandry practice, including slaughter for personal consumption *and cockfighting*;

---

[25]    *See also, e.g.*, Final Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States, ER-37, 58 ("Section 502 makes applicable . . . federal laws existing on January 9, 1978, and amendments to those laws *provided that they are not inconsistent with the Covenant. . . . The most important limitation on the applicability of these laws is Section 103 of the Covenant*.") (emphasis added).

(c) The conduct was a lawful hunting, fishing or trapping practice;

(d) The conduct was in defense of a person or person's property from the reasonable threat of an attack by an animal;

(e) The conduct was lawful research or teaching; or

(f) The conduct was an accepted method of control of rodents, pests or snakes by trapping or killing.

6 CMC § 3197 (emphasis added).  At the hearing in the House of Representative on the bill that became Section 12616, three territorial delegates spoke in opposition, including Delegate Bordallo of Guam, who stated: "[C]ockfighting is a culturally significant practice in many of our islands."  ER-75).  Similarly, Delegate Plaskett of the Virgin Islands stated: "This is a highly regulated, cultural and historic activity in the territories."  *Id*.

In this case, the principal asserted federal interest is likewise moral and cultural.  This is, on both sides, a "culture war."  That was abundantly clear from the hearing in the House of Representatives on what would become AIA § 12616.  Rep. Roskam of Illinois opened debate with a flat moral judgment: "Animal fighting is inappropriate and wrong wherever it happens."  ER-74.  Two different congressmen described cockfighting as "barbaric" – Rep.  Blumenhauer of Oregon, the bill's sponsor, and Rep. Knight of California, who called it "this barbaric activity which has no place in modern society." ER-75.  In debate, Rep. Blumenhauer claimed that

"we" have "gone past" any "cultural tradition" of "animal cruelty," by which, in context, he clearly means cockfighting:

> I am sorry, this Congress has rejected the notion that this is culturally specific. Animal cruelty has no place in any territory, in any State, by any race or ethnic group or cultural tradition. We have gone past that.

ER-75 (statement of Rep. Blumenhauer). It is not clear who he meant by "we." If he meant "we" who adhere to the dominant mainstream culture of the mainland United States, he may well be right. If he meant "we" to include the people of the CNMI, he is clearly wrong, as demonstrated by the recent CNMI law quoted above.[26]

Cultural autonomy is one of the most important aspects of the local matters that self-government is designed to advance and safeguard. The "self-government"

---

[26] Compare the concrete and substantial federal interests at stake in other cases where the balance was found to favor application of a disputed federal law to the CNMI. *See* Richards, *supra*, 4 F.3d at 755 ("millions of dollars" in federal assistance); CNMI III, 670 F.Supp.2d at 87-89 (foreign affairs and national security). At first blush, the federal interest in Chang Da Liu may appear more similarly "moral" to this case. *See* Chang Da Liu, *supra*, 538 F.3d at 1084 (citing "the federal government's significant interest in combating international sex trafficking"). However, such trafficking has been broadly prohibited in international law for over a century, to the point that signatories to the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (Annex II to U.N. Convention against Transnational Organized Crime, A/RES/50/25 (2000)), which include the United States, are not only allowed but obliged to enact law against it. *See id*. at 31 (Art. V). *See also, e.g.*, Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others A/RES/317(IV) (Gen. Assembly 1949); International Convention for the Suppression of the Traffic in Women and Children (League of Nations; Geneva 1921). Similar international agreement exists with respect to such practices as slavery and piracy. There is no such consensus as to cockfighting.

of the CNMI is self-government as understood in international law.[27]   One

significant indicium of self-government in a given territory is the "degree of

autonomy in respect of economic, social and cultural affairs, as illustrated by . . . the

degree of freedom and lack of discrimination against the indigenous population of

the Territory in social legislation[.]"   Resolution No. 742, A/RES/742(VIII) (U.N.

Gen. Assem. 1953). *See also* Resolution No. 1541, A/RES/1541(XV) (U.N. Gen.

---

[27]   *See* U.N. CHARTER, Art. 73 (signatories accept "sacred trust" to "develop self-government" in all territories under their administration which "have not yet attained a full measure of self-government"), *id.* at Art. 76 (objective of trusteeship system is to "promote . . . the trust territories, and their progressive development towards self-government or independence"); Trusteeship Agreement for the Former Japanese Mandated Islands, *ratified by* Pub. L. No. 80-204, ch. 271 (July 18, 1947), 61 Stat. 397, at Art. 6 (obliging United States to "promote the development of the inhabitants . . . toward self-government or independence" in accordance with Article 76(b) of the Charter); COVENANT pmbl. (Whereas, the Charter of the United Nations and the Trusteeship Agreement . . . guarantee to the people of the Northern Mariana Islands the right freely to express their wishes for self-government or independence . . . Now, therefore, the Marianas Political Status Commission . . . and the Personal Representative of the President of the United States have entered into this Covenant . . . .); Pub. L. No. 94-241, *reprinted in* 48 U.S.C. § 1801 ("Whereas the United States in accordance with the trusteeship agreement and the Charter of the United Nations, has assumed the obligation to promote the development of the peoples of the trust territory toward self-government or independence . . . Now be it Resolved . . . That the Covenant . . . is hereby approved."); Presidential Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 3, 1986) (determining that with the establishment of self-government, "the United States has fulfilled its obligations under the Trusteeship Agreement with respect to the Commonwealth of the Northern Mariana Islands"); Security Council Res. 683, U.N. SCOR, 45th Sess., 2972d mtg. at 29, U.N. Doc. S/INF/46 (1990) (noting the duty to develop the trust territory toward self-government or independence, and determining "in light of the entry into force of the new status agreement[] for the . . . Northern Mariana Islands, that the objectives of the Trusteeship Agreement have been fully attained").

Assem. 1960) (self-government should "respect[] the individuality and cultural characteristics of the territory and its peoples").  Especially relevant is the United Nations Declaration on the Rights of Indigenous Peoples, A/RES/61/295 (U.N. Gen. Assem. 2007) (UNDRIP), because it illustrates the application of international principles of self-government to the situation created by the Covenant – *i.e.*, indigenous peoples living and exercising their self-government within the overall sovereignty of a larger nation-state.  UNDRIP recognizes that "[i]ndigenous peoples have the right to maintain and strengthen their distinct . . . social and cultural institutions, while retaining their right to participate fully, if they so choose, in the . . . social and cultural life of the State." *Id*. at Art. 5.  This includes the right "to practice and revitalize their cultural traditions and customs." *id*. at Art. 11(1), and the right "to promote, develop and maintain . . . distinctive customs. . . traditions, procedures [and] practices[.]" *Id*. at Art. 34.  Most relevant to the present case,

> [i]ndigenous peoples have the right to maintain, control, protect and develop their cultural heritage . . . and traditional cultural expressions, as well as the manifestations of their . . . cultures, *including . . . sports and traditional games*[.]

*Id*. at Art. 31(1) (emphasis added).  "In conjunction with indigenous peoples, States shall take effective measures to recognize and protect the exercise of these rights." *Id.* at 31(2). *See also* Resolution No. 2621, A/RES/2621(XXV) (U.N. Gen. Assem. 1970) ("[T]he further continuation of colonialism in all its forms and manifestations [is] a crime which constitutes a violation of the Charter of the United Nations . . .

and the principles of international law.").

The CNMI's own courts recognize that "custom over time may gradually change[,]" Estate of Rangamar, 4 N.M.I. 72, 77 (1993), and change itself is inherently a part of any culture. But self-government assures that such change will come only when the people themselves decide they are ready for it, and will not be forced upon them by distant power brokers who deem themselves morally superior.

At the hearing on the motion to dismiss, Plaintiff's counsel sought an evidentiary hearing on the factors relevant to the balancing test – *i.e.*, "the federal interest to be served by the legislation at issue [and] the degree of intrusion into the internal affairs of the CNMI." He said:

> [T]his is something that we're prepared to offer evidence on, offer testimony on the importance of this. Mr. Salas was just talking to me just as he came in this morning about reminiscing about his grandfather and the cockfights and there's a lot of information. There's a lot of information going to the importance of this activity and its cultural and social importance and historical importance in the Northern Marianas, which we can get into if the Court finds it can't just decide the case in our favor on the law, on what's already before it. We need to have some evidence on this and show the Court what interests are at stake and what is – what is going in our side of the basket and let them put what they want in their side of the basket, as well.
>
> . . .
>
> So, that is – there is potentially a factual issue here. I think it can be decided in the plaintiff's favor, on the law, on this motion, or proceed to – proceed to evidence and maybe a motion for summary judgment or some hearing on this with the parties putting their interests before the Court to be weighed if that needs – if that needs to be done.

27

ER-20-21. In the alternative, he sought leave to amend the Complaint:

> Certainly, we think we've alleged sufficiently to go forward with that. If the Court finds we haven't alleged it sufficiently under the <u>Twombly</u> <u>Iqbal</u> plausibility standard that we apply here on a motion to dismiss,[28] then we would ask for [leave] to amend so that we could allege it in – in greater detail, because we certainly can, and – we – if the need comes to present evidence to the Court to support our allegations, we can certainly do it.

*Id.* However, the district court found that no additional allegations or evidence could save the Complaint:

> Plaintiff's proffer of providing more facts about how deeply entrenched cockfighting is the CNMI would not cure the deficiency. Such amendment would be futile because the federal interests in regulating interstate commerce, preventing the spread of avian flu, and ensuring the humane treatment of animals outweigh the degree of intrusion into the internal affairs of the CNMI as it relates to the tradition of cockfighting.

ER-14-15 (footnote omitted).

> Moreover, because this case is at the motion to dismiss phase, the Court accepted as true well-pleaded facts in the complaint, including Plaintiff's allegation that: "[c]ockfighting [is] a traditional local recreational activity" that is also "a quintessential 'internal affair' of the Northern Mariana Islands."

ER-15 fn. 5 (*quoting* Complaint ¶ 30). *See also id.* at 13 ("At the motion to dismiss phase, the Court accepts Plaintiff's factual allegations as true; so, assuming that cockfighting is deeply entrenched in the CNMI's internal affairs, the question is

---

[28]    *See* <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).

whether that outweighs the federal interests.").

The district court's order thus precluded any opportunity for balancing the interests. It did not evaluate the strengths of the asserted federal interests. The district court had, and we have, no idea whether any "interstate commerce" involved consisted of billions of dollars of pan-Pacific or even worldwide wagering, or the mere fact (if fact it is) that some Saipan farmers may use chicken feed originally produced in the states. The district court had, and we have, no idea whether "avian flu" has ever been detected among Saipan fighting cocks, whether fighting cocks are more prone to either contract it or transmit it than any other birds, or indeed whether it even still exists. The court concluded that the mere assertion of hypothetical federal interests means that those interests, however weak they may be, necessarily outweigh any local interest, however strong, so completely and categorically that there is no need to even hear, much less weigh, the evidence. That is not any kind of "balancing" test, and it does not adequately resolve the tension in the Covenant between the federal legislative authority it permits and the local self-government which it guarantees, and which was the *raison d'etre* for its creation.

## CONCLUSION

In <u>Linsangan</u>, this Court upheld Section 12616's application to Guam, invoking Congress's plenary power over the territories. *See* 2021 WL 6103047 at *1 ("It has long been settled that the Territorial Clause grants to Congress plenary

authority over the territories, including Guam.") (internal punctuation omitted) "[B]ecause of its powers of self-government," however, "the CNMI is not under the plenary authority of the United States." Sagana, supra, 384 F.3d at 734 (citing Commonwealth of the Northern Mariana Islands v. Atalig, 723 F.2d 682 (9th Cir. 1984)). See also Atalig, 723 F.2d at 687 (9th Cir. 1984) ("Guam is subject to the plenary power of Congress and has no inherent right to govern itself. In contrast, the NMI possesses a right to self-government acknowledged in the Trusteeship Agreement and the Covenant.") (citation omitted).

Section 12616 treats the CNMI precisely like the territories, and the district court's analysis of that treatment is the same that would be applied under the Territorial Clause – i.e., that if any rational basis for the application of a federal law can be imagined, then the law applies, no matter how locally disruptive or objectionable it may be. See, e.g., Linsangan, supra (applying similar "rational basis" test). Under this approach, there is no substantive difference between a place being "subject to the plenary power of Congress and ha[ving] no inherent right to govern itself," on the one hand, and "possess[ing] a right to self-government acknowledged in the Trusteeship Agreement and the Covenant" on the other. Such a holding, if allowed to stand, would mean that the Covenant, and the thirty years of trusteeship and development toward self-government that preceded it, were one great sham, an elaborate fig leaf for imperial aggrandizement. Appellant trusts the

30

Court will "find no reason to impute to the Congress the perpetration of such a monumental hoax[,]" <u>Figueroa v. People of Puerto Rico</u>, 232 F.2d 615, 620 (1ˢᵗ Cir. 1956), and will reverse the judgment of the district court.

Respectfully submitted this twenty-sixth day of May, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant

*/s/ Joseph E. Horey*

By:_____

Joseph E. Horey

## STATEMENT OF RELATED CASES

Appellant is aware of no related cases pending before the Court.

## CERTIFICATION OF COMPLIANCE PURSUANT TO NINTH CIRCUIT RULE 32(a)(7)(C)

Pursuant to Ninth Circuit Rule 32(a)(7)(C), I certify that the Opening Brief On Appeal is proportionately spaced, has a typeface of 14 points and contains 8380 words, excluding from the count toward the word limitation the cover page, table of contents, table of authorities, and certificates of counsel.

Dated this 26th day of May, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that Appellant's Opening Brief was filed with the Court and served on Appellee's counsel, Assistant U.S. Attorney John S. Koppell and Abby C. Wright, on May 26, 2023 (May 25 Pacific Time), by using the appellate court's CM/ECF system.

Dated this 26th day of May, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

*230529 appellant's brief 9*