No. 22-16936

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ANDREW SABLAN SALAS,
                            Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,
                            Defendant-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN MARIANA ISLANDS, SAIPAN

_____

**BRIEF FOR DEFENDANT-APPELLEE**

_____


BRIAN M. BOYNTON
    *Principal Deputy Assistant*
    *Attorney General*

SHAWN N. ANDERSON
    *United States Attorney*

ABBY WRIGHT
JOHN S. KOPPEL
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7264*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-2495*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUE...............................................................................1

STATUTES INVOLVED .........................................................................................2

STATEMENT OF THE CASE.................................................................................2

      A. Legal Background ......................................................................................2

          1. *The Covenant to Establish the Northern Mariana Islands* ..............2

          2. *The Animal Welfare Act* ...................................................................7

      B. District Court Proceedings .......................................................................10

SUMMARY OF ARGUMENT ..............................................................................17

STANDARD OF REVIEW ....................................................................................21

ARGUMENT ...........................................................................................................21

I.    7 U.S.C. § 2156, THE RELEVANT PROVISION OF
     THE ANIMAL WELFARE ACT, APPLIES TO THE
     NORTHERN MARIANA ISLANDS UNDER SECTION
     502(a)(2) OF THE COVENANT ................................................................21

II.   THE 2018 AMENDMENT TO THE ANIMAL
     WELFARE ACT NEED NOT NAME THE NORTHERN
     MARIANA ISLANDS .................................................................................32

III.  THE ANIMAL WELFARE ACT, 7 U.S.C. § 2156,
     DOES NOT GOVERN PURELY INTERNAL AFFAIRS,
     AND THERE IS A PREVAILING FEDERAL
     INTEREST IN COCKFIGHTING ..............................................................39

IV.    THE DISTRICT COURT CORRECTLY DISMISSED
PLAINTIFF'S COMPLAINT WITH PREJUDICE AND DID
NOT ABUSE ITS DISCRETION IN DENYING HIS
REQUEST TO AMEND ................................................................46

CONCLUSION ....................................................................................48

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A-1 Ambulance Serv., Inc. v. County of Monterey*,
  90 F.3d 333 (9th Cir. 1996) ................................ 32

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988) ............................... 44

*Club Gallístico de P.R., Inc. v. United States*,
  414 F. Supp. 3d 191 (D.P.R. 2019), *aff'd sub nom.*
  *Hernández-Gotay v. United States*,
  985 F.3d 71 (1st Cir.), *cert. denied*, 142 S. Ct. 336 (2021) ............. 10, 12, 16, 35

*Fang Lin Ai v. United States*,
  809 F.3d 503 (9th Cir. 2015) ......................... 26, 27

*Fleming v. Department of Pub. Safety, Commonwealth of N. Mariana Islands*,
  837 F.2d 401, 408 (9th Cir.), *cert. denied*
  488 U.S. 889 (1988), *overruled on other grounds*,
  *DeNieva v. Reyes*, 966 F.2d 480 (9th Cir. 1992) .................................34

*Hernández-Gotay v. United States*,
  985 F.3d 71 (1st Cir. 2021) ......................... 43, 45

*Linsangan v. United States,* No. 19-00145,
  2020 WL 6130784 (D. Guam Sept. 30, 2020), *aff'd*, No. 20-17024,
  2021 WL 6103047 (9th Cir. Dec. 22, 2021) ...................... 10

*Misch on Behalf of Estate of Misch v. Zee Enters., Inc.*,
  879 F.2d 628 (9th Cir. 1989) ............................... 27

*Northern Mariana Islands v. United States*,
  279 F.3d 1070 (9th Cir. 2002) ............................ 13, 14, 24, 30, 31, 36

*Northern Mariana Islands v. United States*,
  399 F.3d 1057 (9th Cir. 2005) ......................... 4, 34, 36-37

*Oklahoma v. New Mexico*,
  501 U.S. 221 (1991).........................................26

*Perez v. Mortgage Elec. Registration Sys., Inc.*,
  959 F.3d 334 (9th Cir. 2020) ............................ 21

*Saipan Stevedore Co. v. Director, Office of Workers' Comp. Programs*,
133 F.3d 717 (9th Cir. 1998) .......................................................... 2, 22

*Simms v. Simms*,
175 U.S. 162 (1899) ......................................................................... 34

*United States v. Bacon,* No. 09-CR-30101-MJR,
2009 WL 3719396 (S.D. Ill. Nov. 5, 2009) ...................................... 41

*United States v. Chang Da Liu*,
538 F.3d 1078 (9th Cir. 2008) .................................................... 15, 39

*United States v. Gibert*,
677 F.3d 613 (4th Cir. 2012) ................................................. 8, 42, 43

*United States v. Lopez*,
514 U.S. 549 (1995)........................................................................ 42

*United States ex rel. Richards v. De Leon Guerrero*,
4 F.3d 749 (9th Cir. 1993) ................................. 5, 12, 15, 32, 39, 40, 41, 42, 44

*Vincent v. Trend W. Tech. Corp.*,
828 F.2d 563 (9th Cir. 1987) ..................................................... 46, 47

## U.S. Constitution:

Art. IV, § 3, cl. 2 ............................................................................. 7

## Treaty:

Trusteeship Agreement for the Former Japanese Mandated Islands
art. 3, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665 ........................................ 2

## Statutes:

Agriculture Improvement Act of 2018,
Pub. L. No. 115-334, 132 Stat. 4490:
§ 12616, 132 Stat. at 5015-16 ........................................................1
§ 12616(a), 132 Stat. at 5015-16.....................................................10
§ 12616(e), 132 Stat. at 5016 ..........................................................10

iv

Animal Welfare Act Amendments of 1976,
  Pub. L. No. 94-279, § 17, 90 Stat. 417, 421-22 ..............................................7, 8
    7 U.S.C. ch. 54 ........................................................................................ 7
      7 U.S.C. § 2132(c) ................................................................................ 21
      7 U.S.C. § 2132(d) ............................................................................... 22
      7 U.S.C. § 2156 .................................................................... 21, 31, 43
      7 U.S.C. § 2156 (1976) ....................................................................... 11
      7 U.S.C. § 2156(a) ............................................................................... 7
      7 U.S.C. § 2156(a) (1976) .......................................................... 23, 27
      7 U.S.C. § 2156(a)-(c) (1976) ..................................................... 25, 29
      7 U.S.C. § 2156(a)-(d) ....................................................................... 41
      7 U.S.C. § 2156(a)(2) (2018) ............................................................... 9
      7 U.S.C. § 2156(a)(3) (2018) ............................................................... 9
      7 U.S.C. § 2156(b) (2018) .................................................................... 9
      7 U.S.C. § 2156(b) (1976) ........................................................... 23, 27
      7 U.S.C. § 2156(c) (1976) ........................................................... 23, 27
      7 U.S.C. § 2156(d) (2018) .................................................................... 9
      7 U.S.C. § 2156(d) (1976) ................................................... 23, 25, 29
      7 U.S.C. § 2156(e) (2018) .................................................................... 9
      7 U.S.C. § 2156(f)(1) ............................................... 7, 21, 41, 44, 45
      7 U.S.C. § 2156(g)(1) ......................................................................... 20
      7 U.S.C. § 2156(g)(1) (1976) ............................................................. 28
      7 U.S.C. § 2156(g)(2) (1976) ............................................................. 28
      7 U.S.C. § 2156(g)(3) ......................................................................... 18
      7 U.S.C. § 2156(g)(4) (1976) ...................................................... 23, 28

Covenant to Establish a Commonwealth of the Northern Mariana
  Islands in Political Union with the United States of America,
  Pub. L. No. 94-241, 90 Stat. 263 (1976), *reprinted as amended*,
  48 U.S.C. § 1801 note .........................................................................1, 3
    § 101, 90 Stat. at 264................................................................................3
    § 102, 90 Stat. at 264................................................................................3
    § 103, 90 Stat. at 264.............................................................................4, 11
    § 105, 90 Stat. at 264................................................6, 11, 19, 37, 41
    § 502, 90 Stat. at 268..............................................................................11
    § 502(a), 90 Stat. at 268 ...........................................................................5
    § 502(a)(2), 90 Stat. at 268....................................5, 13, 22, 25, 28
    § 502(a)(3), 90 Stat. at 268.....................................................................25
    § 504, 90 Stat. at 268..........................................................................6, 26
    § 1003(b), 90 Stat. at 277 .........................................................................5

Pub. L. No. 89-544, 80 Stat. 350 (1966)....................................7

Pub. L. No. 99-598, 100 Stat. 3351 (1986)
   (codified at 28 U.S.C. § 2409a(g), (m))..........................24

Pub. L. No. 107-171, § 10302, 116 Stat. 134, 491-92 (2002) ................8

Pub. L. No. 110-22, § 3, 121 Stat. 88, 88-89 (2007) ....................... 8-9

Pub. L. No. 110-246, § 14207, 122 Stat. 1651, 2223-24 (2008) ..............9

Pub. L. No. 113-79, § 12308(b)(1), 128 Stat. 649, 990-91 (2014)...........9

28 U.S.C. § 1291 ....................................................... 1

28 U.S.C. § 1294 ....................................................... 1

28 U.S.C. § 1331 ....................................................... 1

48 U.S.C. §§ 1821-1822 ................................................. 1

48 U.S.C. § 1821(a) ................................................... 1

48 U.S.C. § 1824 ...................................................... 1

**Regulation:**

Proclamation No. 4534,
   42 Fed. Reg. 56,593 (Oct. 27, 1977)............................... 3, 5

**Legislative Materials:**

153 Cong. Rec. E2 (daily ed. Jan. 5, 2007) .......................42, 45

153 Cong. Rec. S451 (daily ed. Jan. 11, 2007)....................42, 45

164 Cong. Rec. H4221 (daily ed. May 18, 2018) ...........10, 35

H.R. Rep. No. 94-364 (1975).............................................5

H.R. Rep. No. 94-801 (1976).......................................42, 45

S. Rep. No. 94-596 (1976) ...................................................................... 3, 4

**Other Authority:**

Office of the Governor, Commonwealth of the N. Mariana Islands, *About the CNMI*, https://perma.cc/7U4X-A3HE   2

## STATEMENT OF JURISDICTION

Invoking the jurisdiction of the district court under 48 U.S.C. §§ 1821-1822 and 28 U.S.C. § 1331, plaintiff-appellant challenges a recently enacted statute effectively extending to territories of the United States, including the Northern Mariana Islands—the sole focus of plaintiff's case—the federal ban on cockfighting. *See* ER-197 (Compl. ¶ 1 (Dkt. No. 1)).  The district court granted the government's motion to dismiss for failure to state a claim and dismissed plaintiff's complaint with prejudice.  *See* ER-1-15 (Decision and Order Granting Mot. to Dismiss with Prejudice (Decision) (Dkt. No. 11)).  Plaintiff filed a timely notice of appeal.  *See* ER-16 (Dkt. No. 12).  This Court has jurisdiction pursuant to 48 U.S.C. §§ 1821(a), 1824, and 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUE

Whether the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America," Pub. L. No. 94-241, 90 Stat. 263, 263 (1976) (Covenant), *reprinted as amended*, 48 U.S.C. § 1801 note, precludes application to the Northern Mariana Islands of Section 12616 of the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 12616, 132 Stat. 4490, 5015-16, which extends the federal ban on cockfighting to the territories of the United States.

## STATUTES INVOLVED

The relevant statutes are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. *The Covenant to Establish the Northern Mariana Islands*

The Northern Mariana Islands were colonized by Spain in the 1600s, purchased by Germany in 1899, and transferred to Japan in 1919 through the Treaty of Versailles.[1] Following the defeat of Japan in World War II, the Northern Mariana Islands, along with the rest of Micronesia, became part of the Trust Territory of the Pacific Islands administered by the United States pursuant to an agreement with the United Nations. *See* Trusteeship Agreement for the Former Japanese Mandated Islands art. 3, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665. By the early 1970s, the Northern Mariana Islands became "ideologically diverged from the rest of Micronesia and sought a closer, more permanent relationship with the United States." *Saipan Stevedore Co. v. Director, Office of Workers' Comp. Programs*, 133 F.3d 717, 720 (9th Cir. 1998).

In February 1975, following several rounds of negotiations, a "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with

---

[1] *See* Office of the Governor, Commonwealth of the N. Mariana Islands, *About the CNMI*, https://perma.cc/7U4X-A3HE.

the United States of America" was approved by the Mariana Islands Legislature and subsequently signed by both the Ambassador for the United States and the Marianas Political Status Commission. Pub. L. No. 94-241, 90 Stat. at 263. The Covenant was then approved by the United States Congress on March 24, 1976, giving immediate effect to certain of its provisions. *Id.* On October 24, 1977, the President of the United States issued a proclamation declaring that the Constitution of the Northern Mariana Islands and certain other provisions of the Covenant—including several at issue in this case—would become effective as of January 9, 1978. Proclamation No. 4534, 42 Fed. Reg. 56,593, 56,594 (Oct. 27, 1977).

The Covenant establishes a Commonwealth of the Northern Mariana Islands (Commonwealth or CNMI) "in political union with and under the sovereignty of the United States of America." Covenant § 101, 90 Stat. at 264. The Covenant provides that the "laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands." Covenant § 102, 90 Stat. at 264. Thus, "[a]lthough described as a commonwealth, the relationship [of the Northern Mariana Islands to the United States] is territorial in nature with final sovereignty invested in the United States and plenary legislative authority vested in the United States Congress." S. Rep. No. 94-596, at 2 (1976).

The Covenant does, however, allow the people of the Northern Mariana Islands to "govern themselves with respect to internal affairs in accordance with a

Constitution of their own adoption." Covenant § 103, 90 Stat. at 264. This made the Northern Mariana Islands more like one of the 50 States than were some other territories that did not have their own constitutions and whose ability to self-govern was controlled by organic statutes that could be unilaterally altered by Congress. *See* ER-159 (Mot. to Dismiss, Ex. A (Dkt. No. 3-1), *To Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands," and for Other Purposes: Hearing on H.J. Res. 549, H.J. Res. 550, and H.J. Res. 547 Before the Subcomm. on Territorial & Insular Affairs of the H. Comm. on Interior & Insular Affairs*, 94th Cong. 629 (1975) (excerpts) (Section-by-Section Analysis));[2] *see also* S. Rep. No. 94-596, at 2 ("The essential difference between the Covenant and the usual territorial relationship, such as that of Guam, is the provision in the Covenant that the Marianas constitution and government structure will be a product of a Marianas constitutional convention, as was the case with Puerto Rico, rather than through an organic act of the United States Congress.").

---

[2] The cited Section-by-Section Analysis of the Covenant that is reprinted in the House Committee hearing transcript was prepared by the Marianas Political Status Commission, translated into the three major languages of the Mariana Islands, and distributed to voters to inform their decision prior to the plebiscite on the Covenant. ER-156 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 626). This Court has relied on the Section-by-Section Analysis to interpret the Covenant's provisions. *See Northern Mariana Islands v. United States*, 399 F.3d 1057, 1065 (9th Cir. 2005).

The Covenant also makes several "laws of the United States" in effect on January 9, 1978, "and subsequent amendments to such laws" applicable to the Northern Mariana Islands. Covenant § 502(a), 90 Stat. at 268; *see also* Covenant § 1003(b), 90 Stat. at 277 (stating that Section 502 will become effective "on a date to be determined and proclaimed by the President of the United States"); 42 Fed. Reg. at 56,594 (declaring that date to be January 9, 1978). Relevant here, those included "laws . . . which [we]re applicable to Guam and which [we]re of general application to the several States as they [we]re applicable to the several States." Covenant § 502(a)(2), 90 Stat. at 268. This provision essentially sets forth a "two-part test" for the application of pre-1978 federal law to the Northern Mariana Islands: "applicability to Guam and applicability generally to the states." H.R. Rep. No. 94-364, at 8 (1975). This formula was intended to determine "the initial manner" in which federal law would apply, given that it was impossible for the negotiators of the Covenant "to review each federal law to determine whether and how it should apply." ER-170 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 640).[3]

To conduct such a review, the Covenant directed the President of the United States to appoint a Commission on Federal Laws to "survey the laws of the United

---

[3] The fact that Section 502 was intended as an interim formula does not mean that it is now without effect. Section 502 continues to govern the applicability of federal laws existing prior to January 9, 1978. *United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754 (9th Cir. 1993).

States and to make recommendations to the United States Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner." Covenant § 504, 90 Stat. at 268. This Commission consisted of seven persons—including four from the Northern Mariana Islands—and was charged to consider "the potential effect of each law on local conditions within the Northern Mariana Islands, the policies embodied in the law and the provisions and purposes of th[e] Covenant." *Id.,* 90 Stat. at 268-69. The Commission surveyed the United States Code and produced two interim reports to Congress in January 1982 and August 1985, respectively, and a final report in 1986. *See, e.g.,* SER-85-94 (Mot. to Dismiss, Ex. B (Dkt. No. 3-2)), *Welcoming America's Newest Commonwealth: The Second Interim Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States* (Aug. 1985) (excerpts) (Second Interim Report).

The Covenant makes clear that, after January 9, 1978, Congress may enact new legislation applicable to the Northern Mariana Islands. Covenant § 105, 90 Stat. at 264. "[B]ut if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands." *Id.* The negotiators of the Covenant recognized that Congress holds "extremely broad" legislative powers with respect to the states and that its powers with respect to the Northern Mariana Islands are

theoretically even "broader" because Congress may constitutionally enact laws that "affect matters *within* . . . the territories." ER-160 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 630 (citing U.S. Const. art. IV, § 3, cl. 2)). Section 105 is meant to ensure that "Congress will exercise its special authority under Article IV, Section 3, Clause 2 purposefully." ER-160 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 630).

### 2. *The Animal Welfare Act*

First passed in 1966, the Animal Welfare Act sets standards for the humane care and treatment of animals. Pub. L. No. 89-544, 80 Stat. 350 (1966). The current, amended version of the law requires, among other things, minimum standards of care for certain animals bred for commercial sale, used in research, transported commercially, or exhibited to the public. *See generally* 7 U.S.C. ch. 54. As relevant here, the Animal Welfare Act also contains prohibitions on "animal fighting venture[s]," *id.* § 2156(a), defined as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment," unless the primary purpose is hunting, *id.* § 2156(f)(1).

Congress first added prohibitions on animal fighting through the Animal Welfare Act Amendments of 1976. Pub. L. No. 94-279, § 17, 90 Stat. 417, 421-22 (1976). That law outlawed sponsoring and exhibiting animal fights, as well as

selling, buying, transporting, delivering, or receiving animals for fighting and using the postal service or other interstate instrumentalities to promote animal fighting. *Id.* It contained a wholesale exception to these prohibitions, however, for "fighting ventures involving live birds" (*e.g.*, cockfights), to which the prohibitions would apply "only if the fight is to take place in a State where it would be in violation of the laws thereof." *Id.* at 422. In other words, if a cockfight would not violate State law, then it would not violate federal law either. The term "State" is defined in the Act to include "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." *Id.* at 423.

Over time, Congress imposed more restrictions on cockfighting, regardless of the law of the local jurisdiction, "to reflect the increasing national consensus against this activity." *United States v. Gibert*, 677 F.3d 613, 620 (4th Cir. 2012). In 2002, Congress—without exception for states where cockfighting was legal—prohibited the interstate movement of live birds for cockfighting and forbade the sponsoring or exhibiting of birds in a fighting venture if the person knew the bird moved in interstate or foreign commerce for the purpose of cockfighting. Pub. L. No. 107-171, § 10302, 116 Stat. 134, 491-92 (2002). In 2007, Congress again without exception prohibited the interstate sale and transportation of knives, metal spurs, and other sharp instruments for attaching to the legs of birds during cockfighting. Pub.

L. No. 110-22, § 3, 121 Stat. 88, 88-89 (2007). In 2008, Congress added prohibitions, without exception, on possessing and training animals, including birds, for fighting purposes. Pub. L. No. 110-246, § 14207, 122 Stat. 1651, 2223-24 (2008). And in 2014, Congress added an across-the-board prohibition on attending animal fights or causing persons younger than 16 to attend animal fights, including cockfights. Pub. L. No. 113-79, § 12308(b)(1), 128 Stat. 649, 990-91 (2014). As a result of these changes, as of 2018, it was illegal everywhere in the United States and the territories (including jurisdictions where cockfighting was legal under State or territorial law) to sponsor or exhibit a bird for cockfighting with knowledge that the bird moved in interstate or foreign commerce, 7 U.S.C. § 2156(a)(3) (2018); to attend a cockfight or cause someone under 16 to attend a cockfight, *id.* § 2156(a)(2); to sell, buy, possess, train, transport, deliver, or receive a bird for cockfighting, *id.* § 2156(b); to sell, buy, transport, or deliver in interstate or foreign commerce spurs or other sharp objects used in cockfighting, *id.* § 2156(e); and to use the mail to promote cockfighting or the sale of sharp instruments used in cockfighting, *id.* § 2156(d).

In 2018, Congress finally eliminated all remaining vestiges of a cockfighting exception. The Agricultural Improvement Act of 2018 (AIA) contains a section entitled, "Extending Prohibition on Animal Fighting to the Territories," which strikes former paragraph (3) from § 2156(a), meaning that there is no longer any

exception to the animal fighting prohibitions for States and territories where cockfighting is legal. Pub. L. No. 115-334, § 12616(a), 132 Stat. at 5015-16. The title of the provision reflects the fact that, at the time the amendment passed, every one of the 50 States had outlawed cockfighting, leaving only the territories (including Puerto Rico, Guam, and the Northern Mariana Islands) as locations where cockfighting was legal. *See* 164 Cong. Rec. H4221 (daily ed. May 18, 2018) (statement of Rep. Peter Roskam); *see also* ER-199 (Compl. ¶ 11). The provision went into effect on December 20, 2019—one year after the law's passage. *See* Pub. L. No. 115-334, § 12616(e), 132 Stat. at 5016.

Like plaintiff here, other parties have brought lawsuits challenging the cockfighting provisions of the AIA as they relate to Puerto Rico and Guam. The courts have uniformly upheld the relevant provisions of the AIA. *See Linsangan v. United States*, No. 19-00145, 2020 WL 6130784 (D. Guam Sept. 30, 2020) (granting summary judgment to the United States), *aff'd*, No. 20-17024, 2021 WL 6103047 (9th Cir. Dec. 22, 2021); *Club Gallístico de P.R., Inc. v. United States*, 414 F. Supp. 3d 191 (D.P.R. 2019) (same), *aff'd sub nom. Hernández-Gotay v. United States*, 985 F.3d 71 (1st Cir.), *cert. denied*, 142 S. Ct. 336 (2021).

**B. District Court Proceedings**

**1.** Plaintiff Andrew Sablan Salas—a former member of the Northern Mariana Islands House of Representatives, ER-198 (Compl. ¶¶ 3-4)—brought this action in

district court challenging the lawfulness of Congress's recent extension of the federal cockfighting ban to the Northern Mariana Islands. Plaintiff alleges that he was "regularly and actively" involved in cockfighting from his childhood by raising hundreds of roosters and entering them in cockfights. ER-198 (Compl. ¶ 5). He seeks to resume his cockfighting activities without the threat of prosecution. ER-198 (Compl. ¶ 6). To that end, he requested a declaration from the district court that the Animal Welfare Act's prohibition on cockfighting does not apply within the Northern Mariana Islands and an injunction barring the federal government from enforcing it. ER-202 (Compl. 6).

As the purported basis for such relief, plaintiff advanced three legal theories: (1) when the Covenant was entered in 1978, 7 U.S.C. § 2156 was not generally applicable to the states and therefore neither that statute nor any of its amendments have ever applied to the Northern Mariana Islands, ER-200 (Compl. ¶¶ 17-22) (citing Covenant § 502, 90 Stat. at 268); (2) the AIA does not apply to the states and does not specifically name the Northern Mariana Islands and therefore does not apply to the Northern Mariana Islands, ER-201(Compl. ¶¶ 23-27) (citing Covenant § 105, 90 Stat. at 264); and (3) the prohibited cockfighting activities are part of the internal affairs of the Northern Mariana Islands and therefore cannot be federally regulated, ER-201-202 (Compl. ¶¶ 28-33) (citing Covenant § 103, 90 Stat. at 264).

**2.**  The government moved to dismiss plaintiff's complaint with prejudice for failure to state a claim, and on November 17, 2022, the district court granted the motion.  *See* ER-1, 14-15 (Decision 1, 14-15).  The district court emphasized that plaintiff "contests only one portion of § 2156 [*i.e.*, the cockfighting prohibition]; he does not dispute that other forms of animal fighting, such as dog fights, are prohibited in the CNMI."  ER-5 (Decision 5).  The court agreed with the government that "this carve-out of a particular section of a statute of the larger AIA, is unprecedented," *id.*, and accordingly rejected it.

**a.**  The district court first recognized that in Section 12616 of the AIA, Congress "eliminated the cockfighting exception such that the ultimate effect was 'the prohibition of animal fighting ventures, including live-bird fighting, in every United States jurisdiction[.]'"  ER-5-6 (Decision 5-6) (alteration in original) (quoting *Club Gallistico de P.R. Inc.*, 414 F. Supp. 3d at 200).

The court then analyzed the significance of this change under the Covenant.  *See* ER-6-14 (Decision 6-14).  In doing so, the court looked to § 502 of the Covenant, because that provision "'governs the application to the CNMI of federal laws existing prior to January 9, 1978.'"  ER-6 (Decision 6) (quoting *United States ex rel. Richards v. De Leon Guerrero (Richards)*, 4 F.3d 749, 756 (9th Cir. 1993)).  Because 7 U.S.C. § 2156 existed prior to 1978, the court held that "[S]ection 502 is the pertinent section of the Covenant to determine whether § 2156 applies to the CNMI."

ER-6 (Decision 6). The court further observed that the parties agreed as to the applicability of Section 502 of the Covenant (rather than Section 105). ER-6 (Decision 6).

After reciting the language of Section 502, the district court stated that "the test to determine whether § 2156 is presently applicable to the CNMI is whether § 2156 was a law 'applicable to Guam' and was 'of general application to the several States' in 1978." ER-7 (Decision 7) (quoting Covenant § 502(a)(2), 90 Stat. at 268). Answering both questions in the affirmative, the court concluded that § 2156 is presently applicable to the CNMI.

The district court rejected plaintiff's argument that "the 1976 cockfight prohibition contained in the Animal Welfare Act was not applicable to Guam in 1978 because Guam did not ban cockfighting, and thus cockfighting was not banned federally." ER-7 (Decision 7). The court observed that "just because § 2156(d) did not create a federal ban on cockfighting in Guam does not mean that the statute was not applicable to Guam." ER-7 (Decision 7). In so holding, the court invoked this Court's ruling in *Northern Mariana Islands v. United States*, 279 F.3d 1070, 1073-74 (9th Cir. 2002), defining the meaning of the term "applicable to Guam" in Section 502(a) of the Covenant. *See* ER-7-8 (Decision 7-8).

The district court parsed *Northern Mariana Islands* at length. *See* Dec. 8-9, ER 8-9 (Decision 8-9). The court determined that in that case, which dealt with the

13

applicability to the CNMI of the 1986 amendments to the Quiet Title Act, this Court "held that '[b]ecause the Quiet Title Act was in existence on January 9, 1978, and because the Quiet Title Act is applicable to Guam [pursuant to prior Ninth Circuit precedent] and to the States generally, the Quiet Title Act and its amendments are applicable to the CNMI[.]'" ER 8 (Decision 8) (alterations in original) (quoting *Northern Mariana Islands*, 279 F.3d at 1073). The district court pointed out that in *Northern Mariana Islands* this Court "noted that '[t]he Covenant's framers considered the term "applicable to Guam" to mean not only "applicable with respect to" Guam, but also to mean "applicable within" Guam'"; and further, that the Court "clarified that 'the amendments, regardless of their treatment of Guam, are law within Guam,'" thus making them "applicable to Guam" for purposes of Section 502(a). ER 8 (Decision 8) (alteration in original) (quoting *Northern Mariana Islands*, 279 F.3d at 1073-74). By the same token, in the instant case "[§] 2156 was applicable to Guam even though it did not create a federal ban on cockfighting." ER-8-9 (Decision 8-9). Rather, the statute "created a test to determine the federal legality of cockfighting in a specific jurisdiction[,]" which sufficed to make it "applicable to Guam" in 1978 within the meaning of Section 502(a) of the Covenant. ER-9 (Decision 9).

    **b.** For the same reason, the district court rejected plaintiff's argument that 7 U.S.C. § 2156 was not a "[l]aw of [g]eneral [a]pplication to the [s]everal States" in

1978 under Section 502(a) of the Covenant. *See* ER-9-10 (Decision 9-10). The court held that, as it had already explained with respect to the "applicable to Guam" inquiry, "it logically follows that 'general application to the several States' means 'generally applicable with respect to the several States' and 'generally applicable within the several States.'" ER-9 (Decision 9). In short, § 2156 "was applicable to all the states as it determined whether cockfighting was federally legal in each state." ER-9 (Decision 9).

**c.** The district court next dismissed plaintiff's assertion that Section 12616 of the AIA violates the right of local self-government under Sections 103 and 105 of the Covenant "because the statute's significant intrusion into the CNMI's cultural, political, and local interests in cockfighting outweighs the purely moral federal interest." ER-10 (Decision 10). The court first determined that because 7 U.S.C. § 2156 existed before the Covenant's 1978 effective date, the balancing of interests mandated by *Richards*, 4 F.3d at 754-55, does not apply. *See* ER-11-12 (Decision 11-12) (citing *United States v. Chang Da Liu*, 538 F.3d 1078, 1084 (9th Cir. 2008)). Nonetheless, the court held that "even under the *Richards* test, . . . the federal interests served by § 2156 do not impermissibly intrude into the CNMI's local affairs." ER-12 (Decision 12).

The district court found that the federal government "has several interests in regulating cockfighting." ER-12 (Decision 12). The court pointed to the fact that

cockfighting "events have a substantial effect on interstate commerce," ER-12 (Decision 12) (quoting *Club Gallistico de P.R., Inc.*, 414 F. Supp. 3d at 206); "cockfighting impacts the spread of avian diseases[,]" ER-12 (Decision 12); and "Congress also contemplated moral considerations when passing the AIA, particularly, 'the need to ensure "humane care and treatment" for animals.'" ER-12 (Decision 12)*. (citations omitted). While the court assumed for purposes of the motion to dismiss that "cockfighting is deeply entrenched in the CNMI's internal affairs," ER-13 (Decision 13), it held that "the federal interests in regulating interstate commerce, preventing the spread of avian diseases, and ensuring humane treatment of animals, outweigh the degree of intrusion into the internal affairs of cockfighting," and, "[t]herefore, the AIA does not impermissibly intrude [into] the local affairs of the CNMI," ER-14 (Decision 14).

**d.** Finally, the district court denied plaintiff's motion for leave to amend his complaint, and instead dismissed the complaint with prejudice. ER-14-15 (Decision 14-15). The court held that "amendment would be futile because the federal interests in regulating interstate commerce, preventing the spread of avian flu, and ensuring the humane treatment of animals outweigh the degree of intrusion into the internal affairs of the CNMI as it relates to the tradition of cockfighting." *Id.*

## SUMMARY OF ARGUMENT

Plaintiff raises a number of challenges, based on the Covenant, to Congress's decision to extend the federal ban on cockfighting to the Northern Mariana Islands. The district court correctly rejected all of his claims, however, and its judgment should be affirmed.

**1.** The federal government has imposed prohibitions on animal fighting in the States and the territories since 1976. Initially, these prohibitions exempted fights involving live birds (including cockfights) in areas where such fights were legal under State or territorial law. Between 1976 and 2014, Congress progressively limited this exemption through various legislative actions before closing it altogether in 2018.

**a.** Plaintiff alleges that he engaged in cockfighting when it was legal and wishes to do so again without fear of prosecution. He claims that the Covenant establishing the political union between the United States and the Northern Mariana Islands effectively exempts the latter from federal prohibitions on cockfighting. He therefore seeks an order that would have the remarkable result of exempting residents of the Northern Mariana Islands from the ban that Congress unambiguously intended to apply equally throughout the United States, including in all the territories.

As the district court demonstrated, plaintiff's legal theories about the power of Congress to prohibit cockfighting in the Northern Mariana Islands are meritless. The Animal Welfare Act and its amendments apply in the Northern Mariana Islands pursuant to Section 502(a)(2) of the Covenant, which specifies that all laws of general applicability in existence as of January 9, 1978, and subsequent amendments to those laws, apply with equal force to the Northern Mariana Islands. The animal-fighting prohibitions in the Animal Welfare Act, which predate 1978, are of general applicability. The relevant definitional provision defines the term "State" to encompass "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." 7 U.S.C. § 2156(g)(3).

**b.** Plaintiff nevertheless contends that Congress's prohibition on cockfighting was not "of general application to the several States" within the meaning of Section 502 because Congress made cockfighting a federal violation only in jurisdictions where it was also a violation of the law of the State or territory. But though the prohibition on cockfighting may have operated differently in different jurisdictions, it was still the law in each and every State and territory. And whatever may be said about the Animal Welfare Act's prior exception for cockfighting, there can be no doubt that the broader ban on other forms of animal fighting applied to and operated

18

uniformly in all States and territories. Congress's amendment extending that ban to cockfighting in all jurisdictions therefore applies to the Northern Mariana Islands.

**2.** Plaintiff further contends that the 2018 amendment must satisfy both Sections 105 and 502 of the Covenant. As the district court itself recognized, however, "the parties also agreed in their briefs and at the hearing that section 502 of the Covenant governs, as opposed to [S]ection 105." ER-6 (Decision 6) (citation omitted); *see also* SER-5, 26 (Hearing Tr., Dkt. No. 15). In short, plaintiff took the position that subsequent amendments needed to satisfy only Section 502. Thus, plaintiff should not be heard to raise this argument for the first time on appeal. In any event, even on its own terms plaintiff's claim is meritless. Evaluation of Section 105 demonstrates that it has no application here, because 7 U.S.C. § 2156 existed when the Covenant came into effect in 1978.

Plaintiff argues that, even if 7 U.S.C. § 2156 was made applicable to the Northern Mariana Islands by the Covenant in 1978, the 2018 amendment eliminating the last remaining cockfighting exception is not so applicable because it does not specifically name the Northern Mariana Islands, which Section 105 of the Covenant requires Congress to do if it seeks to impose upon the Northern Mariana Islands legislation that "cannot also be made applicable to the several States." Covenant § 105, 90 Stat. at 264. Plaintiff argues that the 2018 amendment did not apply to the several States because all 50 of the States had already themselves outlawed

cockfighting. But that argument ignores the actual action taken by Congress, which was to fully remove the exception permitting certain aspects of cockfighting ventures depending on the law of the local jurisdiction. Should any State choose to legalize cockfighting now, it would remain illegal under federal law, demonstrating that the 2018 amendment unquestionably applies to the 50 States and the territories.

**3.** Finally, plaintiff argues that banning cockfighting intrudes upon a purely local concern in the Northern Mariana Islands and is therefore forbidden by Sections 103 and 105 of the Covenant. By definition, however, the cockfighting banned by federal law is not purely internal to the Northern Mariana Islands; the statute targets only animal fighting that is "in or affecting interstate or foreign commerce." 7 U.S.C. § 2156(g)(1). And even if there were an intrusion on the internal affairs of the Northern Mariana Islands, it is justified by federal interests in regulating an activity that impacts interstate and/or foreign commerce, that has been connected to the interstate and foreign spread of disease, and that is extensively viewed as a source of moral opprobrium.

**4.** Accordingly, the district court correctly dismissed this action with prejudice and did not abuse its discretion in denying plaintiff's request for leave to amend his complaint. Plaintiff's complaint fails to state a claim that is supported by law, and it is incurably deficient. As the court found, "amendment would be futile because the federal interests in regulating interstate commerce, preventing the spread

of avian flu, and ensuring the humane treatment of animals outweigh the degree of intrusion into the internal affairs of the CNMI as it relates to the tradition of cockfighting."  ER-14-15 (Decision 14-15).  Plaintiff has made no showing to the contrary.

## STANDARD OF REVIEW

The district court's Decision and Order dismissing plaintiff's action for failure to state a claim is subject to *de novo* review.  *See, e.g., Perez v. Mortgage Elec. Registration Sys., Inc.*, 959 F.3d 334, 337 (9th Cir. 2020).

## ARGUMENT

## I.    7 U.S.C. § 2156, THE RELEVANT PROVISION OF THE ANIMAL WELFARE ACT, APPLIES TO THE NORTHERN MARIANA ISLANDS UNDER SECTION 502(a)(2) OF THE COVENANT.

The prohibitions on animal fighting (including cockfighting) in 7 U.S.C. § 2156 apply by the statute's express terms to the Northern Mariana Islands.  The statute bars a variety of activities surrounding "animal fighting venture[s]," which are defined as events "in or affecting interstate or foreign commerce" that involve a fight between animals.  7 U.S.C. § 2156(f)(1).  "[C]ommerce," in turn, refers to commerce "between a place in a State and any place outside of such State, or between points within the same State but through any place outside thereof, or within any territory, possession, or the District of Columbia" or anything that affects the foregoing.  *Id.* § 2132(c).  And "State" is defined in the Act to include "a State of

21

the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, or any other territory or possession of the United States." *Id.* § 2132(d). The term "territory" is construed by this Court to include the Northern Mariana Islands. *See, e.g., Saipan Stevedore Co. v. Director, Office of Workers' Comp. Programs*, 133 F.3d 717, 722-23 (9th Cir. 1998). Thus, § 2156 plainly prohibits animal fighting affecting interstate commerce within the Northern Mariana Islands. And, since 2019, that ban has extended to cockfighting.

Plaintiff contends, however, that Section 502 of the Covenant does not extend the animal-fighting prohibitions in the Animal Welfare Act to the Northern Mariana Islands. As noted, Section 502 specifies which laws of the United States that were in effect as of January 9, 1978, also apply to the Northern Mariana Islands. It provides that such "laws of the United States . . . and subsequent amendments to such laws" apply to the Northern Mariana Islands if they were "applicable to Guam and . . . [were] of general application to the several States." Covenant § 502(a)(2), 90 Stat. at 268. Laws meeting these criteria apply to the Northern Mariana Islands "as they [were] applicable to the several States." *Id.* Plaintiff argues that the prohibitions on animal fighting, which were added through the Animal Welfare Act Amendments of 1976, were not "of general application to the several States," *id.*, because their "application to any state was dependent upon state law." ER-200 (Compl. ¶ 20). Thus, by plaintiff's reading, no part of § 2156 nor any of its

amendments—including the recent amendment extending the ban on animal fighting to cockfighting in all jurisdictions—have ever applied to the Northern Mariana Islands. ER-200 (Compl. ¶¶ 21-22).

Plaintiff's argument is flawed in several respects. First, plaintiff is wrong to assert that § 2156 was not generally "applica[ble] to" the States merely because the operation of the prohibitions against cockfighting was "dependent upon state law." ER-200 (Compl. ¶ 20). Although the prohibitions on cockfighting may have operated differently depending on the law of a given State or territory, the overall statutory scheme for prohibiting cockfighting activities was "of general application" to all States and territories, including Guam. In 1978, it was unlawful to sponsor or exhibit an animal fight, 7 U.S.C. § 2156(a) (1976), to buy or sell an animal for an animal fight, *id.* § 2156(b), and to use the Postal Service to promote an animal fight, *id.* § 2156(c). The statute provided, however, that these prohibited activities "shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof." *Id.* § 2156(d). That provision applied equally to the states and the territories, including Guam, as the Act defined "State" to include "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." *Id.* § 2156(g)(4). These provisions establish that it was the law in all 50 of the States (and in Guam and the territories) that if a

cockfight were unlawful under State law, it was also unlawful under federal law. As a result, the statutory scheme regarding cockfighting was itself generally applicable to the States and Guam and therefore applicable in the Northern Mariana Islands pursuant to Section 502(a)(2) of the Covenant.

This Court has adopted similar reasoning in an analogous context. In *Northern Mariana Islands v. United States*, 279 F.3d 1070 (9th Cir. 2002), the Court considered whether a provision of the Quiet Title Act was "applicable to" Guam and, by extension, to the Northern Mariana Islands under Section 502(a)(2) of the Covenant. The provision of the Quiet Title Act at issue exempted "States—but not other parties" from the Act's twelve-year statute of limitations and imposed a unique notice requirement before filing suit. *Id.* at 1072 (quoting Pub. L. No. 99-598, 100 Stat. 3351 (1986) (codified at 28 U.S.C. § 2409a(g), (m))). The government argued that, because the provision did not exempt Guam—only "States"—from this requirement, the law at issue was not "applicable to" Guam and therefore also not applicable to the Northern Mariana Islands. *Id.* at 1073. Rejecting the argument, the Court reasoned that the amendments creating the exception "regardless of their treatment of Guam, are law within Guam." *Id.* Therefore, the Court concluded that the amendments "*are* 'applicable to Guam,' even though the amendments themselves did not exempt Guam from the Quiet Title Act's twelve-year statute of limitations." *Id.* at 1073-74. So too here. Though the Animal Welfare Act did not

ban cockfighting in every state or territory, due to the fact that those entities did not themselves prohibit the activity, its provisions were nevertheless the law within every state and territory (including Guam) and therefore "applicable to" the several states under the Covenant, just as the provision of the Quiet Title Act at issue in *Northern Mariana Islands* was applicable on Guam, even though the relevant exemption did not itself operate to exclude Guam from the statute of limitations and notice requirement.

Plaintiff's argument regarding Section 502 fails for a second, independent reason: plaintiff ignores that it is only the cockfighting exemption to the animal-fighting prohibitions that operated differently depending on state law in 1978. *See* 7 U.S.C. § 2156(d) (1976). The broader prohibitions on all other forms of animal fighting, *id.* § 2156(a)-(c), were indisputably "applicable to Guam and . . . of general application to the several States," Covenant § 502(a)(2), 90 Stat. at 268. Thus, as the district court held, § 2156 as a whole was applicable to Guam and the several States in 1978 and was therefore applicable to the Northern Mariana Islands pursuant to Section 502(a)(2). The 2018 amendment revised § 2156 to extend this ban on non-bird forms of animal fighting to cockfighting. Under Section 502(a)(3), this "subsequent amendment[]" to a generally applicable statute applies to the Northern Mariana Islands. *See* Covenant § 502(a)(3), 90 Stat. at 268. In other words, even were the Court to disagree with the argument above and regard the cockfighting

25

exception itself as not generally applicable to the States, the broader ban on other forms of animal fighting was indisputably generally applicable, and so the 2018 amendment extending that ban to cockfighting would apply in the Northern Mariana Islands.

Further, applying the animal-fighting prohibitions in the Animal Welfare Act to the Northern Mariana Islands is consistent with the intent of those responsible for drafting and implementing the Covenant. The Covenant is "both a contract and a statute," meaning that "resort to extrinsic evidence of the [Covenant's] negotiations . . . is entirely appropriate." *Fang Lin Ai v. United States*, 809 F.3d 503, 507 n.4 (9th Cir. 2015) (alterations in original) (quoting *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991)). The drafters of the Covenant directed the President to convene a Commission on Federal Laws to review the laws of the United States and determine whether they apply to the Northern Mariana Islands. Covenant § 504, 90 Stat. at 268-69; *see also* ER-170 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 640). In 1985, the Commission issued a Second Interim Report in which it included the results of its survey of various titles of the United States Code. The Commission reported that its staff had examined the chapters of title 7 of the United States Code, including the chapter containing § 2156, and found "[n]o significant problems in the application of these chapters to the Northern Mariana Islands." SER-94 (Mot. to Dismiss, Ex. B, Second Interim Report 229). This Court has given weight to the

conclusions of the Commission in determining what laws do and do not apply to the Northern Mariana Islands under the Covenant. *See Fang Lin Ai*, 809 F.3d at 513-14 (relying in part on Second Interim Report to determine a law's applicability to the Northern Mariana Islands); *Misch on Behalf of Estate of Misch v. Zee Enters., Inc.*, 879 F.2d 628, 630 (9th Cir. 1989) (same). It should do the same here.

It is therefore clear beyond peradventure that § 2156 of the Animal Welfare Act and its subsequent amendments were generally applicable to the States and to Guam and therefore were made applicable to the Northern Mariana Islands pursuant to Section 502(a)(2) of the Covenant. There is no dispute that, as of January 9, 1978, the Animal Welfare Act imposed a general prohibition on animal fighting that applied to every State and to Guam. Specifically, in 1978, the statute made it "unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce." 7 U.S.C. § 2156(a) (1976). It also made it illegal everywhere to buy, sell, deliver, or transport an animal for participation in an "animal fighting venture" or to use the Postal Service to promote an "animal fighting venture." *Id.* § 2156(b), (c). An "animal fighting venture" was defined as "any event which involve[d] a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment except that the term . . . shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting

another animal or animals, such as waterfowl, bird, raccoon, or fox hunting." *Id.* § 2156(g)(1). "Interstate or foreign commerce," in turn, meant "any movement between any place in a State to any place in another State or between places in the same State through another State; or . . . any movement from a foreign country into any State." *Id.* § 2156(g)(2). And "State" was defined so as to include all 50 States and Guam (along with the other territories): "the term 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." *Id.* § 2156(g)(4).

Plaintiff argues erroneously that "7 U.S.C. § 2156 [w]as [n]ot [a]pplicable to Guam in 1978." Pl. Br.14 (italics and bolding omitted); *see also* Pl. Br. 14-18. It is uncontested, however, that § 2156 generally prohibited animal fighting in each and every one of the States and in Guam as of January 9, 1978. The statute unequivocally banned animal fighting ventures (other than cockfighting) in Guam and in all States. Consequently, that general statutory provision also applied in the Northern Mariana Islands under the terms of the Covenant. *See* Covenant § 502(a)(2), 90 Stat. at 268. The 2018 amendment removing the cockfighting exception and extending that general prohibition to cockfighting therefore also applies in the Northern Mariana Islands, because any amendment to a law applicable in the Northern Mariana Islands as of January 9, 1978, also applies to the Northern Mariana Islands. *See id.*

Plaintiff misconstrues the statute when he refers to a "patchwork cockfight prohibition" that did not apply to Guam or uniformly to the States. *See* Pl. Br. 15. In fact, the statute has never contained a standalone "cockfight prohibition." Its structure is different. It set forth in three subsections the generally applicable prohibitions on "animal fighting ventures," 7 U.S.C. § 2156(a)-(c) (1976), which indisputably applied in Guam, and in another subsection provided a separate carve-out provision for cockfighting, *id.* § 2156(d)—which also applied in Guam to remove cockfighting there from the general prohibitions, since cockfighting was not unlawful in Guam. The carve-out specified that the prohibited activities related to animal fighting ventures "shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof." *Id*.

Indeed, plaintiff acknowledges that in 1978 cockfighting was lawful in Guam only because the cockfighting exception in § 2156(d) applied to remove cockfighting from the general prohibitions on activities concerning animal fighting ventures. Pl. Br. 16. The fact that this may have led to cockfighting being legal in some jurisdictions and illegal in others does not mean that any statutory provision did not "apply" to Guam and the several States within the meaning of Section 502 of the Covenant; it means only that the application of the prohibition and conditional exception results in different outcomes in different jurisdictions. Consequently, all

aspects of § 2156(d) were the law within Guam and all of the States, and, as such, applied to the Northern Mariana Islands under Section 502 of the Covenant.

This notion of what it means for a law to apply in a particular jurisdiction is consistent with the approach taken by the Court in *Northern Mariana Islands*, 279 F.3d at 1070, which held that certain statutory amendments "regardless of their treatment of Guam, are law within Guam" and therefore apply to the Northern Mariana Islands under Section 502 of the Covenant. Plaintiff's effort to distinguish *Northern Mariana Islands* fails. The Court in that case confronted a question decidedly similar to the one presented here: did amendments to the Quiet Title Act exempting states from a 12-year statute of limitations "apply to the Northern Mariana Islands" even though they did not actually exempt Guam? *Id*. at 1073. The Court answered that they did, reasoning in part that "the amendments, regardless of their treatment of Guam, are law within Guam" and therefore "apply to" Guam within the meaning of Section 502(a)(2) of the Covenant. *Id.* at 1072-73 (quotation marks omitted). So too here. Even accepting plaintiff's construction (contrary to the statute's structure) that there is some "cockfighting prohibition" that does not have any effect in Guam, that would not change the fact that § 2156 was the "law within Guam" in 1978. *Id*. at 1073. Section 2156 therefore "applied to" Guam, and by extension to the Northern Mariana Islands, and its amendments therefore likewise apply to the Northern Mariana Islands.

Thus, in considering whether a law applied in Guam (and the several States) within the meaning of Section 502(a)(2) of the Covenant, the question is not the law's "treatment of Guam" but whether the law was "law within Guam." *Northern Mariana Islands*, 279 F.3d at 1073. Applying that reasoning here compels the conclusion that § 2156 likewise was the law within Guam, regardless of how it treated Guam, and therefore also applied to the Northern Mariana Islands. This same reasoning applies to the several States. Regardless of how the law treated the States, § 2156 was the law within all the several States and therefore "applied" to them within the meaning of Section 502(a)(2) of the Covenant.

Similarly, plaintiff insists that the "patchwork cockfight prohibition" (Pl. Br. 15) was not of "general application" to the States because cockfighting was not prohibited in every State. *See* Pl. Br. 24. Again, this argument ignores the structure of the relevant provision of the Animal Welfare Act, 7 U.S.C. § 2156. That statute contains no "cockfight prohibition" but rather general prohibitions on animal fighting ventures, which applied in every State, and a separate conditional exception for cockfighting—which applied in every State such that cockfighting was illegal under federal law in States where it was illegal under State law, and legal under federal law in States where it was legal under federal law. Interestingly, it is only this *exception* for cockfighting that operated differently in different States, not the general prohibitions against animal fighting ventures. Thus, under plaintiff's theory

(wrong though it is), the cockfighting exception itself was not "generally applicable" and therefore would not have applied in the Northern Mariana Islands under Section 502 of the Covenant, and cockfighting would have remained subject to the generally applicable prohibitions on animal fighting ventures in § 2156(a) through (c).

## II. THE 2018 AMENDMENT TO THE ANIMAL WELFARE ACT NEED NOT NAME THE NORTHERN MARIANA ISLANDS.

**A.** Raising an argument on appeal that it expressly disavowed in the district court, plaintiff now contends that the 2018 amendment must satisfy both Sections 502 and 105 of the Covenant. *See* Pl. Br. 12-13. As the district court itself recognized, however, "the parties also agreed in their briefs and at the hearing that section 502 of the Covenant governs, as opposed to section 105." ER 6 (Decision 6) (citations omitted); *see also* SER-5, 26 (Hearing Tr. 5, 26)). In short, plaintiff took the position that subsequent amendments needed to satisfy only Section 502. Thus, plaintiff has waived this argument and should not be heard to raise it on appeal. *See, e.g., A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 338-39 (9th Cir. 1996). In any event, even on its own terms plaintiff's claim is meritless; as this Court has held, "Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978, [whereas] Section 105 governs the application of federal laws enacted after that date." *Richards*, 4 F.3d 749, 756 (9th Cir. 1993). 7 U.S.C. § 2156 was enacted in 1976; it is of no moment for present purposes that the relevant amendment to the statute occurred after January 9, 1978.

**B.** Plaintiff nonetheless contends that the 2018 amendment eliminating the remaining exceptions for cockfighting does not apply to the Northern Mariana Islands because it does not specifically name the Northern Mariana Islands. Pl. Br. 14; ER-201 (Compl. ¶¶ 23-27). Section 105 of the Covenant permits Congress to pass legislation governing the Northern Mariana Islands, but it provides that, "if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands." Covenant § 105, 90 Stat. at 264. Plaintiff insists that the 2018 amendment is not "applicable to the several States" because cockfighting was already illegal under the law of all 50 States before the amendment passed. *See* Pl. Br. 14; ER-201 (Compl. ¶ 25).

Section 105 does not require the Northern Mariana Islands to be named in the 2018 amendment to the Animal Welfare Act. Section 105 requires that the Northern Mariana Islands be named in legislation only if that legislation "cannot also be made applicable" to the States. This provision reflects the negotiators' understanding that Congress possessed "extremely broad" powers with respect to the Northern Mariana Islands under the Territorial Clause of the Constitution. ER-160 (Mot. to Dismiss,

33

Ex. A, Section-by-Section Analysis 630);[4] *see also Simms v. Simms*, 175 U.S. 162, 168 (1899) ("In the territories of the United States, Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state[] . . . ."). Section 105 was intended to ensure that these special powers were exercised "purposefully." ER-160 (Mot. to Dismiss, Ex. A, Section-by-Section Analysis 630). The 2018 amendment, however, is not solely an exercise of Congress's powers under the Territorial Clause and is therefore not a provision that "cannot" be applied to the States.[5]

Instead, all that matters for purposes of the instant case is that the amendment is an extension of a statute invoking Congress's broad power to regulate interstate commerce among the States and territories. It therefore clearly can be made

---

[4] This Court has "relied . . . on the Marianas Political Status Commission's 'authoritative' 'Section–by–Section Analysis of the Covenant' to assist . . . in discerning the meaning of the Covenant. *Northern Mariana Islands v. United States*, 399 F.3d 1057, 1065 (9th Cir. 2005) (citing *Fleming v. Department of Pub. Safety, Commonwealth of N. Mariana Islands*, 837 F.2d 401, 408 (9th Cir.), *cert. denied* 488 U.S. 889 (1988), *overruled on other grounds*, *DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992)).

[5] It does not matter that some courts have concluded that the repeal of the cockfighting exception would be permitted under the Territorial Clause. Because the prohibitions on animal fighting ventures and the 2018 amendment repealing the cockfighting exception also invoked and are valid under the Commerce Clause, the 2018 amendment can "be made applicable to the several states" and therefore the Northern Mariana Islands need not be specifically named.

applicable to the States and does not trigger Section 105's requirement to name the Northern Mariana Islands.

Indeed, the amendment is in fact applicable to the States. Following the 2018 amendment, specified cockfighting activities are a violation of federal law in the territories in precisely the same way as they are a violation of federal law in the States, and no repeal of a State or territorial ban on cockfighting would alter that. *See Club Gallístico de P.R., Inc. v. United States*, 414 F. Supp. 3d 191, 208 (D.P.R. 2019) ("The Section 12616 amendments were specifically enacted to extend an already nationwide prohibition to the territories."); 164 Cong. Rec. H4222 (daily ed. May 18, 2018) (statement of Rep. Blumenauer) (stating that the intent of the 2018 amendment was to close "a loophole" because Congress "should have no separate rules for States, territories, or anywhere under our jurisdiction"). Plaintiff's incorrect assumption that the 2018 amendment could not apply to States merely because cockfighting was already illegal there repeats essentially the same error, addressed in the previous part, that undermines plaintiff's argument about Section 502.

The fact that the 2018 amendment resulted in changed circumstances only in the territories does not mean that it did not "apply to" the States. Following the amendment, the statute's prohibitions on animal fighting now extend to cockfighting everywhere in the United States, regardless of whether or not cockfighting is legal

under State law.  Consequently, the 2018 amendment to the Animal Welfare Act is the law in the several States and is therefore "applicable to" the several States, *see Northern Mariana Islands*, 279 F.3d at 1073, defeating the premise of plaintiff's argument.

If 7 U.S.C. § 2156 applied to the Northern Mariana Islands as of January 9, 1978, then it necessarily follows that the 2018 amendment also applies to the Northern Mariana Islands, because under Section 502(a)(2) of the Covenant amendments to applicable laws are also made applicable.  *See Northern Mariana Islands,* 279 F.3d at 1073.  In any event, plaintiff's new argument that the 2018 amendment must specifically name the Northern Mariana Islands if it is regarded as a "new law" is deeply flawed.  Section 105 of the Covenant does not come into play here because the 2018 amendment does not rely exclusively on Congress's Territorial Clause powers, and Congress clearly could—and did—apply the 2018 amendment to all the several States under its Commerce Clause powers.

Nor can it be contended that the specific-naming requirement of Section 105 is intended to apply only where Congress acts exclusively under its Territorial Clause powers.  Any such assertion simply ignores rather than addresses the cited authority supporting defendant's reading.  As explained *supra* pp. 31-32, the discussion of Section 105 in the Section-by-Section Analysis of the Covenant, which has been employed by this Court as an authoritative interpretive guide, *Northern*

36

*Mariana Islands v. United States*, 399 F.3d 1057, 1065 (9th Cir. 2005), makes clear that the specific-naming requirement is intended to ensure that Congress uses its broad Territorial Clause powers "purposefully" when it comes to the Northern Mariana Islands. Plaintiff cannot escape the impact of this authority by simply ignoring it.

By contrast, the notion that the specific-naming requirement of Section 105 must be construed to apply whenever Congress cannot as a practical reality apply a law to the several States is unsupported by reasoned argument or authority. Such a reading is also contrary to the plain text of Section 105, which speaks of law that "cannot be made applicable to the several States," not laws that "actually are applicable." Covenant § 105, 90 Stat. at 264. The use of the phrase "be made" in the provision denotes that it is speaking in terms of law that cannot theoretically be applied to the several States, not laws that actually are applicable to the several States. Because the statutory prohibition on animal fighting and the repeal of the conditional exemption for cockfighting are valid exercises of Congress's Commerce Clause authority and do not rely exclusively on the Territorial Clause, the specific-naming requirement is not implicated.

In any event, the 2018 amendment did in fact apply in every State because it changed the law in every State. As explained, there has never been an independent statutory provision prohibiting cockfighting. There are the general prohibitions on

activities regarding animal fighting ventures and, until 2019, there was the conditional exception for cockfighting. Again, that exception imposed a conditional test: cockfighting would be legal if it was legal under State law and illegal if it was illegal under state law. That test applied in every State and territory; in some places, it had the effect of making cockfighting legal, while in others it had the effect of keeping cockfighting illegal. Following the 2018 amendment, which simply struck the subsection setting forth the conditional test from the statute, the conditional test no longer applies anywhere. This changes the law in every State, including those States where cockfighting was illegal under State law. Should those States repeal their prohibitions on cockfighting, it would nevertheless remain prohibited under federal law. Consequently, even assuming plaintiff's flawed reading of Section 105 as requiring specific naming of the Northern Mariana Islands whenever a law does not as a "practical reality" apply to the several states, the 2018 amendment would not meet that criterion.

The government's construction of the Covenant therefore achieves Congress's intent to make uniform the federal prohibition of cockfighting throughout the States and territories. In other words, it means that precisely the same activities are "reached" in the States as are reached in the Northern Mariana Islands, thereby fulfilling (not subverting) the intent of the Covenant. In any event, as

explained further below, prohibited forms of cockfighting are by definition not purely "intra-territorial" or "intrastate" activities.

## III.   THE ANIMAL WELFARE ACT, 7 U.S.C. § 2156, DOES NOT GOVERN PURELY INTERNAL AFFAIRS, AND THERE IS A PREVAILING FEDERAL INTEREST IN COCKFIGHTING.

Finally, plaintiff contends that cockfighting is a "quintessential 'internal affair' of the Northern Mariana Islands" and that Congress's prohibitions of cockfighting activities are "not consistent with the self-government guarantee of" Section 103 of the Covenant.  ER-201-202 (Compl. ¶¶ 28-33,); *see also* Pl. Br. 20. Plaintiff thus seeks to invoke the balancing of interests test found in *Richards*, 4 F.3d at 754.  This argument is also mistaken for several reasons.

**A.**  First, as the district court held, this Court has "clarified that the *Richards* balancing test is unnecessary for statutes enacted before the Covenant's 1978 effective date; rather, the test should only be used for legislation enacted after the Covenant's effective date."  ER-11 (Decision 11) (citing *United States v. Chang Da Liu*, 538 F.3d 1078, 1084 (9th Cir. 2008)).  Hence, because "§ 2156 existed prior to 1978 such that section 501(a) of the Covenant permits its applicability to the CNMI, analysis under the *Richards* balancing test is not warranted."  ER-11-12 (Decision 11-12,).

**B.**  In any event, even assuming *arguendo* that the *Richards* balancing test comes into play, it is of no avail to plaintiff.  Section 103 ensures the people of the

Northern Mariana Islands the right to "govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption." Section 105, however, permits Congress to "enact legislation . . . which will be applicable to the Northern Mariana Islands"—but provides that, "[i]n order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions" of the Covenant "may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands." As explained by this Court, the first sentence of Section 105 requires that the United States have "an identifiable federal interest that will be served by the relevant legislation," *Richards*, 4 F.3d at 754, but does not preclude the United States from enacting legislation governing the Northern Mariana Islands' internal affairs to advance such an interest. *See id.* at 755 (rejecting argument that second sentence of Section 105 "carv[es] out an area of 'local affairs' immune from federal legislation"); *id.* (reiterating that the second sentence of Section 105 "does not mean that Congress may not pass any legislation 'affecting' the internal affairs of" the Northern Mariana Islands). To determine whether federal legislation of the Northern Mariana Islands' internal affairs is appropriate, courts must balance the identified federal interest "against the degree of intrusion into the internal affairs of the" Northern Mariana Islands. *Id*.

The self-government provisions of the Covenant do not come into play here, because the statutory prohibition on cockfighting inherently does not implicate the Northern Mariana Islands' purely "internal affairs." *Richards*, 4 F.3d at 754. First and foremost, by no stretch of the imagination can regulation of cockfighting reasonably be said to be one of "the fundamental provisions of this Covenant." Covenant § 105, 90 Stat. at 264. Cockfighting simply is not a central attribute of self-government.

Moreover, the statute by its terms criminalizes only cockfighting that is connected to interstate or foreign commerce. It prohibits activities related to any "animal fighting venture," 7 U.S.C. § 2156(a)-(d), and defines "animal fighting venture" as "any event, *in or affecting interstate or foreign commerce*, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment," unless connected to hunting. *Id.* § 2156(f)(1) (emphasis added). Thus, by definition, the statute regulates activities "affecting interstate or foreign commerce," not purely internal affairs. *See United States v. Bacon*, No. 09-CR-30101-MJR, 2009 WL 3719396, at *2 (S.D. Ill. Nov. 5, 2009) (noting that "the terms of the statute [prohibiting animal fighting ventures] only cover matters affecting interstate or foreign commerce").

In any event, even if—contrary to the express terms of the statute—the statutory prohibitions on animal fighting did intrude upon a purely "internal affair"

41

of the Northern Mariana Islands, there are significant federal interests behind those prohibitions. *See Richards*, 4 F.3d at 754. Courts have noted that animal fighting inherently affects interstate commerce; indeed, the "effect of animal fighting on interstate commerce is 'visible to the naked eye.'" *United States v. Gibert*, 677 F.3d 613, 625 (4th Cir. 2012) (quoting *United States v. Lopez*, 514 U.S. 549, 563 (1995)); *see also id.* at 626 ("[T]he link between animal fighting ventures and its effect on interstate commerce is not attenuated. Rather, the link is direct, because animal fighting ventures are inherently commercial enterprises that often involve substantial interstate activity."). And Congress concluded that prohibiting animal fighting is "necessary to prevent and eliminate burden upon [interstate and foreign] commerce, to effectively regulate such commerce, [and] to protect the human values of this great Nation from the subversion of dehumanizing activities." H.R. Rep. No. 94-801, at 10 (1976). Members of Congress also found that cockfighting in particular contributed to the interstate spread of avian flu. 153 Cong. Rec. S451 (daily ed. Jan. 11, 2007) (statement of Sen. Cantwell) ("Interstate and international transport of birds for cockfighting is known to have contributed to the spread of avian influenza in Asia and poses a threat to poultry and public health in the United States."); 153 Cong. Rec. E2 (daily ed. Jan. 5, 2007) (statement of Rep. Gallegly) ("There is the additional concern that cockfighters spread diseases that jeopardize poultry flocks and even public health.").

Courts have credited and sustained these findings by Congress in connection with the 2018 amendment. In a recent decision, the First Circuit analyzed the interstate and foreign impacts of cockfighting that authorized the 2018 amendment and observed that the ban on cockfighting is explicitly limited to activity that is in or affects interstate or foreign commerce. *Hernández-Gotay v. United States*, 985 F.3d 71, 79 (1st Cir. 2021). The Court also emphasized that "[m]ultiple congressional findings underscore the interstate commercial impact of cockfighting[,]" *id.*, and it further opined that animal fighting ventures "(a) attract fighting animals and spectators from numerous states, (b) are or have been advertised in print media of nationwide circulation, and (c) often involve gambling and 'other questionable and criminal activities.'" *Id.* (quoting *Gibert*, 677 F.3d at 625). It also cited a Congressmember's finding that cockfighting is connected to the avian flu, "a concern of particular importance given the present ongoing COVID-19 pandemic." *Id.* The First Circuit concluded that the foregoing factors "require the conclusion that the prohibitions in the statute are about activities which substantially affect interstate commerce." *Id.* As such, they advance an important federal interest.

Plaintiff, on the other hand, offers no more than the conclusory allegation that cockfighting is a "popular and traditional local recreational activity," ER-201 (Compl. ¶¶ 30, 32)—without accounting for the fact that 7 U.S.C. § 2156 applies only to cockfighting affecting interstate commerce, and without acknowledging the

43

articulated federal interests in regulating cockfighting, as well as other forms of animal fighting ventures. Plaintiff's claim therefore lacks both "a cognizable legal theory" and "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

Plaintiff contends that prohibiting cockfighting in the Northern Mariana Islands violates Sections 103 and 105 of the Covenant because the federal interest in banning cockfighting does not outweigh "the degree of intrusion into the internal affairs of the" Northern Mariana Islands. *Richards*, 4 F.3d at 755; Pl. Br. 20-29. It does not appear that any federal law has ever been deemed not to apply to the Northern Mariana Islands under Sections 103 and 105, and the federal prohibition of cockfighting certainly should not be the first. The ban on animal fighting—which now includes an outright ban on cockfighting—does not concern the "internal affairs" of Northern Mariana Islands, *Richards*, 4 F.3d at 754; it definitionally concerns only matters "in or affecting interstate or foreign commerce," 7 U.S.C. § 2156(f)(1).

Unsurprisingly, in both his complaint and his opening brief plaintiff fails to specify any identifiable way in which the cockfighting prohibition intrudes upon the "internal affairs" of the Northern Mariana Islands. His attempt to do so is unavailing. He cites a well-known anthropological essay about cockfighting in Bali, which has nothing to do with the Northern Mariana Islands. *See* Pl. Br. 22. The two cited

44

sources that do address the Northern Mariana Islands indicate nothing more than cockfights historically have occurred in the Northern Mariana Islands and enjoyed some popularity. *See* Pl. Br. 6-7 (citing ER-135, 142 (Pl. Exs. 8, 9)). That falls far short of supporting plaintiff's assertion that cockfighting implicates the "local affairs" of the Northern Mariana Islands.

While plaintiff has failed in his effort to prove an intrusion on the internal affairs of the Northern Mariana Islands, the district court correctly recognized that the United States has demonstrated significant federal interests in banning cockfighting. *See* ER-14 (Decision 14). The provision explicitly targets animal fighting ventures "in or affecting interstate or foreign commerce," 7 U.S.C. § 2156(f)(1), and Congress found that prohibiting animal fighting is "necessary to prevent and eliminate burden upon [interstate and foreign] commerce, to effectively regulate such commerce, [and] to protect the human values of this great Nation from the subversion of dehumanizing activities." H.R. Rep. No. 94-801, at 10. And Congress found in particular that cockfighting can contribute to the interstate spread of avian flu. 153 Cong. Rec. S451 (statement of Sen Cantwell); 153 Cong Rec. E2 (statement of Rep. Gallegly); *see also Hernández-Gotay*, 985 F.3d at 79 ("Multiple congressional findings underscore the interstate commercial impact of cockfighting.").

Plaintiff disparages the federal interests as overly "moral" and concerned with the "barbaric" nature of cockfighting. *See* Pl. Br. 2, 23. That characterization, however, only heightens the federal interest. Where Congress concludes that an activity it finds objectionable affects interstate and foreign commerce, there is a distinct federal interest in prohibiting it. But all the 2018 amendment accomplished was to strike the conditional exception for cockfighting from § 2156(d) and apply the prior version of § 2156(a) through (c) to all jurisdictions. Thus, it is entirely appropriate to look to the legislative history regarding those subjections to identify the federal interests behind them.

## IV. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S COMPLAINT WITH PREJUDICE AND DID NOT ABUSE ITS DISCRETION IN DENYING HIS REQUEST TO AMEND.

It follows from the foregoing that the district court correctly dismissed this action with prejudice and did not abuse its discretion in denying plaintiff's request for leave to amend his complaint. *See, e.g., Vincent v. Trend W. Tech. Corp.*, 828 F.2d 563, 570-71 (9th Cir. 1987). Plaintiff's complaint fails to state a claim that is supported by law, and it is incurably deficient. Not only did plaintiff not take advantage of his initial right to amend his complaint, or thereafter move at any time to do so, but he failed to specify anywhere—*i.e.*, in his opposition to the motion to dismiss, at the hearing on that motion, in a post-judgment motion under Federal Rule of Civil Procedure 59 or 60, or in his opening brief to this Court—the material he

proposed to introduce in an effort to salvage his defective complaint. *Cf. Vincent,* 828 F.2d 563 (relying on similar considerations to hold that district court did not abuse its discretion in denying leave to amend complaint). As the court found, "amendment would be futile because the federal interests in regulating interstate commerce, preventing the spread of avian flu, and ensuring the humane treatment of animals outweighs the degree of intrusion into the internal affairs of the CNMI as it relates to the tradition of cockfighting." ER-14-15 (Decision 14-15). That should be the end of the matter.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney*
 *General*

SHAWN N. ANDERSON
 *United States Attorney*

ABBY WRIGHT
 /s/ John S. Koppel
JOHN S. KOPPEL
 (202) 514-2495
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7264*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., NW*
 *Washington, DC 20530-0001*
 *Counsel for Defendant-Appellee*

JUNE 2023

## STATEMENT OF RELATED CASES

Defendant-appellee is not aware of any related cases within the meaning of Ninth Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure. 32(a)(7)(B) because it contains 11,325 words, excluding exempt material, according to the count of Microsoft Word.

 /s/ John S. Koppel
JOHN S. KOPPEL
*Counsel for Defendant-Appellee*
john.koppel@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and that I served counsel for Appellant by the same means.

       /s/ John S. Koppel
JOHN S. KOPPEL
*Counsel for Defendant-Appellee*
john.koppel@usdoj.gov

# ADDENDUM

# TABLE OF CONTENTS

**Page**

Agriculture Improvement Act of 2018,
  Pub. L. No. 115-334, § 12616, 132 Stat. 4490 ..........................................ADD. 1

7 U.S.C. § 2156 (2019) ....................................................................................ADD. 2

7 U.S.C. § 2156 (2018) ....................................................................................ADD. 6

Pub. L. No. 94-241, 90 Stat. 263 (1976).........................................................ADD. 11

**Agriculture Improvement Act of 2018,**
**Pub. L. No .115-334, § 12616, 132 Stat. 4490**

### SEC. 12616. EXTENDING PROHIBITION ON ANIMAL FIGHTING TO THE TERRITORIES.

(a) **IN GENERAL**.—Section 26 of the Animal Welfare Act (7 U.S.C. 2156) is amended—

(1) in subsection (a)—

(A) in paragraph (1), by striking "Except as provided in paragraph (3), it" and inserting "It"; and

(B) by striking paragraph (3);

(2) by striking subsection (d); and

(3) by redesignating subsections (e), (f), (g), (h), (i), and (j) as subsections (d), (e), (f), (g), (h), and (i), respectively.

(b) **USE OF POSTAL SERVICE OR OTHER INTERSTATE INSTRUMENTALITIES**.—Section 26(c) of the Animal Welfare Act (7 U.S.C. 2156(c)) is amended by striking "(e)" and inserting "(d)".

(c) **CRIMINAL PENALTIES**.—Subsection (i) of section 26 of the Animal Welfare Act (7 U.S.C. 2156), as redesignated by section 2(3), is amended by striking "(e)" and inserting "(d)".

(d) **ENFORCEMENT OF ANIMAL FIGHTING PROHIBITIONS**.—Section 49(a) of title 18, United States Code, is amended by striking "(e)" and inserting "(d)".

(e) **EFFECTIVE DATE**.—The amendments made by this section shall take effect on the date that is one year after the date of the enactment of this Act.

*************************

ADD. 1

**7 U.S.C. § 2156**
## § 2156. Animal fighting venture prohibition
### Effective: December 20, 2019

(a) Sponsoring or exhibiting an animal in, attending, or causing an individual who has not attained the age of 16 to attend, an animal fighting venture

  (1) Sponsoring or exhibiting

It shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture.

  (2) Attending or causing an individual who has not attained the age of 16 to attend

It shall be unlawful for any person to--

    (A) knowingly attend an animal fighting venture; or

    (B) knowingly cause an individual who has not attained the age of 16 to attend an animal fighting venture.


(b) Buying, selling, delivering, possessing, training, or transporting animals for participation in animal fighting venture

It shall be unlawful for any person to knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture.


(c) Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture

It shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for commercial speech for purposes of advertising an animal, or an instrument described in subsection (d), for use in an animal fighting venture, promoting1 or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.


ADD. 2

(d) Buying, selling, delivering, or transporting sharp instruments for use in animal fighting venture

It shall be unlawful for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture.

(e) Investigation of violations by Secretary; assistance by other Federal agencies; issuance of search warrant; forfeiture; costs recoverable in forfeiture or civil action

The Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section, and the Secretary may obtain the assistance of the Federal Bureau of Investigation, the Department of the Treasury, or other law enforcement agencies of the United States, and State and local governmental agencies, in the conduct of such investigations, under cooperative agreements with such agencies. A warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located. Any United States marshal or any person authorized under this section to conduct investigations may apply for and execute any such warrant, and any animal seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection. Necessary care including veterinary treatment shall be provided while the animals are so held in custody. Any animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct. Costs incurred for

ADD. 3

care of animals seized and forfeited under this section shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business.

(f) Definitions

In this section--

(1) the term "animal fighting venture" means any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment, except that the term "animal fighting venture" shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal;

(2) the term "instrumentality of interstate commerce" means any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce;

(3) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;2

(4) the term "animal" means any live bird, or any live mammal, except man.

(g) Relationship to other provisions

The conduct by any person of any activity prohibited by this section shall not render such person subject to the other sections of this chapter as a dealer, exhibitor, or otherwise.

(h) Conflict with State law

(1) In general

The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any

ADD. 4

requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

(2) Omitted

(i) Criminal penalties

The criminal penalties for violations of subsection (a), (b), (c), or (d) are provided in section 49 of Title 18.

ADD. 5

**7 U.S.C. § 2156**
### § 2156. Animal fighting venture prohibition
### (2018)

**(a)** Sponsoring or exhibiting an animal in, attending, or causing an individual who has not attained the age of 16 to attend, an animal fighting venture

(1) Sponsoring or exhibiting

Except as provided in paragraph (3), it shall be unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture.

(2) Attending or causing an individual who has not attained the age of 16 to attend

It shall be unlawful for any person to-

(A) knowingly attend an animal fighting venture; or

(B) knowingly cause an individual who has not attained the age of 16 to attend an animal fighting venture.

(3) Special rule for certain State

With respect to fighting ventures involving live birds in a State where it would not be in violation of the law, it shall be unlawful under this subsection for a person to sponsor or exhibit a bird in the fighting venture only if the person knew that any bird in the fighting venture was knowingly bought, sold, delivered, transported, or received in interstate or foreign commerce for the purpose of participation in the fighting venture.

ADD. 6

**(b)** Buying, selling, delivering, possessing, training, or transporting animals for participation in animal fighting venture

It shall be unlawful for any person to knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture.

**(c)** Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture

It shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any instrumentality of interstate commerce for commercial speech for purposes of advertising an animal, or an instrument described in subsection (e), for use in an animal fighting venture, promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

**(d)** Violation of State law

Notwithstanding the provisions of subsection (c), the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.

**(e)** Buying, selling, delivering, or transporting sharp instruments for use in animal fighting venture

It shall be unlawful for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any

ADD. 7

other sharp instrument attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture.

**(f)** Investigation of violations by Secretary; assistance by other Federal agencies; issuance of search warrant; forfeiture; costs recoverable in forfeiture or civil action

The Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section, and the Secretary may obtain the assistance of the Federal Bureau of Investigation, the Department of the Treasury, or other law enforcement agencies of the United States, and State and local governmental agencies, in the conduct of such investigations, under cooperative agreements with such agencies. A warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located. Any United States marshal or any person authorized under this section to conduct investigations may apply for and execute any such warrant, and any animal seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection. Necessary care including veterinary treatment shall be provided while the animals are so held in custody. Any animal involved in any violation of this section

ADD. 8

shall be liable to be proceeded against and forfeited to the United States at any time on com- plaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct. Costs incurred for care of animals seized and forfeited under this section shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business.

**(g)** Definitions

In this section-

(1) the term "animal fighting venture" means any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment, except that the term "animal fighting venture" shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal;

(2) the term "instrumentality of interstate commerce" means any written, wire, radio, television or other form of communication in, or using a facility of, interstate commerce;

(3) the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

ADD. 9

(4) the term "animal" means any live bird, or any live mammal, except man.

**(h)** Relationship to other provisions

The conduct by any person of any activity prohibited by this section shall not render such· person subject to the other sections of this chapter as a dealer, exhibitor, or otherwise.

**(i)** Conflict with State law

(1) In general

The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

(2) Omitted

**(j)** Criminal penalties

(1) The criminal penalties for violations of subsection (a), (b), (c), or (e) are provided in section 49 of title 18.

PUBLIC LAW 94-241—MAR. 24, 1976          90 STAT. 263

**Public Law 94-241**
**94th Congress**

## Joint Resolution

To approve the "Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", and for other purposes.

Mar. 24, 1976
[H.J. Res. 549]

Whereas the United States is the administering authority of the Trust Territory of the Pacific Islands under the terms of the trusteeship agreement for the former Japanese-mandated islands entered into by the United States with the Security Council of the United Nations on April 2, 1947, and approved by the United States on July 18, 1947; and

48 USC 1681 note.

Whereas the United States, in accordance with the trusteeship agreement and the Charter of the United Nations, has assumed the obligation to promote the development of the peoples of the trust territory toward self-government or independence as may be appropriate to the particular circumstances of the trust territory and its peoples and the freely expressed wishes of the peoples concerned; and

Whereas the United States, in response to the desires of the people of the Northern Mariana Islands clearly expressed over the past twenty years through public petition and referendum, and in response to its own obligations under the trusteeship agreement to promote self-determination, entered into political status negotiations with representatives of the people of the Northern Mariana Islands; and

Whereas, on February 15, 1975, a "Covenant to Establish A Commonwealth of the Northern Mariana Islands in Political Union with the United States of America" was signed by the Marianas Political Status Commission for the people of the Northern Mariana Islands and by the President's Personal Representative, Ambassador F. Haydn Williams for the United States of America, following which the covenant was approved by the unanimous vote of the Mariana Islands District Legislature on February 20, 1975 and by 78.8 per centum of the people of the Northern Mariana Islands voting in a plebiscite held on June 17, 1975: Now be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, the text of which is as follows, is hereby approved.

Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America. Congressional approval. 48 USC 1681 note.

"Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America

"Whereas, the Charter of the United Nations and the Trusteeship Agreement between the Security Council of the United Nations and the United States of America guarantee to the people of the Northern Mariana Islands the right freely to express their wishes for self-government or independence; and



Add.11

"Whereas, the United States supports the desire of the people of the Northern Mariana Islands to exercise their inalienable right of self-determination; and

"Whereas, the people of the Northern Mariana Islands and the people of the United States share the goals and values found in the American system of government based upon the principles of government by the consent of the governed, individual freedom and democracy; and

"Whereas, for over twenty years, the people of the Northern Mariana Islands, through public petition and referendum, have clearly expressed their desire for political union with the United States;

"Now, therefore, the Marianas Political Status Commission, being the duly appointed representative of the people of the Northern Mariana Islands, and the Personal Representative of the President of the United States have entered into this Covenant in order to establish a self-governing commonwealth for the Northern Mariana Islands within the American political system and to define the future relationship between the Northern Mariana Islands and the United States. This Covenant will be mutually binding when it is approved by the United States, by the Mariana Islands District Legislature and by the people of the Northern Mariana Islands in a plebiscite, constituting on their part a sovereign act of self-determination.

## "Article I

### "political relationship

"Section 101. The Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth to be known as the 'Commonwealth of the Northern Mariana Islands', in political union with and under the sovereignty of the United States of America.

"Section 102. The relations between the Northern Mariana Islands and the United States will be governed by this Covenant which, together with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the Northern Mariana Islands.

"Section 103. The people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption.

"Section 104. The United States will have complete responsibility for and authority with respect to matters relating to foreign affairs and defense affecting the Northern Mariana Islands.

"Section 105. The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

PUBLIC LAW 94–241—MAR. 24, 1976     90 STAT. 265

## "ARTICLE II

### "CONSTITUTION OF THE NORTHERN MARIANA ISLANDS

"SECTION 201. The people of the Northern Mariana Islands will formulate and approve a Constitution and may amend their Constitution pursuant to the procedures provided therein.

"SECTION 202. The Constitution will be submitted to the Government of the United States for approval on the basis of its consistency with this Covenant and those provisions of the Constitution, treaties and laws of the United States to be applicable to the Northern Mariana Islands. The Constitution will be deemed to have been approved six months after its submission to the President on behalf of the Government of the United States unless earlier approved or disapproved. If disapproved the Constitution will be returned and will be resubmitted in accordance with this Section. Amendments to the Constitution may be made by the people of the Northern Mariana Islands without approval by the Government of the United States, but the courts established by the Constitution or laws of the United States will be competent to determine whether the Constitution and subsequent amendments thereto are consistent with this Covenant and with those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands. *Submittal to U.S. for approval.*

"SECTION 203. (a) The Constitution will provide for a republican form of government with separate executive, legislative and judicial branches, and will contain a bill of rights.

"(b) The executive power of the Northern Mariana Islands will be vested in a popularly elected Governor and such other officials as the Constitution or laws of the Northern Mariana Islands may provide.

"(c) The legislative power of the Northern Mariana Islands will be vested in a popularly elected legislature and will extend to all rightful subjects of legislation. The Constitution of the Northern Mariana Islands will provide for equal representation for each of the chartered municipalities of the Northern Mariana Islands in one house of a bicameral legislature, notwithstanding other provisions of this Covenant or those provisions of the Constitution or laws of the United States applicable to the Northern Mariana Islands.

"(d) The judicial power of the Northern Mariana Islands will be vested in such courts as the Constitution or laws of the Northern Mariana Islands may provide. The Constitution or laws of the Northern Mariana Islands may vest in such courts jurisdiction over all causes in the Northern Mariana Islands over which any court established by the Constitution or laws of the United States does not have exclusive jurisdiction.

"SECTION 204. All members of the legislature of the Northern Mariana Islands and all officers and employees of the Government of the Northern Mariana Islands will take an oath or affirmation to support this Covenant, those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands, and the Constitution and laws of the Northern Mariana Islands.

## "ARTICLE III

### "CITIZENSHIP AND NATIONALITY

"SECTION 301. The following persons and their children under the age of 18 years on the effective date of this Section, who are not citizens or nationals of the United States under any other provision of law, and who on that date do not owe allegiance to any foreign state, are

Add.13

declared to be citizens of the United States, except as otherwise provided in Section 302:

"(a) all persons born in the Northern Mariana Islands who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, and who on that date are domiciled in the Northern Mariana Islands or in the United States or any territory or possession thereof;

"(b) all persons who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, who have been domiciled continuously in the Northern Mariana Islands for at least five years immediately prior to that date, and who, unless under age, registered to vote in elections for the Marianas Islands District Legislature or for any municipal election in the Northern Mariana Islands prior to January 1, 1975; and

"(c) all persons domiciled in the Northern Mariana Islands on the day preceding the effective date of this Section, who, although not citizens of the Trust Territory of the Pacific Islands, on that date have been domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974.

"SECTION 302. Any person who becomes a citizen of the United States solely by virtue of the provisions of Section 301 may within six months after the effective date of that Section or within six months after reaching the age of 18 years, whichever date is the later, become a national but not a citizen of the United States by making a declaration under oath before any court established by the Constitution or laws of the United States or any court of record in the Commonwealth in the form as follows:

"'I _____ being duly sworn, hereby declare my intention to be a national but not a citizen of the United States.'"

"SECTION 303. All persons born in the Commonwealth on or after the effective date of this Section and subject to the jurisdiction of the United States will be citizens of the United States at birth.

"SECTION 304. Citizens of the Northern Mariana Islands will be entitled to all privileges and immunities of citizens in the several States of the United States.

## "ARTICLE IV

### "JUDICIAL AUTHORITY

District Court for the Northern Mariana Islands. Establishment

"SECTION 401. The United States will establish for and within the Northern Mariana Islands a court of record to be known as the 'District Court for the Northern Mariana Islands'. The Northern Mariana Islands will constitute a part of the same judicial circuit of the United States as Guam.

"SECTION 402. (a) The District Court for the Northern Mariana Islands will have the jurisdiction of a district court of the United States, except that in all causes arising under the Constitution, treaties or laws of the United States it will have jurisdiction regardless of the sum or value of the matter in controversy.

"(b) The District Court will have original jurisdiction in all causes in the Northern Mariana Islands not described in Subsection (a) jurisdiction over which is not vested by the Constitution or laws of the Northern Mariana Islands in a court or courts of the Northern Mariana Islands. In causes brought in the District Court solely on

the basis of this subsection, the District Court will be considered a court of the Northern Mariana Islands for the purposes of determining the requirements of indictment by grand jury or trial by jury.

"(c) The District Court will have such appellate jurisdiction as the Constitution or laws of the Northern Mariana Islands may provide. When it sits as an appellate court, the District Court will consist of three judges, at least one of whom will be a judge of a court of record of the Northern Mariana Islands.

"SECTION 403. (a) The relations between the courts established by the Constitution or laws of the United States and the courts of the Northern Mariana Islands with respect to appeals, certiorari, removal of causes, the issuance of writs of habeas corpus and other matters or proceedings will be governed by the laws of the United States pertaining to the relations between the courts of the United States and the courts of the several States in such matters and proceedings, except as otherwise provided in this Article; provided that for the first fifteen years following the establishment of an appellate court of the Northern Mariana Islands the United States Court of Appeals for the judicial circuit which includes the Northern Mariana Islands will have jurisdiction of appeals from all final decisions of the highest court of the Northern Mariana Islands from which a decision could be had in all cases involving the Constitution, treaties or laws of the United States, or any authority exercised thereunder, unless those cases are reviewable in the District Court for the Northern Mariana Islands pursuant to Subsection 402(c).

"(b) Those portions of Title 28 of the United States Code which apply to Guam or the District Court of Guam will be applicable to the Northern Mariana Islands or the District Court for the Northern Mariana Islands, respectively, except as otherwise provided in this Article.

"ARTICLE V

"APPLICABILITY OF LAWS

"SECTION 501. (a) To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States: Article I, Section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; Amendments 1 through 9, inclusive; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with approval of the Government of the Northern Mariana Islands and of the Government of the United States.

*USC prec. title 1.*

"(b) The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to Sections 203, 506 and 805 and the proviso in Subsection (a) of this Section.

90 STAT. 268          PUBLIC LAW 94–241—MAR. 24, 1976

"Section 502. (a) The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

"(1) those laws which provide federal services and financial assistance programs and the federal banking laws as they apply to Guam; Section 228 of Title II and Title XVI of the Social Security Act as it applies to the several States; the Public Health Service Act as it applies to the Virgin Islands; and the Micronesian Claims Act as it applies to the Trust Territory of the Pacific Islands;

"(2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States; and

"(3) those laws not described in paragraph (1) or (2) which are applicable to the Trust Territory of the Pacific Islands, but not their subsequent amendments unless specifically made applicable to the Northern Mariana Islands, as they apply to the Trust Territory of the Pacific Islands until termination of the Trusteeship Agreement, and will thereafter be inapplicable.

"(b) The laws of the United States regarding coastal shipments and the conditions of employment, including the wages and hours of employees, will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands.

"Section 503. The following laws of the United States, presently inapplicable to the Trust Territory of the Pacific Islands, will not apply to the Northern Mariana Islands except in the manner and to the extent made applicable to them by the Congress by law after termination of the Trusteeship Agreement:

"(a) except as otherwise provided in Section 506, the immigration and naturalization laws of the United States;

"(b) except as otherwise provided in Subsection (b) of Section 502, the coastwise laws of the United States and any prohibition in the laws of the United States against foreign vessels landing fish or unfinished fish products in the United States; and

"(c) the minimum wage provisions of Section 6, Act of June 25, 1938, 52 Stat. 1062, as amended.

"Section 504. The President will appoint a Commission on Federal Laws to survey the laws of the United States and to make recommendations to the United States Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner, and which applicable laws should be made inapplicable and to what extent and in what manner. The Commission will consist of seven persons (at least four of whom will be citizens of the Trust Territory of the Pacific Islands who are and have been for at least five years domiciled continuously in the Northern Mariana Islands at the time of their appointments) who will be representative of the federal, local, private and public interests in the applicability of laws of the United States to the Northern Mariana Islands. The Commission will make its final report and recommendations to the Congress within one year after the termination of the Trusteeship Agreement, and before that time will make such interim reports and recommendations to the Congress as it considers appropriate to facilitate the transition of the Northern Mariana Islands to its new political status. In formulating its recommendations the Commission will take into consideration the potential effect of each law on local conditions within the Northern Mariana Islands,

42 USC 428, 1381.
42 USC 201 note.
50 USC app. 2018.

29 USC 206.
Commission on Federal Laws.

Membership.

Reports to Congress.

PUBLIC LAW 94–241—MAR. 24, 1976          90 STAT. 269

the policies embodied in the law and the provisions and purposes of this Covenant. The United States will bear the cost of the work of the Commission.

"SECTION 505. The laws of the Trust Territory of the Pacific Islands, of the Mariana Islands District and its local municipalities, and all other Executive and District orders of a local nature applicable to the Northern Mariana Islands on the effective date of this Section and not inconsistent with this Covenant or with those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands will remain in force and effect until and unless altered by the Government of the Northern Mariana Islands.

"SECTION 506. (a) Notwithstanding the provisions of Subsection 503(a), upon the effective date of this Section the Northern Mariana Islands will be deemed to be a part of the United States under the Immigration and Nationality Act, as amended for the following purposes only, and the said Act will apply to the Northern Mariana Islands to the extent indicated in each of the following Subsections of this Section.

"(b) With respect to children born abroad to United States citizen or non-citizen national parents permanently residing in the Northern Mariana Islands the provisions of Sections 301 and 308 of the said Act will apply.

"(c) With respect to aliens who are 'immediate relatives' (as defined in Subsection 201(b) of the said Act) of United States citizens who are permanently residing in the Northern Mariana Islands all the provisions of the said Act will apply, commencing when a claim is made to entitlement to 'immediate relative' status. A person who is certified by the Government of the Northern Mariana Islands both to have been a lawful permanent resident of the Northern Mariana Islands and to have had the 'immediate relative' relationship denoted herein on the effective date of this Section will be presumed to have been admitted to the United States for lawful permanent residence as of that date without the requirement of any of the usual procedures set forth in the said Act. For the purpose of the requirements of judicial naturalization, the Northern Mariana Islands will be deemed to constitute a State as defined in Subsection 101(a) paragraph (36) of the said Act. The Courts of record of the Northern Mariana Islands and the District Court for the Northern Mariana Islands will be included among the courts specified in Subsection 310(a) of the said Act and will have jurisdiction to naturalize persons who become eligible under this Section and who reside within their respective jurisdictions.

"(d) With respect to persons who will become citizens or nationals of the United States under Article III of this Covenant or under this Section the loss of nationality provisions of the said Act will apply.

"ARTICLE VI

"REVENUE AND TAXATION

"SECTION 601. (a) The income tax laws in force in the United States will come into force in the Northern Mariana Islands as a local territorial income tax on the first day of January following the effective date of this Section, in the same manner as those laws are in force in Guam.

"(b) Any individual who is a citizen or a resident of the United States, of Guam, or of the Northern Mariana Islands (including a

8 USC 1101 note.

8 USC 1401, 1408.
"Immediate relatives."
8 USC 1151.

8 USC 1101.

8 USC 1421.

national of the United States who is not a citizen), will file only one income tax return with respect to his income, in a manner similar to the provisions of Section 935 of Title 26, United States Code.

"(c) References in the Internal Revenue Code to Guam will be deemed also to refer to the Northern Mariana Islands, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof or of this Covenant.

**Additional taxes levied by Island government.**

"SECTION 602. The Government of the Northern Mariana Islands may by local law impose such taxes, in addition to those imposed under Section 601, as it deems appropriate and provide for the rebate of any taxes received by it, except that the power of the Government of the Northern Mariana Islands to rebate collections of the local territorial income tax received by it will be limited to taxes on income derived from sources within the Northern Mariana Islands.

"SECTION 603. (a) The Northern Mariana Islands will not be included within the customs territory of the United States.

"(b) The Government of the Northern Mariana Islands may, in a manner consistent with the international obligations of the United States, levy duties on goods imported into its territory from any area outside the customs territory of the United States and impose duties on exports from its territory.

"(c) Imports from the Northern Mariana Islands into the customs territory of the United States will be subject to the same treatment as imports from Guam into the customs territory of the United States.

"(d) The Government of the United States will seek to obtain from foreign countries favorable treatment for exports from the Northern Mariana Islands and will encourage other countries to consider the Northern Mariana Islands a developing territory.

"SECTION 604. (a) The Government of the United States may levy excise taxes on goods manufactured, sold or used or services rendered in the Northern Mariana Islands in the same manner and to the same extent as such taxes are applicable within Guam.

"(b) The Government of the Northern Mariana Islands will have the authority to impose excise taxes upon goods manufactured, sold or used or services rendered within its territory or upon goods imported into its territory, provided that such excise taxes imposed on goods imported into its territory will be consistent with the international obligations of the United States.

**U.S. property exclusion from customs duties.**

"SECTION 605. Nothing in this Article will be deemed to authorize the Government of the Northern Mariana Islands to impose any customs duties on the property of the United States or on the personal property of military or civilian personnel of the United States Government or their dependents entering or leaving the Northern Mariana Islands pursuant to their contract of employment or orders assigning them to or from the Northern Mariana Islands or to impose any taxes on the property, activities or instrumentalities of the United States which one of the several States could not impose; nor will any provision of this Article be deemed to affect the operation of the **50 USC app. 501.** Soldiers and Sailors Civil Relief Act of 1940, as amended, which will be applicable to the Northern Mariana Islands as it is applicable to Guam.

**Northern Mariana Islands Social Security Retirement Fund, transfer to U.S. Treasury.**

"SECTION 606. (a) Not later than at the time this Covenant is approved, that portion of the Trust Territory Social Security Retirement Fund attributable to the Northern Mariana Islands will be transferred to the Treasury of the United States, to be held in trust as a

PUBLIC LAW 94–241—MAR. 24, 1976          90 STAT. 271

separate fund to be known as the 'Northern Mariana Islands Social Security Retirement Fund'. This fund will be administered by the *Administration.* United States in accordance with the social security laws of the Trust Territory of the Pacific Islands in effect at the time of such transfer, which may be modified by the Government of the Northern Mariana Islands only in a manner which does not create any additional differences between the social security laws of the Trust Territory of the Pacific Islands and the laws described in Subsection (b). The United States will supplement such fund if necessary to assure that persons receive benefits therefrom comparable to those they would have received from the Trust Territory Social Security Retirement Fund under the laws applicable thereto on the day preceding the establishment of the Northern Mariana Islands Social Security Retirement Fund, so long as the rate of contributions thereto also remains comparable.

"(b) Those laws of the United States which impose excise and self-employment taxes to support or which provide benefits from the United States Social Security System will upon termination of the Trusteeship Agreement or such earlier date as may be agreed to by the Government of the Northern Mariana Islands and the Government of the United States become applicable to the Northern Mariana Islands as they apply to Guam.

"(c) At such time as the laws described in Subsection (b) become applicable to the Northern Mariana Islands:

"(1) the Northern Mariana Islands Social Security Retirement Fund will be transferred into the appropriate Federal Social Security Trust Funds;

"(2) prior contributions by or on behalf of persons domiciled in the Northern Mariana Islands to the Trust Territory Social Security Retirement Fund or the Northern Mariana Islands Social Security Retirement Fund will be considered to have been made to the appropriate Federal Social Security Trust Funds for the purpose of determining eligibility of those persons in the Northern Mariana Islands for benefits under those laws; and

"(3) persons domiciled in the Northern Mariana Islands who are eligible for or entitled to social security benefits under the laws of the Trust Territory of the Pacific Islands or of the Northern Mariana Islands will not lose their entitlement and will be eligible for or entitled to benefits under the laws described in Subsection (b).

"SECTION 607. (a) All bonds or other obligations issued by the *Bonds and other* Government of the Northern Mariana Islands or by its authority will *obligations,* be exempt, as to principal and interest, from taxation by the United *exemption.* States, or by any State, territory or possession of the United States, or any political subdivision of any of them.

"(b) During the initial seven year period of financial assistance provided for in Section 702, and during such subsequent periods of financial assistance as may be agreed, the Government of the Northern Mariana Islands will authorize no public indebtedness (other than bonds or other obligations of the Government payable solely from revenues derived from any public improvement or undertaking) in excess of ten percentum of the aggregate assessed valuation of the property within the Northern Mariana Islands.

89–194 O—78—pt. 1——21

Add.19

"ARTICLE VII

"UNITED STATES FINANCIAL ASSISTANCE

"SECTION 701. The Government of the United States will assist the Government of the Northern Mariana Islands in its efforts to achieve a progressively higher standard of living for its people as part of the American economic community and to develop the economic resources needed to meet the financial responsibilities of local self-government. To this end, the United States will provide direct multi-year financial support to the Government of the Northern Mariana Islands for local government operations, for capital improvement programs and for economic development. The initial period of such support will be seven years, as provided in Section 702.

**Seven year grant assistance, appropriation authorization.**

"SECTION 702. Approval of this Covenant by the United States will constitute a commitment and pledge of the full faith and credit of the United States for the payment, as well as an authorization for the appropriation, of the following guaranteed annual levels of direct grant assistance to the Government of the Northern Mariana Islands for each of the seven fiscal years following the effective date of this Section:

"(a) $8.25 million for budgetary support for government operations, of which $250,000 each year will be reserved for a special education training fund connected with the change in the political status of the Northern Mariana Islands;

"(b) $4 million for capital improvement projects, of which $500,000 each year will be reserved for such projects on the Island of Tinian and $500,000 each year will be reserved for such projects on the Island of Rota; and

"(c) $1.75 million for an economic development loan fund, of which $500,000 each year will be reserved for small loans to farmers and fishermen and to agricultural and marine cooperatives, and of which $250,000 each year will be reserved for a special program of low interest housing loans for low income families.

**Federal programs and services availability.**

"SECTION 703. (a) The United States will make available to the Northern Mariana Islands the full range of federal programs and services available to the territories of the United States. Funds provided under Section 702 will be considered to be local revenues of the Government of the Northern Mariana Islands when used as the local share required to obtain federal programs and services.

"(b) There will be paid into the Treasury of the Government of the Northern Mariana Islands, to be expended to the benefit of the people thereof as that Government may by law prescribe, the proceeds of all customs duties and federal income taxes derived from the Northern Mariana Islands, the proceeds of all taxes collected under the internal revenue laws of the United States on articles produced in the Northern Mariana Islands and transported to the United States, its territories or possessions, or consumed in the Northern Mariana Islands, the proceeds of any other taxes which may be levied by the Congress on the inhabitants of the Northern Mariana Islands, and all quarantine, passport, immigration and naturalization fees collected in the Northern Mariana Islands, except that nothing in this Section shall be construed to apply to any tax imposed by Chapters 2 or 21 of Title 26, United States Code.

**26 USC 1401, 3101.**

"SECTION 704. (a) Funds provided under Section 702 not obligated or expended by the Government of the Northern Mariana Islands

during any fiscal year will remain available for obligation or expenditure by that Government in subsequent fiscal years for the purposes for which the funds were appropriated.

"(b) Approval of this Covenant by the United States will constitute an authorization for the appropriation of a pro-rata share of the funds provided under Section 702 for the period between the effective date of this Section and the beginning of the next succeeding fiscal year. <span style="float:right">Pro-rata share, appropriation authorization.</span>

"(c) The amounts stated in Section 702 will be adjusted for each fiscal year by a percentage which will be the same as the percentage change in the United States Department of Commerce composite price index using the beginning of Fiscal Year 1975 as the base.

"(d) Upon expiration of the seven year period of guaranteed annual direct grant assistance provided by Section 702, the annual level of payments in each category listed in Section 702 will continue until Congress appropriates a different amount or otherwise provides by law.

"ARTICLE VIII

"PROPERTY

"SECTION 801. All right, title and interest of the Government of the Trust Territory of the Pacific Islands in and to real property in the Northern Mariana Islands on the date of the signing of this Covenant or thereafter acquired in any manner whatsoever will, no later than upon the termination of the Trusteeship Agreement, be transferred to the Government of the Northern Mariana Islands. All right, title and interest of the Government of the Trust Territory of the Pacific Islands in and to all personal property on the date of the signing of this Covenant or thereafter acquired in any manner whatsoever will, no later than upon the termination of the Trusteeship Agreement, be distributed equitably in a manner to be determined by the Government of the Trust Territory of the Pacific Islands in consultation with those concerned, including the Government of the Northern Mariana Islands.

"SECTION 802. (a) The following property will be made available to the Government of the United States by lease to enable it to carry out its defense responsibilities: <span style="float:right">Leased property, U.S. defense purposes.</span>

"(1) on Tinian Island, approximately 17,799 acres (7,203 hectares) and the waters immediately adjacent thereto;

"(2) on Saipan Island, approximately 177 acres (72 hectares) at Tanapag Harbor; and

"(3) on Farallon de Medinilla Island, approximately 206 acres (83 hectares) encompassing the entire island, and the waters immediately adjacent thereto.

"(b) The United States affirms that it has no present need for or present intention to acquire any greater interest in property listed above than that which is granted to it under Subsection 803(a), or to acquire any property in addition to that listed in Subsection (a), above, in order to carry out its defense responsibilities.

"SECTION 803. (a) The Government of the Northern Mariana Islands will lease the property described in Subsection 802(a) to the Government of the United States for a term of fifty years, and the Government of the United States will have the option of renewing this lease for all or part of such property for an additional term of fifty years if it so desires at the end of the first term.

Add.21

"(b) The Government of the United States will pay to the Government of the Northern Mariana Islands in full settlement of this lease, including the second fifty year term of the lease if extended under the renewal option, the total sum of $19,520,600, determined as follows:

"(1) for that property on Tinian Island, $17.5 million;

"(2) for that property at Tanapag Harbor on Saipan Island, $2 million; and

"(3) for that property known as Farallon de Medinilla, $20,600.

The sum stated in this Subsection will be adjusted by a percentage which will be the same as the percentage change in the United States Department of Commerce composite price index from the date of signing the Covenant.

Technical Agreement Regarding Use of Land To Be Leased by the U.S.

"(c) A separate Technical Agreement Regarding Use of Land To Be Leased by the United States in the Northern Mariana Islands will be executed simultaneously with this Covenant. The terms of the lease to the United States will be in accordance with this Section and with the terms of the Technical Agreement. The Technical Agreement will also contain terms relating to the leaseback of property, to the joint use arrangements for San Jose Harbor and West Field on Tinian Island, and to the principles which will govern the social structure relations between the United States military and the Northern Mariana Islands civil authorities.

"(d) From the property to be leased to it in accordance with this Covenant the Government of the United States will lease back to the Government of the Northern Mariana Islands, in accordance with the Technical Agreement, for the sum of one dollar per acre per year, approximately 6,458 acres (2,614 hectares) on Tinian Island and approximately 44 acres (18 hectares) at Tanapag Harbor on Saipan Island, which will be used for purposes compatible with their intended military use.

"(e) From the property to be leased to it at Tanapag Harbor on Saipan Island the Government of the United States will make available to the Government of the Northern Mariana Islands 133 acres (54 hectares) at no cost. This property will be set aside for public use as an American memorial park to honor the American and Marianas dead in the World War II Marianas Campaign. The $2 million received from the Government of the United States for the lease of this property will be placed into a trust fund, and used for the development and maintenance of the park in accordance with the Technical Agreement.

"SECTION 804. (a) The Government of the United States will cause all agreements between it and the Government of the Trust Territory of the Pacific Islands which grant to the Government of the United States use or other rights in real property in the Northern Mariana Islands to be terminated upon or before the effective date of the Section. All right, title and interest of the Government of the Trust Territory of the Pacific Islands in and to any real property with respect to which the Government of the United States enjoys such use or other rights will be transferred to the Government of the Northern Mariana Islands at the time of such termination. From the time such right, title and interest is so transferred the Government of the Northern Mariana Islands will assure the Government of the United States the continued use of the real property then actively used by the Government of the United States for civilian governmental purposes on terms comparable to those enjoyed by the Government of the United

PUBLIC LAW 94–241—MAR. 24, 1976            90 STAT. 275

States under its arrangements with the Government of the Trust Territory of the Pacific Islands on the date of the signature of this Covenant.

"(b) All facilities at Isely Field developed with federal aid and all facilities at that field usable for the landing and take-off of aircraft will be available to the United States for use by military and naval aircraft, in common with other aircraft, at all times without charge, except, if the use by military and naval aircraft shall be substantial, a reasonable share, proportional to such use, of the cost of operating and maintaining the facilities so used may be charged at a rate established by agreement between the Government of the Northern Mariana Islands and the Government of the United States.

"SECTION 805. Except as otherwise provided in this Article, and notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands, the Government of the Northern Mariana Islands, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency:

"(a) will until twenty-five years after the termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent; and

"(b) may regulate the extent to which a person may own or hold land which is now public land.

"SECTION 806. (a) The United States will continue to recognize and respect the scarcity and special importance of land in the Northern Mariana Islands. If the United States must acquire any interest in real property not transferred to it under this Covenant, it will follow the policy of seeking to acquire only the minimum area necessary to accomplish the public purpose for which the real property is required, of seeking only the minimum interest in real property necessary to support such public purpose, acquiring title only if the public purpose cannot be accomplished if a lesser interest is obtained, and of seeking first to satisfy its requirement by acquiring an interest in public rather than private real property.

"(b) The United States may, upon prior written notice to the Government of the Northern Mariana Islands, acquire for public purposes in accordance with federal laws and procedures any interest in real property in the Northern Mariana Islands by purchase, lease, exchange, gift or otherwise under such terms and conditions as may be negotiated by the parties. The United States will in all cases attempt to acquire any interest in real property for public purposes by voluntary means under this Subsection before exercising the power of eminent domain. No interest in real property will be acquired unless duly authorized by the Congress of the United States and appropriations are available therefor.

"(c) In the event it is not possible for the United States to obtain an interest in real property for public purposes by voluntary means, it may exercise within the Commonwealth the power of eminent domain to the same extent and in the same manner as it has and can exercise the power of eminent domain in a State of the Union. The power of eminent domain will be exercised within the Commonwealth only to the extent necessary and in compliance with applicable United States laws, and with full recognition of the due process required by the United States Constitution.

Isely Field facilities, availability to U.S.

Landholding restrictions.

Power of eminent domain.

USC prec. title 1.

Add.23

PUBLIC LAW 94–241—MAR. 24, 1976

"Article IX

"Northern Mariana Islands Representative and Consultation

"Section 901. The Constitution or laws of the Northern Mariana Islands may provide for the appointment or election of a Resident Representative to the United States, whose term of office will be two years, unless otherwise determined by local law, and who will be entitled to receive official recognition as such Representative by all of the departments and agencies of the Government of the United States upon presentation through the Department of State of a certificate of selection from the Governor. The Represenative must be a citizen and resident of the Northern Mariana Islands, at least twenty-five years of age, and, after termination of the Trusteeship Agreement, a citizen of the United States.

Special representatives, report.

"Section 902. The Government of the United States and the Government of the Northern Mariana Islands will consult regularly on all matters affecting the relationship between them. At the request of either Government, and not less frequently than every ten years, the President of the United States and the Governor of the Northern Mariana Islands will designate special representatives to meet and to consider in good faith such issues affecting the relationship between the Northern Mariana Islands and the United States as may be designated by either Government and to make a report and recommendations with respect thereto. Special representatives will be appointed in any event to consider and to make recommendations regarding future multi-year financial assistance to the Northern Mariana Islands pursuant to Section 701, to meet at least one year prior to the expiration of every period of such financial assistance.

"Section 903. Nothing herein shall prevent the presentation of cases or controversies arising under this Covenant to courts established by the Constitution or laws of the United States. It is intended that any such cases or controversies will be justiciable in such courts and that the undertakings by the Government of the United States and by the Government of the Northern Mariana Islands provided for in this Covenant will be enforceable in such courts.

"Section 904. (a) The Government of the United States will give sympathetic consideration to the views of the Government of the Northern Mariana Islands on international matters directly affecting the Northern Mariana Islands and will provide opportunities for the effective presentation of such views to no less extent than such opportunities are provided to any other territory or possession under comparable circumstances.

Promotion of local tourism.

"(b) The United States will assist and facilitate the establishment by the Northern Mariana Islands of offices in the United States and abroad to promote local tourism and other economic or cultural interests of the Northern Mariana Islands.

"(c) On its request the Northern Mariana Islands may participate in regional and other international organizations concerned with social, economic, educational, scientific, technical and cultural matters when similar participation is authorized for any other territory or possession of the United States under comparable circumstances.

## "Article X

### "Approval, effective dates, and definitions

"Section 1001. (a) This Covenant will be submitted to the Mariana Islands District Legislature for its approval. After its approval by the Mariana Islands District Legislature, this Covenant will be submitted to the people of the Northern Mariana Islands for approval in a plebiscite to be called by the United States. Only persons who are domiciled exclusively in the Northern Mariana Islands and who meet such other qualifications, including timely registration, as are promulgated by the United States as administering authority will be eligible to vote in the plebiscite. Approval must be by a majority of at least 55% of the valid votes cast in the plebiscite. The results of the plebiscite will be certified to the President of the United States.

"(b) This Covenant will be approved by the United States in accordance with its constitutional processes and will thereupon become law.

"Section 1002. The President of the United States will issue a proclamation announcing the termination of the Trusteeship Agreement, or the date on which the Trusteeship Agreement will terminate, and the establishment of the Commonwealth in accordance with this Covenant. Any determination by the President that the Trusteeship Agreement has been terminated or will be terminated on a day certain will be final and will not be subject to review by any authority, judicial or otherwise, of the Trust Territory of the Pacific Islands, the Northern Mariana Islands or the United States.

"Section 1003. The provisions of this Covenant will become effective as follows, unless otherwise specifically provided:

"(a) Sections 105, 201–203, 503, 504, 606, 801, 903 and Article X will become effective on approval of this Covenant;

"(b) Sections 102, 103, 204, 304, Article IV, Sections 501, 502, 505, 601–605, 607, Article VII, Sections 802–805, 901 and 902 will become effective on a date to be determined and proclaimed by the President of the United States which will be not more than 180 days after this Covenant and the Constitution of the Northern Mariana Islands have both been approved; and

"(c) The remainder of this Covenant will become effective upon the termination of the Trusteeship Agreement and the establishment of the Commonwealth of the Northern Mariana Islands.

"Section 1004. (a) The application of any provision of the Constitution or laws of the United States which would otherwise apply to the Northern Mariana Islands may be suspended until termination of the Trusteeship Agreement if the President finds and declares that the application of such provision prior to termination would be inconsistent with the Trusteeship Agreement.

"(b) The Constitution of the Northern Mariana Islands will become effective in accordance with its terms on the same day that the provisions of this Covenant specified in Subsection 1003 (b) become effective, provided that if the President finds and declares that the effectiveness of any provision of the Constitution of the Northern Mariana Islands prior to termination of the Trusteeship Agreement would be inconsistent with the Trusteeship Agreement such provision will be ineffec-

Covenant approval by U.S.

Trusteeship Agreement termination; establishment of Commonwealth, proclamation.

Effective dates.

Constitution of the Northern Mariana Islands, effective date.

90 STAT. 278            PUBLIC LAW 94-241—MAR. 24, 1976

tive until termination of the Trusteeship Agreement. Upon the establishment of the Commonwealth of the Northern Mariana Islands the Constitution will become effective in its entirety in accordance with its terms as the Constitution of the Commonwealth of the Northern Mariana Islands.

Definitions.      "SECTION 1005. As used in this Covenant:

"(a) 'Trusteeship Agreement' means the Trusteeship Agreement for the former Japanese Mandated Islands concluded between the Security Council of the United Nations and the United States of America, which entered into force on July 18, 1947;

"(b) 'Northern Mariana Islands' means the area now known as the Mariana Islands District of the Trust Territory of the Pacific Islands, which lies within the area north of 14° north latitude, south of 21° north latitude, west of 150° east longitude and east of 144° east longitude;

"(c) 'Government of the Northern Mariana Islands' includes, as appropriate, the Government of the Mariana Islands District of the Trust Territory of the Pacific Islands at the time this Covenant is signed, its agencies and instrumentalities, and its successors, including the Government of the Commonwealth of the Northern Mariana Islands;

"(d) 'Territory or possession' with respect to the United States includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam and American Samoa;

"(e) 'Domicile' means that place where a person maintains a residence with the intention of continuing such residence for an unlimited or indefinite period, and to which such person has the intention of returning whenever he is absent, even for an extended period.

"Signed at Saipan, Mariana Islands on the fifteenth day of February, 1975.

"For the people of the Northern Mariana Islands:

EDWARD DLG. PANGELINAN,
Chairman, Marianas
Political Status Commission.

VICENTE N. SANTOS.
Vice Chairman, Marianas
Political Status Commission.

"For the United States of America:

Ambassador F. HAYDN WILLIAMS,
Personal Representative of the
President of the United States.

"Members of the Marianas Political Status Commission:

JUAN LG. CABRERA.
VICENTE T. CAMACHO.
JOSE R. CRUZ.
BERNARD V. HOFSCHNEIDER.
BENJAMIN T. MANGLONA.
DANIEL T. MUNA.
DR. FRANCISCO T. PALACIOS.
JOAQUIN I. PANGELINAN.
MANUEL A. SABLAN.
JOANNES B. TAIMANAO.
PEDRO A. TENORIO."

PUBLIC LAW 94–241—MAR. 24, 1976    90 STAT. 279

Sec. 2. It is the sense of the Congress that pursuant to section 902 of the foregoing Covenant, and in any case within ten years from the date of the enactment of this resolution, the President of the United States should request, on behalf of the United States, the designation of special representatives to meet and to consider in good faith such issues affecting the relationship between the Northern Mariana Islands and the United States as may be designated by either Government and to make a report and recommendations with respect thereto.

Special representatives, appointment by President, report to Congress. 48 USC 1681 note.

Approved March 24, 1976.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 94–364 (Comm. on Interior and Insular Affairs).
SENATE REPORTS: No. 94–433 (Comm. on Interior and Insular Affairs) and No.
    94–596 (Committees on Foreign Relations and Armed Services).
CONGRESSIONAL RECORD:
    Vol. 121 (1975): July 21, considered and passed House.
    Vol. 122 (1976): Feb. 24, considered and passed Senate, amended.
        Mar. 11, House concurred in Senate amendments.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS:
    Vol. 12, No. 13 (1976): Mar. 24, Presidential statement.