APPEAL NO. 22-16936

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**ANDREW SABLAN SALAS**,

Plaintiff-Appellant,

vs.

**UNITED STATES OF AMERICA,**

Defendant-Appellee.

_____

Appeal from the District Court for the Northern Mariana Islands
District Court No. 1:22-cv-00008

_____

**APPELLANT'S REPLY BRIEF**

_____

JOSEPH E. HOREY
BANES HOREY BERMAN & MILLER, LLC
First Floor, Macaranas Building
4165 Beach Road, Garapan
Commonwealth of the Northern Mariana Islands
PO Box 501969, Saipan MP 96950
Telephone: (670) 234-5684
Fax No. (670) 234-568

# TABLE OF CONTENTS

INTRODUCTION     1

ARGUMENT     1

A. The Covenant Alone Controls the Application of a Federal Law to the CNMI.     1

B. Section 12616 Does Not Apply to the CNMI via Covenant § 502.     2

    1. With Respect to Birds, 7 U.S.C. §2156(a) Did Not Apply to Guam in 1978.     2

    2. The Government's Contrary Arguments Are Unavailing.     5

       a. The Cockfight Prohibition In 7 U.S.C. § 2156(a) (1976) Was a "Law."     5

       b. The Cockfight Prohibition In 7 U.S.C. § 2156(a) (1976) Did Not "Apply" to Guam.     8

    3. The Animal Fighting Prohibition of 7 U.S.C. § 2156(a) Was Not of General Application to the States in 1978.     15

    4. The Government's Authorities Do Not Support Affirmance.     16

C. Section 12616 Does Not Apply to the CNMI via Covenant § 105.     18

    1. Appellant Did Not Concede This Issue, and the Court Should Reach It.     18

    2. "Cannot" Should Be Given Its Plain, Common Meaning.     21

D. Section 12616 Violates Self-Government and Therefore Does Not Apply.     21

CONCLUSION     27

i

# TABLE OF AUTHORITIES

**US-CNMI Covenant**

| | |
|---|---|
| Preamble | 12 |
| Section 103 | 21 |
| Section 105 | 1, 18, 19, 20, 21 |
| Section 502 | 3, 6, 13, 16, 17, 18, 19, 21 |
| Section 503 | 6, 7 |
| Section 504 | 17 |
| Section 506 | 8 |
| Section 606 | 6 |
| Section 1003 | 18, 19 |

**<u>Covenant Legislative History</u>**

| | |
|---|---|
| Administration's Section-by-Section Analysis of the Covenant | 11 |
| Senate's Section-by-Section Analysis of the Covenant | 11 |
| Marianas Political Status Commission's Section-by-Section Analysis of the Covenant | 14, 16 |
| 122 Cong. Rec. 7272 (1976) | 14 |

**<u>Statutes</u>**

| | |
|---|---|
| 7 U.S.C. § 2156 (2019-present) (Appellee's Brief Addendum 2-5) | 1 |

7 U.S.C. § 2156 (1976-2002) (Reply Brief Addendum 1)     3, 4, 5, 8, 11, 16, 17

28 U.S.C. § 2409a     16

42 U.S.C. §§ 1351-55     10

42 U.S.C. §§ 1382-1383f     11

46 U.S.C. § 251 (1950)     7

46 U.S.C. § 55114 (2006-present)     7, 9

U.S. Pub. L. 81-751 (September 2, 1950), 64 Stat. 577 (Nicholson Act)     7

U.S. Pub. L. 92-603 (October 30, 1972), 86 Stat. 1329, § 303     11

U.S. Pub. L. 94–279 (April 22, 1976), 90 Stat 417 (Animal Welfare Act Amendments of 1976), § 17     19

U.S. Pub. L. 109-304 (October 6, 2006), 120 Stat. 1485     7

U.S. Pub. L. 115-334 (December 29, 2018), 132 Stat. 4490 (Agriculture Improvement Act of 2018), § 12616     1, 3, 18, 21

**Cases**

Avila v. I.N.S., 731 F.2d 616 (9th Cir. 1984)     19

Cardenas v. Anzai, 311 F.3d 929 (9th Cir. 2002)     20

Chew Heong v. United States, 112 U.S. 536 (1884)     13

Chicken Ranch Rancheria of Me-Wuk Indians v. California, 42 F.4th 1024 (9th Cir. 2022)     11

Columbia Steel Casting Co. v. Portland Gen. Elec. Co., 111 F.3d 1427 (9th Cir. 1996)     20

Commonwealth of the Northern Mariana Islands v. Atalig,
723 F.2d 682 (9th Cir. 1984) — 24

Commonwealth of the Northern Mariana Islands v. United States,
279 F.3d 1070 (9th Cir. 2002) ("CNMI I") — 13, 16, 17

Commonwealth of the Northern Mariana Islands v. United States,
399 F.3d 1057 (9th Cir. 2005) ("CNMI II") — 2

Cotter v. City of Boston, 193 F.Supp.2d 323 (D. Mass. 2002) — 23

County of Wayne v. Hathcock, 684 N.W.2d 765 (Mich. 2004) — 10

Dunn v. Blumstein, 405 U.S. 330 (1972) — 22

Fang Lin Ai v. United States, 809 F.3d 503 (9th Cir. 2015) — 6

Flamingo Resort, Inc. v. United States, 664 F.2d 1387 (9th Cir. 1982) — 19

Gale v. Andrus, 643 F.2d 826 (D.C. Cir. 1980) — 12

GCIU-Employer Retirement Fund v. MNG Enterprises, Inc.,
51 F.4th 1092 (9th Cir. 2022) — 15

Guam v. Guerrero, 290 F.3d 1210 (9th Cir. 2002) — 19

Hillblom v. United States, 896 F.2d 426 (9th Cir. 1990) — 1

In Re Kansas Indians, 72 U.S. (5 Wall.) 737 (1866) — 14

Kramer v. Union Free School Dist. No. 15, 395 U.S. 621 (1969) — 22

Lake County v. Rollins, 130 U.S. 662 (1889) — 9

League of Women Voters of Michigan v.
Secretary of State, 975 N.W.2d 840 (Mich. 2022) — 10

Ngiraingas v. Sanchez, 858 F.2d 1368 (9th Cir. 1988) — 24

People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90 (9th Cir. 1974) — 9

iv

Ratzlaf v. United States, 510 U.S. 135 (1994) ..... 6

Sagana v. Tenorio, 384 F.3d 731 (9th Cir. 2004) ..... 2

Saipan Stevedore Co., Inc. v. Director, Ofc. of Workers'
Comp. Programs, 133 F.3d 717 (9th Cir. 1998) ..... 2, 3, 17

San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1 (1973) ..... 22

Shaw v. Hunt, 517 U.S. 899 (1996) ..... 23

Shelby County, Ala. v. Holder, 570 U.S. 529 (2013) ..... 26

Southwest Airlines Co. v. Saxon, ___ U.S. ___, 142 S. Ct. 1783 (2022) ..... 9

Smith v. Williams, 871 F.3d 684 (9th Cir. 2017) ..... 6

Swim v. Bergland, 696 F.2d 712 (9th Cir. 1983) ..... 14

Temengil v. Trust Territory of the Pacific Islands,
881 F.2d 647 (9th Cir. 1989) ..... 12

TRW, Inc. v. Andrews, 534 U.S. 19 (2001) ..... 15

United States v. Carey, 929 F.3d 1092 (9th Cir. 2019) ..... 19

United States v. Carter, 421 F.3d 909 (9th Cir. 2005) ..... 8, 21

United States v. Classic, 313 U.S. 299 (1941) ..... 12

United States v. Miller, 822 F.2d 828 (9th Cir. 1987) ..... 19

United States v. Morrison, 529 U.S. 598 (2000) ..... 24

United States ex rel. Richards v. Deleon Guerrero,
4 F.3d 749 (9th Cir. 1993) ..... 1, 2, 19, 22, 23, 24

United States v. Vaello Madero, __ U.S. __, 142 S. Ct. 1539 (2022) ..... 11

United States v. Virginia, 518 U.S. 515 (1996)                                    23

United States v. Wright, 46 F.4th 938 (9th Cir. 2022)                             2

Wabol v. Villacrusis, 958 F.2d 1450 (9th Cir. 1990)                              13

**International Materials**

United Nations Charter                                                            12

Trusteeship Agreement for the Former Japanese Mandated Islands                   12

United Nations Declaration on the Rights of Indigenous Peoples                    27

U.S. State Department, https://geneva.usmission.gov/2010/12/17/u-s-
supports-united-nations-declaration-on-the-rights-of-indigenous-peoples/         27

**Other**

Second Interim Report of the NMI Commission on Federal Laws                       17

Final Report of the NMI Commission on Federal Laws                               17

Cooley, CONSTITUTIONAL LIMITATIONS                                               10

RANDOM HOUSE COLLEGE DICTIONARY (1984 ed.)                                        9

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984 ed.)                              9

James Joyce, "The Dead," in DUBLINERS (1914)                                     15

Emmanuel Erediano, "Ancient Chamorros may have come from Indonesia,
researchers say," Marianas Variety (June 1, 2022), www.mvariety.com              26

# INTRODUCTION

With the enactment of Section 12616 of the Agriculture Improvement Act of 2018, U.S. Pub. L. 115-334, amending 7 U.S.C. § 2156(a), Congress has prohibited cockfighting in "the territories," even where it is legal under non-federal law. This was in direct contrast to its practice with respect to cockfights in the States, which were subject to no federal ban so long as they remained legal under State law. As Appellant established in his Opening Brief, Section 12616 does not properly apply to the Commonwealth of the Northern Mariana Islands (CNMI). The Government's contrary arguments are unavailing, for the reasons set out in further detail herein.

# ARGUMENT

## A. THE COVENANT ALONE CONTROLS THE APPLICATION OF FEDERAL LAW TO THE CNMI

The Government begins by suggesting that 7 U.S.C. § 2156 (2019) applies to the CNMI by its own "express terms," *i.e.*, its use of the term "territory" in its definition of the "States" to which it applies. Appellee's Brief at 21-22. This notion must be quashed at the outset. This Court has consistently held that "the authority of the United States towards the CNMI arises *solely* under the Covenant." Hillblom v. United States, 896 F.2d 426, 429 (9th Cir. 1990) (emphasis added). *See also* U.S. *ex rel.* Richards v. Deleon Guerrero, 4 F.3d 749, 754 (9th Cir. 1993) ("At the outset, we emphasize that the authority of the United States towards the CNMI arises solely

under the Covenant.") (internal quotation marks omitted); <u>CNMI v. United States</u>, 399 F.3d 1057, 1062-63 (9th Cir. 2005) ("<u>CNMI II</u>") ("We do not dispute that the authority of the United States towards the CNMI arises solely under the Covenant.") (internal quotation marks omitted); <u>Sagana v. Tenorio</u>, 384 F.3d 731, 734 (9th Cir. 2004) (same).

The Government cites <u>Saipan Stevedore Co. v. Director, Ofc. of Workers' Comp. Programs</u>, 133 F.3d 717, 722-23 (9th Cir. 1998), in support of a contrary rule, but <u>Richards</u>, a pre-<u>Stevedore</u> case, specifically rejects the concept of any federal authority in the CNMI independent of the Covenant. When the Government argued in <u>Richards</u> that a contested law was independently valid there by its own force, by virtue of Congress' powers over the territories, this Court wrote: "*Even if* the Territorial Clause provides the constitutional basis for Congress' legislative authority in the Commonwealth, it is *solely* by the Covenant that we measure the limits of Congress' legislative power." 4 F.3d at 754 (emphasis added). *See also id.* ("The Covenant['s]…provisions *alone* define the boundaries of [US-CNMI] relations.") (emphasis added).

The <u>Stevedore</u> panel could not have altered this principle even if it had wanted to, as it is the law of the circuit. *See, e.g.*, <u>United States v. Wright</u>, 46 F.4th 938, 946 (9th Cir. 2022) ("Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that

ruling becomes the law of the circuit, and the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.") (citations and internal punctuation omitted). Nor is it clear that it even wanted to. <u>Saipan Stevedore</u> itself holds that "it is by the Covenant that we measure the limits" of "Congress' legislative authority in the Commonwealth[.]" 133 F.3d at 721. *See also id*. ("The extent to which federal laws enacted prior to January 9, 1978, affect the Commonwealth is governed by § 502 of the Covenant[.]"). To the extent <u>Saipan Stevedore</u> relies on the Covenant, it states the correct rule. To the extent it suggests that the "express terms" of a federal statute can be independently sufficient to make it applicable to the CNMI, such suggestion is dicta incompatible with circuit law, and incompatible with even the correct parts of <u>Stevedore</u> itself. This Court must rely on the Covenant alone in determining the applicability of Section 12616 to the CNMI.

## A. SECTION 12616 DOES NOT APPLY TO THE CNMI VIA COVENANT § 502

### 1. With Respect to Birds, 7 U.S.C. § 2156(a) Did Not Apply to Guam in 1978.

Section 12616 does not apply via Covenant § 502, because the law it amended, the cockfight prohibition of 7 U.S.C. § 2156(a), did not apply to Guam on January 9, 1978. On that date, that § 2156(a) provided:

> It shall be unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce.

3

7 U.S.C. § 2156(a) (1976).[1] This language prohibited cockfighting, because "animal fighting venture" was defined as "a fight between at least two animals...conducted for purposes of sport," *id*. at § 2156(g)(1), while "animal" was defined to include "any live bird[.]" *Id*. at § 2156(g)(5). 7 U.S.C. § 2156(a) (1976) was the first of three prohibitions dealing in various ways with animal fighting, *see id*. at §§ 2156(a)/(b)/(c), all of which were limited by the next subsection:

> Notwithstanding the provisions of subsections (a), (b), or (c) of this section, the activities prohibited by such subsection shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.

*Id*. at § 2156(d) (1976). "State" was defined to include "any territory," *id*. at § 2156(g)(4)), thereby including Guam. Since cockfighting was lawful on Guam, then, by the plain terms of subsection (d), the prohibition contained in subsection (a) did not, "with respect to fighting ventures involving live birds," apply to Guam in 1978, nor have any amendments to it since, including those discussed in Amicus' Brief at 14-16.[2]

---

[1]      The full text of 7 U.S.C. § 7156 in the form existing on January 9, 1978, is set forth in the Addendum hereto.

[2]      The Government mischaracterizes Appellant's position as being that "no part of § 2156 nor any of its amendments…have ever applied to the Northern Mariana Islands." Appellee's Brief at 22-23. In fact, Appellant argues only that *the prohibition on cockfighting in* § 2156(a) has never applied there. Section 2156 applies there with respect to "animal fighting ventures" involving dogs, bears, or any

### 2. The Government's Contrary Arguments Are Unavailing.

*a. The Cockfight Prohibition in 7 U.S.C. § 2156(a) (1976) Was a "Law."*

The Government argues that no "law" prohibiting cockfighting ever existed, within the meaning of Covenant § 502, since the statute imposing the prohibition, 7 U.S.C. § 2156(a) (1976), applied to cockfights only within the broader category of "animal" fights. *See, e.g.*, Appellee's Brief at 29 ("In fact, the statute has never contained a standalone 'cockfight prohibition.' Its structure is different."); *id*. at 31 ("Again, this argument ignores the structure of . . . 7 U.S.C. § 2156."). The Government also argues that a "law," within the meaning of § 502, refers only to "the overall statutory scheme," by which it evidently means the full text of 7 U.S.C. § 2156 (1976). *See* Appellee's Brief at 23 ("the overall statutory scheme") (*citing* 7 U.S.C. § 2156(b)/(c)/(d)/(g) (1976)); *id*. at 24 ("the statutory scheme"); *id*. at 25 ("2156 as a whole"). Appellant, by contrast, identifies the "law" in functional terms: "any prohibition in the laws of the United States against animal fighting ventures involving live birds, as traditionally practiced in the Northern Mariana Islands." Appellant's Brief at 18. In other words, the Government interprets "laws" *structurally*, while Appellant interprets it *substantively*.

---

other mammals – but not birds. (Nor any other non-mammals. With "animal" defined as bird or mammal (§ 2156(g)(5)), the prohibition has never applied to fish, reptiles, or any other class of the animal family, and would not prevent a fighting venture involving, *e.g.*, sharks, alligators, or scorpions.)

Since Covenant § 502 does not state whether "laws" should be read structurally or substantively, and is therefore ambiguous standing alone,[3] the term should be construed as used elsewhere in the Covenant. *See. e.g.*, <u>Ratzlaf v. United States</u>, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears."); <u>Smith v. Williams</u>, 871 F.3d 684, 687 (9th Cir. 2017) (describing <u>Ratzlaf</u> rule as "well-established"). The Covenant uses the term in both senses. It sometimes identifies applicable and non-applicable "laws" structurally. *See, e.g.*, COVENANT § 502(a)(1) ("Section 228 of Title II and Title XVI of the Social Security Act"); *id*. ("the Public Health Service Act"); *id*. ("the Micronesian Claims Act"). More often, it identifies them substantively. *See, e.g.*, *id*. ("those laws which provide federal services and financial assistance programs"); *id*. ("the federal banking laws"); *id*. at § 502(b) ("[t]he laws...regarding coastal shipments and the conditions of employment"); *id*. at § 503(a) ("the immigration and naturalization laws"); *id*. at § 503(b) ("the coastwise laws"); *id*. at § 606(b) ("[t]hose laws...which impose excise and self-employment taxes to support or which provide benefits from the United States Social Security

---

[3]     In <u>Fang Lin Ai v. United States</u>, 809 F.3d 503 (9th Cir. 2015), this Court recognized that what constitutes a distinct "law" for purposes of Covenant § 606(b) could be ambiguous. *See id*. at 513 ("To the extent that the phrase 'those laws' is ambiguous, in that the laws could be broken down further to include only 26 U.S.C. § 3111(a) (the portion of FICA imposing an excise tax), rather than all of FICA, we may look to extrinsic drafting sources to resolve this ambiguity.").

System"). Once, it gives a mixed structural-substantive description of a "law." *See* COVENANT § 503(c) ("the minimum wage provisions of Section 6, Act of June 25, 1938, 52 Stat. 1062, as amended"). "Laws," as used in the Covenant, therefore refers to laws in either the structural or substantive sense.

The Covenant's usage also shows that "laws," in the substantive sense, can include particular applications of more broadly worded laws. For example, the Covenant names, as a "law" inapplicable to the CNMI, "any prohibition in the laws of the United States against foreign vessels landing fish or unfinished fish products in the United States." COVENANT § 503(b). The only such prohibition when the Covenant was adopted was the Nicholson Act, former 46 U.S.C. 251, which prohibited foreign vessels from landing fish or "fish products" at U.S. ports. U.S. Pub. L. 81-751 (September 2, 1950), 64 Stat. 577.[4] However, the Covenant provided that only prohibitions of landing *unfinished* fish products (*e.g.*, guts, viscera, etc.) would not apply. This left the Nicholson Act applicable to the CNMI to the extent – but only to the extent – it applied to *finished* fish products, *e.g.*, canned or smoked fish.[5] Just as a prohibition of "unfinished fish products" is a "law" within the broader

---

[4] The Act is now found, with some formatting changes, at 46 U.S.C. § 55114(a).

[5] 46 U.S.C. § 55114(d) now provides that "[s]ubsection (a) does not apply to the Northern Mariana Islands." This was added in 2006. *See* U.S. Pub. L. 109-304 (October 6, 2006), § 8(c), 120 Stat. 1485, 1639.

prohibition of "fish products," so is a prohibition on bird fighting a "law" even though found within the broader prohibition of "animal fighting."

This sense of "law" is also implicit in a section of the Covenant making certain immigration laws applicable to the CNMI only for limited purposes, or to limited classes of persons. *See* COVENANT § 506(b) ("*With respect to children born abroad...*Section 301 and 308 of the [Immigration and Nationality] Act will apply."); *id*. at § 506(c) ("*With respect to aliens who are 'immediate relatives'...*the said Act will apply[.]"); *id*. at § 506(d) ("*With respect to persons who will become citizens...*the loss of nationality provisions of the said Act will apply") (all emphases added). It is thus entirely consistent with the Covenant's use of the term "laws" to speak of a prohibition on animal fighting *with respect to birds* as a "law."

### b. The Cockfight Prohibition In 7 U.S.C. § 2156(a) (1976) Did Not "Apply" to Guam.

Finally, the Government argues that the cockfight prohibition *applied* to Guam in 1978 in that it *did not* apply there. *See, e.g.*, Appellee's Brief at 29 ("The fact that this may have led to cockfighting being legal in some jurisdictions and illegal in others does not mean that any statutory provision did not 'apply' to Guam[;]...it means only that the application of the prohibition and conditional exception results in different outcomes in different jurisdictions."). This is sophistry. It is a "fundamental canon of statutory construction...that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."

8

United States v. Carter, 421 F.3d 909, 911 (9th Cir. 2005) (*quoting* Perrin v. United States, 444 U.S. 37, 42 (1979)).  *See also, e.g.*, Southwest Airlines Co. v. Saxon, 142 S. Ct. 1783, 1788 (2022) ("We interpret this language according to its ordinary, contemporary, common meaning.")) (citations and internal punctuation omitted). The "ordinary, contemporary, common meaning" of "apply" is to have some practical effect,[6] and a law imposing a ban that bans nothing in a given place has no more practical effect in that place than a law that is never enacted in the first place. By the Government's logic, 46 U.S.C. § 55114(d) ("Subsection (a) does not apply to the Northern Mariana Islands"), actually means that Subsection (a) *does* apply there.

The need to adhere to the "ordinary, contemporary, common meaning" is especially true in the case of the Covenant, which is in substance the constitution of the US-CNMI union,[7] and which, like a constitution, owes its legal force to popular ratification.  Since the ratifiers would have understood and approved the document

---

[6]     *See, e.g.*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984 ed.) ("to put to use esp. for some practical purpose...to have relevance or a valid connection"); RANDOM HOUSE COLLEGE DICTIONARY (1984 ed.) ("to make practical or active use of...to be pertinent, suitable or relevant").  The definition in Amicus' Brief at 11 is neither common nor clear.

[7]     *Cf.* People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90, 98 (9th Cir. 1974) ("[T]he Trusteeship Agreement constitutes the plaintiffs' basic constitutional document.").

in accordance with its everyday meaning, so too must the Court read and apply it.

*See, e.g.,* Lake County v. Rollins, 130 U.S. 662, 671 (1889) ("The simplest and most

obvious interpretation of a constitution, if in itself sensible, is the most likely to be

that meant by the people in its adoption.").

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.

County of Wayne v. Hathcock, 684 N.W.2d 765, 779 (Mich. 2004) (*quoting* Cooley,

CONSTITUTIONAL LIMITATIONS at 81). *See also, e.g.*, League of Women Voters of

Michigan v. Secretary of State, 975 N.W.2d 840, 873 (Mich. 2022) ("The primary

objective in interpreting a constitutional provision is to determine the text's

original meaning to the ratifiers, the people, at the time of ratification. The lodestar

principle is that of 'common understanding,' the sense of the words used that would

have been most obvious to those who voted to adopt the constitution.") (footnotes

and internal quotation marks omitted).

    The Covenant framers themselves spoke in this kind of plain language. For

example, the Social Security Act formerly provided for disability benefits through a

system that was partly federally funded and partly state funded. *See* 42 U.S.C. §§

1351-55. In 1972, however, this system, insofar as it applied to the fifty states and the District of Columbia, was replaced by federally funded Supplemental Security Income (SSI), *see* 42 U.S.C. §§ 1382-1383f, leaving the original system intact only in "Puerto Rico, Guam, and the Virgin Islands." *See* U.S. Pub. L. 92-603 (October 30, 1972), § 303, 86 Stat. 1329, 1484. *See generally* United States v. Vaello Madero, 142 S. Ct. 1539, 1542 (2022) (describing present situation). The Government would no doubt argue that the "overall statutory scheme" of the Social Security Act, including Title XVI (the SSI sections), is "applicable to Guam," because it is all "the law within Guam," the only difference being that the law "treats Guam differently." However, this was understood by the parties negotiating the Covenant to mean that Title XVI was "not applicable to Guam."[8] Similarly, 7 U.S.C. § 2156(a) (1976) was *not applicable to Guam*.

In addition to applying the plain meaning rule, the Court should resolve any ambiguity in "apply" so as to advance the purpose of the Covenant. *See, e.g.*, Chicken Ranch Rancheria of Me-Wuk Indians v. California, 42 F.4th 1024, 1043 (9th Cir. 2022) ("Interpretation of a word or phrase depends upon reading the whole

---

[8] *See, e.g.*, ER-32-33, Senate's Analysis of the Covenant, ("Title XVI of the Social Security Act which applies to all the States will not [*sic*] apply to the Northern Mariana Islands, *although it is not applicable to Guam*.") (emphasis added); ER-35-36, Administration's Analysis of the Covenant ("Title XVI of the Social Security Act which applies to all the States will apply to the Northern Mariana Islands, *although it is not applicable to Guam*.") (emphasis added).

statutory text, considering the purpose and context of the statute . . .") (*quoting* <u>Dolan v. U.S. Postal Service</u>, 546 U.S. 481 (2006)).  This principle of construction, like the plain meaning rule, is applicable to any legal text, but, like that rule, also has special force for instruments requiring popular ratification:

> For in setting up an enduring framework of government [the Framers of the United States Constitution] undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government. If we remember that 'it is a Constitution we are expounding,' we cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose.

<u>United States v. Classic</u>, 313 U.S. 299, 316 (1941) (quoting <u>M'Culloch v. Maryland</u>, 17 U.S. (18 Wheat.) 316 (1819)).  The purpose of the Covenant was to fulfill the Trusteeship, *see* Covenant Preamble, and the purpose of the Trusteeship was to establish self-government in the CNMI.  *See, e.g.*, <u>Temengil v. Trust Territory of the Pacific Islands</u>, 881 F.2d 647, 649 (9th Cir. 1989) ("The paramount duty of the United States was to steward Micronesia to self-government."); <u>Gale v. Andrus</u>, 643 F.2d 826, 830 (D.C. Cir. 1980) ("The task of the United States under the Trusteeship Agreement at issue is primarily to nurture the Trust Territory toward self-

government.").[9]  A statute enacted pursuant to a treaty, and purporting to effectuate the treaty, must be read *in pari materia* with the treaty.  Chew Heong v. United States, 112 U.S. 536, 549 (1884).

> For since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputed to Congress an intention to disregard the plighted faith of the government, and, consequently, the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty.

*Id.*[10] The method chosen was by treating the Northern Marianas as if they were a state. *See, e.g.*, CNMI v. United States, 279 F.3d 1070, 1073 (9th Cir. 2002) ("CNMI I") ("[W]hen section 502(a)(2) governs, it requires not only that the law being applied…be effective in the CNMI as it is in the States, but also that the CNMI be treated *as if it were a State* for purposes of that law.") (emphasis in original) (*citing* Fleming v. Dept. of Public Safety, 837 F.2d 401, 406 (9th Cir.1988)).  The formula of Covenant § 502(a)(2) applies existing laws to the CNMI "as they are applicable

---

[9]     *See* Trusteeship Agreement for the Former Japanese Mandated Islands, (July 18, 1947), 61 Stat. 3301, at Art. 6 (US agrees to "promote the development of the inhabitants…toward self-government or independence"). *See also* UNITED NATIONS CHARTER, 59 Stat. 1031, at Art. 76 (stating objective of trusteeship system to "promote [the trust territories'] progressive development towards self-government or independence") & Art. 73 (signatories accepting "sacred trust" to "develop self-government" in all territories under their administration which "have not yet attained a full measure of self-government").

[10]     *See also* Wabol v. Villacrusis, 958 F.2d 1450, 1459 (9th Cir. 1990) ("It appears that in approving the Covenant . . . the federal government was potentially constrained by . . . the Trusteeship Agreement[.]").

to the several States" – *not* as they are applicable to the territories. This distinction was:

> intended to prevent the application of laws so as to reach intraterritorial matters within the Northern Mariana Islands where similar intrastate matters within the states are not reached. To reach matters in the Northern Marianas would be inconsistent with the guarantee of local self-government contained in the Covenant.

Marianas Political Status Commission, Section-by-Section Analysis of the Covenant, ER-171-72. The effect of the Government's reading is to apply the law to the CNMI as a territory.[11]

Finally, any ambiguity should be resolved in favor of the CNMI people. This is the rule for the construction of Indian treaties, which, like the Covenant, are negotiated agreements between the United States and peoples toward whom the United States stood in a trust relation. *See, e.g.*, Swim v. Bergland, 696 F.2d 712, 719 (9th Cir. 1983) ("It is a well settled rule of construction in Indian law that any ambiguity in treaty language must be resolved in favor of the Indians."); In Re Kansas Indians, 72 U.S. (5 Wall.) 737, 760 (1866) ("[E]nlarged rules of construction are adopted in reference to Indian treaties...The language used in treaties with the Indians shall never be construed to their prejudice, if words be made

---

[11] In fact, Congress was clear that it was legislating for the territories alone. It expressly said it was "extending [the] prohibition on animal fighting to the territories." 132 Stat. at 5015. *See also, e.g.*, ER-74 ("What this amendment does, Mr. Chairman, is very simple: it proposes to do the same thing in the territories.") (statement of Rep. Roskum).

use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of the treaty."). This same principle is endorsed in the legislative history of the Covenant. *See* 122 Cong. Rec. 7272 (1976) ("[A]ll possible ambiguities should be resolved in favor of and to the benefit of the people and Government of the Northern Mariana Islands.") (statement of Rep. Burton).

### 3. The Animal Fighting Prohibition of 7 U.S.C. § 2156(a) Was Not of General Application to the States in 1978.

The Government has no response to Appellant's argument that the cockfight prohibition was not "*general* application" to the States in 1978, because it did not apply to them consistently and uniformly. *See* Appellant's Opening Brief at 18-20. However, no word in an instrument should be considered superfluous. On the contrary,

> [i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.

TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).

*See also, e.g.*, GCIU-Employer Retirement Fund v. MNG Enterprises, Inc., 51 F.4th 1092, 1097 (9th Cir. 2022) (same principle). As such, "*general* application" must mean something more than mere "application." But the Government's argument proceeds as if the word "general" were not there. As shown in Appellant's Brief at 18-19, "general" means equal and across-the-board, not treating one differently from

another.[12]  The animal fighting prohibition applied in one way to some states, and in a different way to others.  There was a "[s]pecial rule for certain State[s]."  Appellee's Brief at Add. 6 (2018 version of § 2156).  *Because* subsection (d) was general in 1978, subsection (a) was not.  By applying to the states *selectively*, it did not apply to them *generally*.[13]

### 4.  The Government's Authorities Do Not Support Affirmance

The Government invokes <u>CNMI I</u>, *supra*, to argue that 7 U.S.C. § 2156 (1976) was "applicable to Guam" in 1978, *see* Appellee's Brief at 24, 30, but the issues in <u>CNMI I</u> were altogether different.  As noted in Appellant's Brief at 16-17, <u>CNMI I</u> involved a statute of limitations, 28 U.S.C. § 2409a(g), that undisputedly applied to Guam and the States in 1978; the issue was whether a 1986 amendment to that law, itself applicable to the States but not Guam, would apply to the CNMI under Covenant § 502.   The issue here, by contrast, is whether a law applied to Guam in 1978 in the first place.  Another difference between the cases is that, in <u>CNMI I</u>, it was the exception to the limitations period (*i.e.*, the exception for actions brought by states) which did not apply to Guam, leaving the statute itself still applicable there.

---

[12]   *Cf.* James Joyce, "The Dead" ("[S]now was general all over Ireland.  It was falling . . . upon all the living and the dead.").

[13]   As for the cases cited in Amicus' Brief at 12, it need only be said that a law requiring a license of everyone is general; a law penalizing only some for the same conduct is not.

In this case, the *exception* to the cockfight ban (*i.e.*, the exception for states and territories where cockfighting was legal) *did* apply to Guam, meaning that the ban itself did not. Finally, the "applicability to Guam" at issue in this case is a law's applicability to Guam in the geographic sense – *i.e.*, its applicability "within or with respect to [Guam] or the people who reside in or who are citizens of [Guam]." Status Commission Section-by-Section Analysis, ER-171 (internal quotation marks omitted). The "applicability" at issue in <u>CNMI I</u> was applicability to Guam in the *personal* sense – *i.e.*, "Guam" as a legal entity litigating a case – an altogether different kind of "applicability," and not the kind meant by Covenant § 502.

Finally, in arguing that 7 U.S.C. § 2156 became applicable through Covenant § 502(a)(2), the Government relies on the Second Interim Report of the NMI Commission on Federal Laws. *See* Appellee's Brief at 26-27. However, the passage cited does not discuss 7 U.S.C. § 2156, or any part of Title 7, Chapter 54 (the Animal Welfare Act), at all, except in the vaguest terms as one of dozens of "remaining chapters in Title 7," after Chapter 12. *See* SER-94. Furthermore, the Commission was an advisory board tasked with recommending what laws "should" apply, not framers deciding what laws *do* apply. *See* COVENANT § 504. Also, even if the Commission did consider 7 U.S.C. § 2156 at the time (1985), it would have discovered the 1976 version of the law, which exempted jurisdictions where local law allowed cockfighting. Finally, the Second Interim Report is just that – an *interim*

17

report. The Commission's *Final* Report eschewed the Interim Report's law-by-law approach in favor of "a more general rule by which the application of federal law can be judged in the future." *See* Final Report of Commission on Federal Laws, ER-60. The Final Report has also been relied on by this Court. *See* <u>Saipan Stevedore</u>, 133 F.3d at 725.

### C.  SECTION 12616 DOES NOT APPLY TO THE CNMI VIA COVENANT § 105.

### 1.  Appellant Did Not Concede This Issue, and the Court Should Reach It.

The Government claims that Appellant conceded this issue. Appellee's Brief at 32. In fact, Appellant never made the "concession" that the Government claims. Appellant acknowledged the applicability of Covenant § 502 to the question at hand, but he kept the door open to the possible application of § 105 as well. In Appellant's brief in district court, he stated,

> Plaintiff submits that the applicability of AIA § 12616 to the CNMI is properly evaluated under the formula of COVENANT § 502(a)(2), because it was a "subsequent amendment" of a law "in existence" on January 9, 1978, namely 7 U.S.C. § 2156(a). However, if it is viewed as a new law enacted in 2018, perhaps because it imposed new legal burdens in places where they had not previously existed, its applicability would be evaluated under COVENANT § 105.

FER-6. The Government acknowledged this to be a "conditional argument" by Appellant, FER-3, and responded to it on its merits. *See* FER-3-5. At oral argument, Appellant's counsel agreed that "this [*i.e.*, Section 12616] is an amendment to an

existing pre '78 law," SER-28, which of course it is. Saying so does not mean that

§ 105 did not or could not apply to it.

Even if this is taken as a "concession," moreover, it does not bind this Court.

Any concession that Covenant § 105, which came into effect in 1976,[14] and which

applies on its face to all "legislation," does not apply to "amendments," which of

course *are* "legislation" by definition, would have been legally erroneous, and this

Court is not bound by legally erroneous concessions:

> We see no reason why we should make what we think would be an erroneous decision, because the applicable law was not insisted upon by one of the parties. The rule has been repeated in a variety of circumstances....The policy is longstanding and applied whether it is the government or a private party which has made the erroneous concession.

United States v. Miller, 822 F.2d 828, 832 (9th Cir. 1987) (citations and internal

quotation marks omitted) (*quoting* Smith Engineering Co. v. Rice, 102 F.2d 492,

499 (9th Cir.1938)). *See also, e.g.*, Flamingo Resort, Inc. v. United States, 664 F.2d

1387, 1391 fn. 5 (9th Cir. 1982) ("And even if such a concession was made..., we are

not bound by a party's erroneous view of the law."); Guam v. Guerrero, 290 F.3d

---

[14]    *See* COVENANT § 1003(a) ("Section 105 . . . will become effective on approval of this Covenant"). The Covenant was approved March 24, 1976. *See* U.S. Pub. L. 94-241 (March 24, 1976), 90 Stat. 263 (Appellee's Brief Addendum 11). 7 U.S.C. § 2156 was enacted one month after this, on April 22, 1976. *See* U.S. Pub. L. 94-279 (April 22, 1976), 90 Stat. 421. It was therefore enacted when Covenant § 105 was already in effect, but before Covenant § 502 came into effect, which did not occur until January 9, 1978. *See* Richards, *supra*, 4 F.3d at 756; COVENANT § 1003(b).

1210, 1222 fn. 20 (9th Cir. 2002) ("[W]e are not bound by legal concessions or stipulations made by the parties."). *See generally* Avila v. I.N.S., 731 F.2d 616, 620-21 (9th Cir. 1984); United States v. Carey, 929 F.3d 1092, 1097 (9th Cir. 2019) (stating same rule). This is particularly true if the conceded issue is purely one of law, if consideration of the issue will not prejudice the opposing party, and if "there are significant questions of general impact." *See, e.g.*, Cardenas v. Anzai, 311 F.3d 929, 938-39 (9th Cir. 2002) ("[T]he court may, in its discretion, review an issue conceded or neglected below if the issue is purely one of law and the pertinent record has been fully developed, or when there are significant questions of general impact.") (*quoting* U.S. v. California, 932 F.2d 1346 (9th Cir.1991)) (internal punctuation omitted); Columbia Steel Casting Co. v. Portland Gen. Elec. Co., 111 F.3d 1427, 1443 (9th Cir. 1996) ("Because the...issue...is a pure issue of law, and because consideration of it will not prejudice Columbia Steel, we exercise our discretion to consider it"). Consideration of the application of Section 105 of the Covenant will not prejudice the Government, because the issue has already been thoroughly briefed below. *See* FER-3-9. Furthermore, its applicability to amendments is a "significant question[] of general impact" in the CNMI, which, if it is not addressed and resolved now, will surely arise gain in the future, either with respect to the cockfight ban or some other federal law.

20

### 2. "Cannot" Should Be Given Its Plain, Common Meaning.

Section 105 applies to legislation that "cannot also be made applicable to the several States." The Government and Amicus argue that legislation "cannot" be made applicable to the States only when Congress lacks the constitutional power to make it so. *See* Appellee's Brief at 33-34, Amicus Brief at 13. As already discussed above, however, it is a "fundamental canon of statutory construction...that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Carter, *supra*, 421 F.3d at 911. In ordinary usage, there can be many reasons why something "cannot" be done. Legal prohibition is one, but simple practical impossibility is another, and it was practically impossible for the elimination of an exception for "a State where it would not be in violation of the law" to affect any State, because, in 2018, there were no such States. Similarly, a statute enacted today for "all States lying wholly south of the Tropic of Cancer," defining "State" to include territories, cannot apply to the States, and would in fact apply only to the territories, since all U.S. territories, and no States, lie wholly south of that line.

### C. SECTION 12616 VIOLATES SELF-GOVERNMENT AND THEREFORE DOES NOT APPLY

Appellant established in his Opening Brief that, even if Section 12616 would otherwise apply to the CNMI via either Sections 502, 105, or both, of the Covenant, its application would nevertheless be precluded by the guarantee of self-government

21

in Section 103. *See* Appellant's Brief at 20-29. The Government argues that various federal interests are served by the ban. *See*, *e.g.*, Appellee's Brief at 42 ("interstate spread of avian flu"); *id*. at 43 ("spectators from numerous states"); *id*. ("questionable and criminal activities"). Even if these interests were valid in the abstract, however, the Government makes no showing, or even any claim, that any of them formed the actual impetus for the enactment of Section 12616 by Congress, or that there was any evidence before Congress supporting any of them. Without such a showing, the Government cannot prevail.

This Court has recognized that, in the context of the Covenant, the CNMI people's right of self-government as to internal affairs and their "right to vote for the CNMI officials who govern internal affairs" are "essentially the same." Richards, *supra*, 4 F.3d at 756. In reviewing legislation for violation of such rights, "the general presumption of constitutionality…if the Court can conceive of a 'rational basis'" for the law is "not applicable." Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 627-28 (1969). This is because such deference is "based on an assumption that the institutions of…government are structured so as to represent fairly all the people[;]" and "when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality." *Id.* at 628. In such cases, "the purpose of the [statute] and the assertedly overriding interests served by it must meet close constitutional

scrutiny." Dunn v. Blumstein, 405 U.S. 330, 336 (1972) (*quoting* Evans v. Cornman, 398 U.S. 398 (1970)) (internal quotation marks omitted).[15]  In exercising such scrutiny, it is necessary to know the actual interest intended to be served by the challenged legislation.

> [A law] cannot withstand strict scrutiny based upon speculation about what may have motivated the legislature.  To be a compelling interest, the State must show that the alleged objective was the legislature's actual purpose for the [law], and the legislature must have had a strong basis in evidence to support that justification before it implements the [law.]

Shaw v. Hunt, 517 U.S. 899, 908 fn. 4 (1996) (citation and internal quotation marks omitted). *See also, e.g.*, Cotter v. City of Boston, 193 F.Supp.2d 323, 339 (D. Mass. 2002), *aff'd in part, rev'd in part*, 323 F.3d 160 (1ˢᵗ Cir. 2003) ("A defendant may not submit a *post hoc* rationalization for [the challenged law] where it is clear that such a justification never crossed the decision maker's mind at the time the decision was made.").  Even under intermediate scrutiny, the justification for a challenged law "must be genuine, not hypothesized or invented *post hoc* in response to litigation." United States v. Virginia, 518 U.S. 515, 533 (1996).

A standard allowing mere hypothetical purposes to suffice would mean that a law constitutional under *any* provision, including the Territorial Clause and the

---

[15]    *See also, e.g.,* San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (strict scrutiny of laws affecting "discrete and insular minorities").  The CNMI, of course, is "insular" in the truest sense of the word.

Commerce Clause, would automatically apply to the CNMI, regardless of its local impact, and despite the lack of local participation in its formation. *But see* COVENANT § 105; Saipan Stevedore, *supra*, 133 F.3d at 721-25 (treating consistency with self-government as a requirement separate from and additional to constitutionality).[16] Furthermore, such a system would mean leave no substantive difference between the CNMI and territories such as Guam and Puerto Rico. *But see, e.g.*, CNMI v. Atalig, 723 F.2d 682, 691 n.28 (9th Cir. 1984) ("As a commonwealth, the NMI will enjoy a right to self-government guaranteed by the mutual consent provisions of the Covenant. No similar guarantees have been made to Puerto Rico or any other territory."); Ngiraingas v. Sanchez, 858 F.2d 1368, 1371 n.1 (9th Cir. 1988), *aff'd*, 495 U.S. 182 (1990) ("Guam's relation to the United States is entirely different…unlike [the CNMI], it is subject to the plenary power of Congress and has no inherent right to govern itself.") (internal quotation marks omitted).

In this case, neither avian flu nor interstate commerce had any record influence on Congress. One representative mentioned "questionable and criminal activities:"

---

[16] Since the Richards balancing test, not the Commerce Clause, governs applicability, it is not necessary that a law has "no impact whatsoever on interstate commerce" to be inapplicable. *See* Amicus Brief at 16. Instead, the extent of impact is a factor to be balanced.

> We are talking about stuff that attracts gangs. We are talking about stuff that attracts drug trafficking. We are talking about stuff that attracts violence.

ER-76 (statement of Rep. Roskam). Suppression of violent crime, however, is a local matter, even by domestic constitutional standards. *See, e.g.*, <u>US v. Morrison</u>, 529 U.S. 598, 615 (2000). Furthermore, there was no evidence, or even any claim, that criminal activity was associated with cockfighting in the CNMI. As admitted in Amicus' Brief at 19, "there is little data available yet" – including to Congress – "on the details of cockfighting in the CNMI."[17]

Some of the federal interests claimed by the Government and Amicus were asserted by Congress, not in 2018, but when enacting a previous amendment in 2007. *See* Appellee's Brief at 42; Amicus Brief at 22. However, <u>Richards</u> requires us to balance "the federal interest to be served *by the legislation at issue*," 4 F.3d at 755 (emphasis added), not the interest to be served by some other legislation years earlier. Besides, the 2007 amendment left intact the existing system of patchwork cockfight legality. The 2007 Congress evidently believed it could best advance its interests by not disrupting that system. And if Congress reached that conclusion in 2007, there is no reason to believe the same interests caused it to reach the opposite conclusion in 2018. If Congress singles out some states, it "must identify those

---

[17]    And if Amicus' speculative commercial impact is fact, there is no reason a law could not be narrowly tailored to address it.

25

jurisdictions to be singled out on a basis that makes sense in light of current conditions. It cannot rely simply on the past." Shelby County, Ala. v. Holder, 570 U.S. 529, 553 (2013).

Finally, the Government argues that the cockfighting prohibition does not implicate the CNMI's "purely internal affairs." *See* Appellee's Brief at 41. However, Richards teaches that there are few if any "purely" local or "purely" federal matters; most issues contain a mix of both, requiring a balancing test to weigh them. *See* 4 F.3d at 755 (Section 103 does not "carv[e] out an area of 'local affairs' immune from federal legislation"). Furthermore, the district court ruled based on the federal interest only, accepting for purposes of the motion to dismiss that substantial local impact existed. *See* ER-16 ("assuming that cockfighting is deeply entrenched in the CNMI's internal affairs"); ER-18 fn. 5 ("accept[ing] as true…that cockfighting is a traditional local recreational activity that is also a quintessential internal affair of the Northern Mariana Islands.") (internal quotation marks omitted). Finally, Appellant showed that cockfighting was a traditional activity beloved for centuries by the local population, *see* ER-135-148,[18] recognized by social scientists

---

[18]    Amicus' denigration of a custom documented as early as 1772 as "relatively recent" (Amicus Brief at 18) is absurd. Besides, since "[i]t is…likely that the ancient Chamorros originated from Indonesia," Emmanuel Erediano, "Ancient Chamorros may have come from Indonesia, researchers say," Marianas Variety (June 1, 2022), www.mvariety.com, the custom may be even older. *Cf.* ER-77 *ff.* (Bali cockfights).

as culturally significant, *see* ER-77-134, and protected by principles of international law. *See* United Nations Declaration on the Rights of Indigenous Peoples, A/RES/61/295 (U.N. Gen. Assem. 2007) (Addendum 6 hereto) at Art. 31(1) ("Indigenous peoples have the right to maintain, control [and] protect . . . the manifestations of their...cultures, including...sports and traditional games.").[19] To strike it down should require considerably greater and more substantive justification than subjective moral grandstanding.

## CONCLUSION

For the foregoing reasons, and all the reasons stated in Appellant's Opening Brief, the judgment of the district court should be reversed.

Respectfully submitted this 17th day of August, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant

*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

---

[19]     The U.S. has announced its support for the Declaration. *See* U.S. State Department, https://geneva.usmission.gov/2010/12/17/u-s-supports-united-nations-declaration-on-the-rights-of-indigenous-peoples/.

## CERTIFICATION OF COMPLIANCE PURSUANT TO NINTH CIRCUIT RULE 32(a)(7)(C)

Pursuant to Ninth Circuit Rule 32(a)(7)(C), I certify that Appellant's Reply Brief is proportionately spaced, has a typeface of 14 points and contains 6997 words, excluding from the count toward the word limitation the cover page, table of contents, table of authorities, and certificates of counsel.

Dated this 17th day of August, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey

# ADDENDUM

## TABLE OF CONTENTS

7 U.S.C. § 2156 (1976)      ADD. 1

United Nations Declaration on the Rights of Indigenous Peoples      ADD. 4

**7 U.S.C. § 2156**
**(enacted April 22, 1976)**
**(existing in this form on January 9, 1978)**

### § 2156. Animal fighting venture prohibition

### (a) Sponsoring or exhibiting animal in any fighting venture

It shall be unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce.

### (b) Buying, selling, delivering, or transporting animals for participation in animal fighting venture

It shall be unlawful for any person to knowingly sell, buy, transport, or deliver to another person or receive from another person for purposes of transportation, in interstate or foreign commerce, any dog or other animal for purposes of having the dog or other animal participate in an animal fighting venture.

### (c) Use of Postal Service or other interstate instrumentality for promoting or furthering animal fighting venture

It shall be unlawful for any person to knowingly use the mail service of the United States Postal Service or any interstate instrumentality for purposes of promoting or in any other manner furthering an animal fighting venture except as performed outside the limits of the States of the United States.

### (d) Violation of State law

Notwithstanding the provisions of subsections (a), (b), or (c) of this section, the activities prohibited by such subsections shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof.

### (e) Penalties

Any person who violates subsection (a), (b), or (c) of this section shall be fined not more than $5,000 or imprisoned for not more than 1 year, or both, for each such violation.

ADD. 1

## (f) Investigation of violations by Secretary; assistance by other Federal agencies; issuance of search warrant; forfeiture; costs recoverable in forfeiture or civil action

The Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section, and the Secretary may obtain the assistance of the Federal Bureau of Investigation, the Department of the Treasury, or other law enforcement agencies of the United States, and State and local governmental agencies, in the conduct of such investigations, under cooperative agreements with such agencies. A warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate within the district wherein the animal sought is located. Any United States marshal or any person authorized under this section to conduct investigations may apply for and execute any such warrant, and any animal seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection. Necessary care including veterinary treatment shall be provided while the animals are so held in custody. Any animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct. Costs incurred by the United States for care of animals seized and forfeited under this section shall be recoverable from the owner of the animals if he appears in such forfeiture proceeding or in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business.

## (g) Definitions

For purposes of this section—

(1) the term "animal fighting venture" means any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment except that the term "animal fighting venture" shall not be deemed to include any activity the primary purpose of which involves the use of one or more animals in hunting another animal or animals, such as waterfowl, bird, raccoon, or fox hunting;

ADD. 2

**(2)** the term "interstate or foreign commerce" means--

    **(A)** any movement between any place in a State to any place in another State or between places in the same State through another State; or

    **(B)** any movement from a foreign country into any State;

**(3)** the term "interstate instrumentality" means telegraph, telephone, radio, or television operating in interstate or foreign commerce;

**(4)** the term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

**(5)** the term "animal" means any live bird, or any live dog or other mammal, except man; and

**(6)** the conduct by any person of any activity prohibited by this section shall not render such person subject to the other sections of this chapter as a dealer, exhibitor, or otherwise.

### (h) Conflict with State law

The provisions of this chapter shall not supersede or otherwise invalidate any such State, local, or municipal legislation or ordinance relating to animal fighting ventures except in case of a direct and irreconcilable conflict between any requirements thereunder and this chapter or any rule, regulation, or standard hereunder.

ADD. 3

United Nations

A/RES/61/295

 **General Assembly**

Distr.: General
2 October 2007

**Sixty-first session**
Agenda item 68

## Resolution adopted by the General Assembly on 13 September 2007

[*without reference to a Main Committee (A/61/L.67 and Add.1)*]

### 61/295.  United Nations Declaration on the Rights of Indigenous Peoples

*The General Assembly*,

*Taking note* of the recommendation of the Human Rights Council contained in its resolution 1/2 of 29 June 2006,[1] by which the Council adopted the text of the United Nations Declaration on the Rights of Indigenous Peoples,

*Recalling* its resolution 61/178 of 20 December 2006, by which it decided to defer consideration of and action on the Declaration to allow time for further consultations thereon, and also decided to conclude its consideration before the end of the sixty-first session of the General Assembly,

*Adopts* the United Nations Declaration on the Rights of Indigenous Peoples as contained in the annex to the present resolution.

*107th plenary meeting*
*13 September 2007*

**Annex**

**United Nations Declaration on the Rights of Indigenous Peoples**

*The General Assembly*,

*Guided* by the purposes and principles of the Charter of the United Nations, and good faith in the fulfilment of the obligations assumed by States in accordance with the Charter,

*Affirming* that indigenous peoples are equal to all other peoples, while recognizing the right of all peoples to be different, to consider themselves different, and to be respected as such,

*Affirming also* that all peoples contribute to the diversity and richness of civilizations and cultures, which constitute the common heritage of humankind,

---

[1] See *Official Records of the General Assembly, Sixty-first Session, Supplement No. 53* (A/61/53), part one, chap. II, sect. A.

A/RES/61/295

*Affirming further* that all doctrines, policies and practices based on or advocating superiority of peoples or individuals on the basis of national origin or racial, religious, ethnic or cultural differences are racist, scientifically false, legally invalid, morally condemnable and socially unjust,

*Reaffirming* that indigenous peoples, in the exercise of their rights, should be free from discrimination of any kind,

*Concerned* that indigenous peoples have suffered from historic injustices as a result of, inter alia, their colonization and dispossession of their lands, territories and resources, thus preventing them from exercising, in particular, their right to development in accordance with their own needs and interests,

*Recognizing* the urgent need to respect and promote the inherent rights of indigenous peoples which derive from their political, economic and social structures and from their cultures, spiritual traditions, histories and philosophies, especially their rights to their lands, territories and resources,

*Recognizing also* the urgent need to respect and promote the rights of indigenous peoples affirmed in treaties, agreements and other constructive arrangements with States,

*Welcoming* the fact that indigenous peoples are organizing themselves for political, economic, social and cultural enhancement and in order to bring to an end all forms of discrimination and oppression wherever they occur,

*Convinced* that control by indigenous peoples over developments affecting them and their lands, territories and resources will enable them to maintain and strengthen their institutions, cultures and traditions, and to promote their development in accordance with their aspirations and needs,

*Recognizing* that respect for indigenous knowledge, cultures and traditional practices contributes to sustainable and equitable development and proper management of the environment,

*Emphasizing* the contribution of the demilitarization of the lands and territories of indigenous peoples to peace, economic and social progress and development, understanding and friendly relations among nations and peoples of the world,

*Recognizing in particular* the right of indigenous families and communities to retain shared responsibility for the upbringing, training, education and well-being of their children, consistent with the rights of the child,

*Considering* that the rights affirmed in treaties, agreements and other constructive arrangements between States and indigenous peoples are, in some situations, matters of international concern, interest, responsibility and character,

*Considering also* that treaties, agreements and other constructive arrangements, and the relationship they represent, are the basis for a strengthened partnership between indigenous peoples and States,

*Acknowledging* that the Charter of the United Nations, the International Covenant on Economic, Social and Cultural Rights[2] and the International Covenant on Civil and Political Rights,[2] as well as the Vienna Declaration and Programme of

_____

[2] See resolution 2200 A (XXI), annex.

2

Action,[3] affirm the fundamental importance of the right to self-determination of all peoples, by virtue of which they freely determine their political status and freely pursue their economic, social and cultural development,

*Bearing in mind* that nothing in this Declaration may be used to deny any peoples their right to self-determination, exercised in conformity with international law,

*Convinced* that the recognition of the rights of indigenous peoples in this Declaration will enhance harmonious and cooperative relations between the State and indigenous peoples, based on principles of justice, democracy, respect for human rights, non-discrimination and good faith,

*Encouraging* States to comply with and effectively implement all their obligations as they apply to indigenous peoples under international instruments, in particular those related to human rights, in consultation and cooperation with the peoples concerned,

*Emphasizing* that the United Nations has an important and continuing role to play in promoting and protecting the rights of indigenous peoples,

*Believing* that this Declaration is a further important step forward for the recognition, promotion and protection of the rights and freedoms of indigenous peoples and in the development of relevant activities of the United Nations system in this field,

*Recognizing and reaffirming* that indigenous individuals are entitled without discrimination to all human rights recognized in international law, and that indigenous peoples possess collective rights which are indispensable for their existence, well-being and integral development as peoples,

*Recognizing* that the situation of indigenous peoples varies from region to region and from country to country and that the significance of national and regional particularities and various historical and cultural backgrounds should be taken into consideration,

*Solemnly proclaims* the following United Nations Declaration on the Rights of Indigenous Peoples as a standard of achievement to be pursued in a spirit of partnership and mutual respect:

*Article 1*

Indigenous peoples have the right to the full enjoyment, as a collective or as individuals, of all human rights and fundamental freedoms as recognized in the Charter of the United Nations, the Universal Declaration of Human Rights[4] and international human rights law.

*Article 2*

Indigenous peoples and individuals are free and equal to all other peoples and individuals and have the right to be free from any kind of discrimination, in the exercise of their rights, in particular that based on their indigenous origin or identity.

---

[3] A/CONF.157/24 (Part I), chap. III.
[4] Resolution 217 A (III).

*Article 3*

Indigenous peoples have the right to self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

*Article 4*

Indigenous peoples, in exercising their right to self-determination, have the right to autonomy or self-government in matters relating to their internal and local affairs, as well as ways and means for financing their autonomous functions.

*Article 5*

Indigenous peoples have the right to maintain and strengthen their distinct political, legal, economic, social and cultural institutions, while retaining their right to participate fully, if they so choose, in the political, economic, social and cultural life of the State.

*Article 6*

Every indigenous individual has the right to a nationality.

*Article 7*

1.    Indigenous individuals have the rights to life, physical and mental integrity, liberty and security of person.

2.    Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples and shall not be subjected to any act of genocide or any other act of violence, including forcibly removing children of the group to another group.

*Article 8*

1.    Indigenous peoples and individuals have the right not to be subjected to forced assimilation or destruction of their culture.

2.    States shall provide effective mechanisms for prevention of, and redress for:

(*a*)    Any action which has the aim or effect of depriving them of their integrity as distinct peoples, or of their cultural values or ethnic identities;

(*b*)    Any action which has the aim or effect of dispossessing them of their lands, territories or resources;

(*c*)    Any form of forced population transfer which has the aim or effect of violating or undermining any of their rights;

(*d*)    Any form of forced assimilation or integration;

(*e*)    Any form of propaganda designed to promote or incite racial or ethnic discrimination directed against them.

*Article 9*

Indigenous peoples and individuals have the right to belong to an indigenous community or nation, in accordance with the traditions and customs of the

community or nation concerned. No discrimination of any kind may arise from the exercise of such a right.

*Article 10*

Indigenous peoples shall not be forcibly removed from their lands or territories. No relocation shall take place without the free, prior and informed consent of the indigenous peoples concerned and after agreement on just and fair compensation and, where possible, with the option of return.

*Article 11*

1.    Indigenous peoples have the right to practise and revitalize their cultural traditions and customs. This includes the right to maintain, protect and develop the past, present and future manifestations of their cultures, such as archaeological and historical sites, artefacts, designs, ceremonies, technologies and visual and performing arts and literature.

2.    States shall provide redress through effective mechanisms, which may include restitution, developed in conjunction with indigenous peoples, with respect to their cultural, intellectual, religious and spiritual property taken without their free, prior and informed consent or in violation of their laws, traditions and customs.

*Article 12*

1.    Indigenous peoples have the right to manifest, practise, develop and teach their spiritual and religious traditions, customs and ceremonies; the right to maintain, protect, and have access in privacy to their religious and cultural sites; the right to the use and control of their ceremonial objects; and the right to the repatriation of their human remains.

2.    States shall seek to enable the access and/or repatriation of ceremonial objects and human remains in their possession through fair, transparent and effective mechanisms developed in conjunction with indigenous peoples concerned.

*Article 13*

1.    Indigenous peoples have the right to revitalize, use, develop and transmit to future generations their histories, languages, oral traditions, philosophies, writing systems and literatures, and to designate and retain their own names for communities, places and persons.

2.    States shall take effective measures to ensure that this right is protected and also to ensure that indigenous peoples can understand and be understood in political, legal and administrative proceedings, where necessary through the provision of interpretation or by other appropriate means.

*Article 14*

1.    Indigenous peoples have the right to establish and control their educational systems and institutions providing education in their own languages, in a manner appropriate to their cultural methods of teaching and learning.

2.    Indigenous individuals, particularly children, have the right to all levels and forms of education of the State without discrimination.

ADD.0008

3. States shall, in conjunction with indigenous peoples, take effective measures, in order for indigenous individuals, particularly children, including those living outside their communities, to have access, when possible, to an education in their own culture and provided in their own language.

*Article 15*

1. Indigenous peoples have the right to the dignity and diversity of their cultures, traditions, histories and aspirations which shall be appropriately reflected in education and public information.

2. States shall take effective measures, in consultation and cooperation with the indigenous peoples concerned, to combat prejudice and eliminate discrimination and to promote tolerance, understanding and good relations among indigenous peoples and all other segments of society.

*Article 16*

1. Indigenous peoples have the right to establish their own media in their own languages and to have access to all forms of non-indigenous media without discrimination.

2. States shall take effective measures to ensure that State-owned media duly reflect indigenous cultural diversity. States, without prejudice to ensuring full freedom of expression, should encourage privately owned media to adequately reflect indigenous cultural diversity.

*Article 17*

1. Indigenous individuals and peoples have the right to enjoy fully all rights established under applicable international and domestic labour law.

2. States shall in consultation and cooperation with indigenous peoples take specific measures to protect indigenous children from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development, taking into account their special vulnerability and the importance of education for their empowerment.

3. Indigenous individuals have the right not to be subjected to any discriminatory conditions of labour and, inter alia, employment or salary.

*Article 18*

Indigenous peoples have the right to participate in decision-making in matters which would affect their rights, through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision-making institutions.

*Article 19*

States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them.

*Article 20*

1.    Indigenous peoples have the right to maintain and develop their political, economic and social systems or institutions, to be secure in the enjoyment of their own means of subsistence and development, and to engage freely in all their traditional and other economic activities.

2.    Indigenous peoples deprived of their means of subsistence and development are entitled to just and fair redress.

*Article 21*

1.    Indigenous peoples have the right, without discrimination, to the improvement of their economic and social conditions, including, inter alia, in the areas of education, employment, vocational training and retraining, housing, sanitation, health and social security.

2.    States shall take effective measures and, where appropriate, special measures to ensure continuing improvement of their economic and social conditions. Particular attention shall be paid to the rights and special needs of indigenous elders, women, youth, children and persons with disabilities.

*Article 22*

1.    Particular attention shall be paid to the rights and special needs of indigenous elders, women, youth, children and persons with disabilities in the implementation of this Declaration.

2.    States shall take measures, in conjunction with indigenous peoples, to ensure that indigenous women and children enjoy the full protection and guarantees against all forms of violence and discrimination.

*Article 23*

Indigenous peoples have the right to determine and develop priorities and strategies for exercising their right to development. In particular, indigenous peoples have the right to be actively involved in developing and determining health, housing and other economic and social programmes affecting them and, as far as possible, to administer such programmes through their own institutions.

*Article 24*

1.    Indigenous peoples have the right to their traditional medicines and to maintain their health practices, including the conservation of their vital medicinal plants, animals and minerals. Indigenous individuals also have the right to access, without any discrimination, to all social and health services.

2.    Indigenous individuals have an equal right to the enjoyment of the highest attainable standard of physical and mental health. States shall take the necessary steps with a view to achieving progressively the full realization of this right.

*Article 25*

Indigenous peoples have the right to maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands, territories, waters and coastal seas and other resources and to uphold their responsibilities to future generations in this regard.

*Article 26*

1.    Indigenous peoples have the right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired.

2.    Indigenous peoples have the right to own, use, develop and control the lands, territories and resources that they possess by reason of traditional ownership or other traditional occupation or use, as well as those which they have otherwise acquired.

3.    States shall give legal recognition and protection to these lands, territories and resources. Such recognition shall be conducted with due respect to the customs, traditions and land tenure systems of the indigenous peoples concerned.

*Article 27*

States shall establish and implement, in conjunction with indigenous peoples concerned, a fair, independent, impartial, open and transparent process, giving due recognition to indigenous peoples' laws, traditions, customs and land tenure systems, to recognize and adjudicate the rights of indigenous peoples pertaining to their lands, territories and resources, including those which were traditionally owned or otherwise occupied or used. Indigenous peoples shall have the right to participate in this process.

*Article 28*

1.    Indigenous peoples have the right to redress, by means that can include restitution or, when this is not possible, just, fair and equitable compensation, for the lands, territories and resources which they have traditionally owned or otherwise occupied or used, and which have been confiscated, taken, occupied, used or damaged without their free, prior and informed consent.

2.    Unless otherwise freely agreed upon by the peoples concerned, compensation shall take the form of lands, territories and resources equal in quality, size and legal status or of monetary compensation or other appropriate redress.

*Article 29*

1.    Indigenous peoples have the right to the conservation and protection of the environment and the productive capacity of their lands or territories and resources. States shall establish and implement assistance programmes for indigenous peoples for such conservation and protection, without discrimination.

2.    States shall take effective measures to ensure that no storage or disposal of hazardous materials shall take place in the lands or territories of indigenous peoples without their free, prior and informed consent.

3.    States shall also take effective measures to ensure, as needed, that programmes for monitoring, maintaining and restoring the health of indigenous peoples, as developed and implemented by the peoples affected by such materials, are duly implemented.

*Article 30*

1.    Military activities shall not take place in the lands or territories of indigenous peoples, unless justified by a relevant public interest or otherwise freely agreed with or requested by the indigenous peoples concerned.

2.    States shall undertake effective consultations with the indigenous peoples concerned, through appropriate procedures and in particular through their representative institutions, prior to using their lands or territories for military activities.

*Article 31*

1.    Indigenous peoples have the right to maintain, control, protect and develop their cultural heritage, traditional knowledge and traditional cultural expressions, as well as the manifestations of their sciences, technologies and cultures, including human and genetic resources, seeds, medicines, knowledge of the properties of fauna and flora, oral traditions, literatures, designs, sports and traditional games and visual and performing arts. They also have the right to maintain, control, protect and develop their intellectual property over such cultural heritage, traditional knowledge, and traditional cultural expressions.

2.    In conjunction with indigenous peoples, States shall take effective measures to recognize and protect the exercise of these rights.

*Article 32*

1.    Indigenous peoples have the right to determine and develop priorities and strategies for the development or use of their lands or territories and other resources.

2.    States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free and informed consent prior to the approval of any project affecting their lands or territories and other resources, particularly in connection with the development, utilization or exploitation of mineral, water or other resources.

3.    States shall provide effective mechanisms for just and fair redress for any such activities, and appropriate measures shall be taken to mitigate adverse environmental, economic, social, cultural or spiritual impact.

*Article 33*

1.    Indigenous peoples have the right to determine their own identity or membership in accordance with their customs and traditions. This does not impair the right of indigenous individuals to obtain citizenship of the States in which they live.

2.    Indigenous peoples have the right to determine the structures and to select the membership of their institutions in accordance with their own procedures.

*Article 34*

Indigenous peoples have the right to promote, develop and maintain their institutional structures and their distinctive customs, spirituality, traditions, procedures, practices and, in the cases where they exist, juridical systems or customs, in accordance with international human rights standards.

*Article 35*

Indigenous peoples have the right to determine the responsibilities of individuals to their communities.

*Article 36*

1.    Indigenous peoples, in particular those divided by international borders, have the right to maintain and develop contacts, relations and cooperation, including activities for spiritual, cultural, political, economic and social purposes, with their own members as well as other peoples across borders.

2.    States, in consultation and cooperation with indigenous peoples, shall take effective measures to facilitate the exercise and ensure the implementation of this right.

*Article 37*

1.    Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties, agreements and other constructive arrangements.

2.    Nothing in this Declaration may be interpreted as diminishing or eliminating the rights of indigenous peoples contained in treaties, agreements and other constructive arrangements.

*Article 38*

States in consultation and cooperation with indigenous peoples, shall take the appropriate measures, including legislative measures, to achieve the ends of this Declaration.

*Article 39*

Indigenous peoples have the right to have access to financial and technical assistance from States and through international cooperation, for the enjoyment of the rights contained in this Declaration.

*Article 40*

Indigenous peoples have the right to access to and prompt decision through just and fair procedures for the resolution of conflicts and disputes with States or other parties, as well as to effective remedies for all infringements of their individual and collective rights. Such a decision shall give due consideration to the customs, traditions, rules and legal systems of the indigenous peoples concerned and international human rights.

*Article 41*

The organs and specialized agencies of the United Nations system and other intergovernmental organizations shall contribute to the full realization of the provisions of this Declaration through the mobilization, inter alia, of financial cooperation and technical assistance. Ways and means of ensuring participation of indigenous peoples on issues affecting them shall be established.

ADD.0013

*Article 42*

The United Nations, its bodies, including the Permanent Forum on Indigenous Issues, and specialized agencies, including at the country level, and States shall promote respect for and full application of the provisions of this Declaration and follow up the effectiveness of this Declaration.

*Article 43*

The rights recognized herein constitute the minimum standards for the survival, dignity and well-being of the indigenous peoples of the world.

*Article 44*

All the rights and freedoms recognized herein are equally guaranteed to male and female indigenous individuals.

*Article 45*

Nothing in this Declaration may be construed as diminishing or extinguishing the rights indigenous peoples have now or may acquire in the future.

*Article 46*

1.    Nothing in this Declaration may be interpreted as implying for any State, people, group or person any right to engage in any activity or to perform any act contrary to the Charter of the United Nations or construed as authorizing or encouraging any action which would dismember or impair, totally or in part, the territorial integrity or political unity of sovereign and independent States.

2.    In the exercise of the rights enunciated in the present Declaration, human rights and fundamental freedoms of all shall be respected. The exercise of the rights set forth in this Declaration shall be subject only to such limitations as are determined by law and in accordance with international human rights obligations. Any such limitations shall be non-discriminatory and strictly necessary solely for the purpose of securing due recognition and respect for the rights and freedoms of others and for meeting the just and most compelling requirements of a democratic society.

3.    The provisions set forth in this Declaration shall be interpreted in accordance with the principles of justice, democracy, respect for human rights, equality, non-discrimination, good governance and good faith.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that Appellant's Opening Brief was filed with the Court and served on Appellee's counsel, Assistant U.S. Attorneys John S. Koppel and Abby Wright, on August 17, 2023, Pacific Time, by using the appellate court's CM/ECF system.

Dated this 17th day of August, 2023.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Appellant


*/s/ Joseph E. Horey*
By:_____
Joseph E. Horey