**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDREW SABLAN SALAS, | No. 22-16936 |
| *Plaintiff-Appellant*, | D.C. No. 1:22-cv-00008 |
| v. | |
| UNITED STATES OF AMERICA, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the District Court
for the Northern Mariana Islands
Ramona V. Manglona, Chief District Judge, Presiding

Argued and Submitted February 12, 2024
Honolulu, Hawaii

Filed August 27, 2024

Before: Richard A. Paez, Milan D. Smith, Jr., and Lucy H. Koh, Circuit Judges.

Opinion by Judge Koh;
Concurrence by Judge Paez

## SUMMARY[*]

### Animal Welfare Act

The panel affirmed the district court's dismissal of a complaint brought by a resident of the Commonwealth of the Northern Mariana Islands ("CNMI") alleging that the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "Covenant") precludes the application to the CNMI of a federal cockfighting prohibition.

The Animal Welfare Act ("AWA"), 7 U.S.C. § 2156, as amended in 1976, prohibited animal fighting, with an exception that if a state or territory's laws authorized cockfighting, then cockfighting in that state or territory was not federally prohibited. Because cockfighting was lawful in both Guam and the CNMI under each jurisdiction's own laws, cockfighting was not federally prohibited there until a 2018 Amendment to the AWA, which prohibited cockfighting in every United States jurisdiction.

The panel held that because 7 U.S.C. § 2156 existed on January 9, 1978, Covenant § 502—which determines the applicability of laws of the United States in existence on January 9, 1978, and subsequent amendments to such laws— governs whether 7 U.S.C. § 2156 and its 2018 Amendment are applicable to the CNMI. Applying § 502, the panel held that because 7 U.S.C. § 2156 was in existence when the Covenant took effect on January 9, 1978, and was applicable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to Guam and to the States generally, 7 U.S.C. § 2156 and its 2018 Amendment are applicable to the CNMI.

The panel held that Covenant § 105—which determines the applicability of laws enacted after January 9, 1978—does not govern the applicability of amendments to statutes in existence on January 9, 1978, and that Covenant § 502 alone governs. However, even if Covenant § 105 governs, 7 U.S.C. § 2156 and its 2018 Amendment would still apply to the CNMI because they are "applicable to the several States" and do not intrude impermissibly upon the internal affairs of the CNMI.

Concurring in the result, Judge Paez disagreed that Covenant § 502 alone governs whether 7 U.S.C. § 2156 and its 2018 Amendment apply to the CNMI, and would hold that Covenant § 105 also applies to amendments to laws in existence on January 9, 1978. Even so, however, plaintiff failed to demonstrate that 7 U.S.C. § 2156 and its 2018 Amendment impermissibly intrude upon the internal affairs of the CNMI.

## COUNSEL

Joseph E. Horey (argued), Banes Horey Berman & Miller LLC, Saipan, Northern Mariana Islands, for Plaintiff-Appellant.

Anne Murphy (argued), Trial Attorney, United States Department of Justice, Washington, D.C.; Abby C. Wright and John S. Koppel, Appellate Staff Attorneys; Shawn N. Anderson, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington,

D.C.; Jessica F. Cruz and Mikel W. Schwab, Assistant United States Attorneys, Office of the United States Attorney, Hagåtña, Guam; for Defendant-Appellee.

Jessica L. Blome, Greenfire Law PC, Berkeley, California, for Amici Curiae Animal Wellness Action, Animal Wellness Foundation, and The Center for a Humane Economy.

## OPINION

KOH, Circuit Judge:

Andrew Sablan Salas ("Salas"), a resident of the Commonwealth of the Northern Mariana Islands ("CNMI"), filed suit seeking a declaratory judgment stating that the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "Covenant"), Pub. L. No. 94-241, 90 Stat. 263 (1976), precludes the application to the CNMI of a federal cockfighting prohibition set forth in 7 U.S.C. § 2156 and its 2018 Amendment. Salas also sought an injunction barring the prohibition's enforcement. In response, the government filed a motion to dismiss. Finding that the federal cockfighting prohibition applied to the CNMI pursuant to the Covenant, the district court dismissed the complaint with prejudice. Salas appeals that decision. We conclude that 7 U.S.C. § 2156 and its 2018 Amendment apply to the CNMI. Accordingly, we affirm.

## LEGAL BACKGROUND

### I. The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States.

After Japan's defeat in World War II, the United Nations Trusteeship Council established the Trust Territory of the Pacific Islands, encompassing most of the islands of Micronesia formerly held by Japan, including the CNMI. *United States ex rel. Richards v. Guerrero*, 4 F.3d 749, 751 (9th Cir. 1993). The United Nations appointed the United States as the administering authority of the Trust Territory pursuant to a trusteeship agreement. *Id*. The agreement imposed on the United States a duty to "promote the development of the inhabitants of the trust territory toward self-government or independence." *Id*. In 1972, the United States entered formal negotiations with the Northern Mariana Islands as part of this obligation. *Id*.

In 1975, negotiations between the United States and the Northern Mariana Islands concluded with the signing of the Covenant. *Id*. The Covenant established "a self-governing commonwealth for the Northern Mariana Islands within the American political system" and "define[d] the future relationship between the Northern Mariana Islands and the United States." Pub. L. No. 94-241, 90 Stat. 263, 264 (1976). The Covenant was unanimously endorsed by the Northern Mariana Islands legislature on February 20, 1975, and approved by 78.8% of the people of the Northern Mariana Islands voting in a plebiscite held later that year. *Id*. at 263. The Covenant reflected the Northern Mariana Islands' "desire for political union with the United States" which "for over twenty years" had been "clearly expressed" through "public petition and referendum." *Id*. at 264.

In 1976, Congress approved and enacted the Covenant into law, the main provisions of which became effective on January 9, 1978. Proclamation 4534, 42 Fed. Reg. 56,593 (Oct. 24, 1977). Today, "the authority of the United States towards the CNMI arises solely under the Covenant." *Hillblom v. United States*, 896 F.2d 426, 429 (9th Cir. 1990). Because the Covenant created a "unique" relationship between the United States and the CNMI, its provisions alone define the boundaries of those relations. *N. Mariana Islands v. Atalig*, 723 F.2d 682, 684–87 (9th Cir. 1984).

The Covenant provides that certain provisions of the United States Constitution and certain United States statutes apply to the CNMI. For those laws not explicitly addressed, the Covenant provides formulae for determining whether a federal law will apply to the CNMI. Three sections of the Covenant are at issue in this case: § 103, § 105, and § 502. These sections outline which federal laws in existence on January 9, 1978, and which federal laws enacted thereafter apply to the CNMI.

Section 103 of the Covenant provides:

> The people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption.

Section 105 of the Covenant, which governs laws enacted after January 9, 1978, provides, in relevant part:

> The United States may enact legislation . . . which will be applicable to the Northern Mariana Islands, but if such legislation

cannot also be made applicable to the several States[,] the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands.

Section 502 of the Covenant, which governs the application of laws in effect on January 9, 1978, provides:

(a) The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

(1) those laws which provide federal services and financial assistance programs and the federal banking laws as they apply to Guam . . . .

(2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States; and

(3) those laws not described in paragraph (1) or (2) which are applicable to the Trust Territory of the Pacific Islands, but not their subsequent amendments unless specifically made applicable to the Northern Mariana Islands . . . .

Thus, under § 502(a)(2), a federal law that was both "applicable to Guam" and "applicable to the several States" on January 9, 1978, applies to the CNMI.

To facilitate the transition of the Northern Mariana Islands to its new political status, the Covenant established the Commission on Federal Laws ("Commission") to survey the laws of the United States and make recommendations to Congress as to which laws should be made applicable or inapplicable to the CNMI and to what extent and in what manner. Covenant § 504; *Micronesian Telecomms. Corp. v. NLRB*, 820 F.2d 1097, 1101 (9th Cir. 1987). In formulating its recommendations, the Commission considered the policies embedded in the law and the provisions and purposes of the Covenant. Covenant § 504. The Commission published its recommendations as interim reports to Congress until the Trust Territory's termination. *Id*.

In its second interim report, the Commission reported that it examined the chapters of Title 7 of the United States Code, including the chapter containing 7 U.S.C. § 2156, and found "[n]o significant problems in the application of these chapters to the Northern Mariana Islands." Commission on Federal Laws, Welcoming America's Newest Commonwealth: The Second Interim Report of the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States 229 (1985) ("Second Interim Report").

## II. The Animal Welfare Act and the Agriculture Improvement Act of 2018.

The Animal Welfare Act ("AWA"), established in 1966, sets forth standards for the humane care and treatment of animals. Pub. L. No. 89-544, 80 Stat. 350 (1966). In 1976, Congress amended the Animal Welfare Act to prohibit animal fighting. Pub. L. No. 94-279, 90 Stat. 417 (1976). That amendment, codified as 7 U.S.C. § 2156, is the pertinent version of § 2156 at issue here.

Section 2156 provided that "[i]t shall be unlawful for any person to knowingly sponsor or exhibit an animal in any animal fighting venture to which any animal was moved in interstate or foreign commerce." 7 U.S.C. § 2156(a) (1976). Section 2156(d) provided an exception stating that the prohibition of animal fighting ventures "shall be unlawful with respect to fighting ventures involving live birds only if the fight is to take place in a State where it would be in violation of the laws thereof." *Id.* § 2156(d). "State" was defined as "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." *Id*. § 2156(g)(4). Therefore, after 1976, cockfighting was federally unlawful in a particular state or territory only if that state or territory also deemed cockfighting unlawful. In other words, if a state or territory's laws authorized cockfighting, then cockfighting in that state or territory was not federally prohibited.

Because cockfighting was lawful in both Guam and the CNMI under each jurisdiction's own laws, cockfighting was not federally prohibited there under the AWA.

In 2018, Congress passed the Agriculture Improvement Act of 2018 ("AIA"), which amended the AWA. Section 12616 of the AIA, hereafter the "2018 Amendment," eliminated the cockfighting exception contained in 7 U.S.C. § 2156(d). Pub. L. No. 115-334, 132 Stat. 4490 (2018). The ultimate effect of the 2018 Amendment was "the prohibition of animal fighting ventures, including live-bird fighting, in every United States jurisdiction." *Club Gallístico de Puerto Rico Inc. v. United States*, 414 F. Supp. 3d 191, 200 (D.P.R. 2019) (citations omitted), *aff'd sub nom. Hernández-Gotay v. United States*, 985 F.3d 71 (1st Cir.), *cert. denied sub nom. Ortiz-Diaz v. United States*, 142 S. Ct. 336 (2021).

Thus, after the AIA went into effect, cockfighting was federally prohibited in both Guam and the CNMI.

## FACTUAL AND PROCEDURAL BACKGROUND

Until 2019, when the AIA prohibited cockfighting completely, Salas had been regularly and actively involved in cockfighting. After the passage of the AIA, Salas filed suit in the District Court for the Northern Mariana Islands, seeking a declaratory judgment stating that 7 U.S.C. § 2156 did not apply to the CNMI in 1978, and in turn, that the 2018 Amendment (eliminating the cockfighting exception) did not apply to the CNMI. Salas also sought an injunction prohibiting the U.S. government from enforcing those laws in the CNMI.

In his complaint, Salas advanced three legal theories as to why the Covenant precluded the application of the AWA's federal prohibition on cockfighting to the CNMI. First, Salas argued that because § 2156 was not a law of general application in 1978, it did not apply to the CNMI under Covenant § 502. Second, Salas asserted that § 2156 did not apply to the CNMI under § 105 because it could not be made applicable to the several states. Finally, Salas contended that the 2018 Amendment intrudes into the internal affairs of the CNMI in violation of Covenant § 103, which preserves the CNMI's right of local self-government.

The government moved to dismiss Salas's complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted the government's motion with prejudice. In its decision, the district court noted that § 502 "was the pertinent section of the Covenant to determine whether § 2156 applies to the CNMI" because § 2156 existed prior to 1978. Additionally, because the parties "agreed in their briefs and at the hearing

that section 502 of the Covenant governs, as opposed to section 105," the district court found it unnecessary to address whether § 105 of the Covenant precludes the application of § 2156 to the CNMI. For the reasons below, the district court determined that § 2156 applied to the CNMI because § 2156 was applicable to Guam and the several states as required by § 502 of the Covenant.

First, the district court found that § 2156 "was applicable to Guam" in 1978, explaining that although the § 2156(d) exception allowed cockfighting to remain legal in Guam, the lack of a cockfighting prohibition in Guam did not mean that the statute was not "applicable to Guam." The district court noted that Salas's argument that § 2156 needed to impose a federal cockfighting prohibition in Guam for it to apply to Guam under Covenant § 502, was "very similar to the government's unsuccessful argument" in *Northern Mariana Islands v. United States*, 279 F.3d 1070 (9th Cir. 2002), where the Ninth Circuit defined "applicable to Guam" to mean "applicable within" and "applicable with respect to" Guam. Because the Ninth Circuit's definition of "applicable to Guam" foreclosed "Plaintiff's proposed definition of 'apply,'" the district court found that § 2156 applies to Guam.

Next, the district court found that § 2156 was applicable to the several States under Covenant § 502. Because the Ninth Circuit in *Northern Mariana Islands* defined the phrase "applicable to Guam" to mean "applicable with respect to" and "applicable within" Guam," the district court held that § 502's phrase "general application to the several States" also meant "applicable within" and "applicable with respect to" the several States, as principles of statutory interpretation require a court to presume that the same words

and phrases have the same meaning when used in different parts of the same statute.

Finally, the district court determined that Covenant § 103 did not preclude the 2018 Amendment's application to the CNMI because § 502 governed, as opposed to § 105. Because Covenant § 502 governed, the requirement under § 103, that a federal law not intrude on the CNMI's internal affairs, was not implicated. Even if such a requirement were implicated, the district court explained that the federal interests in regulating interstate or foreign commerce, protecting the nation's values, and controlling the interstate spread of the avian flu outweighed any degree of intrusion. The district court declined to give Salas leave to amend his complaint, noting that Salas's request to plead more facts regarding the importance of cockfighting in the CNMI was unnecessary because the district court had presumed cockfighting regulation to be an internal affair of the CNMI. Additionally, leave to amend would be futile because the federal interests outweighed any intrusion caused by § 2156 and its 2018 Amendment. The district court thus dismissed Salas's complaint with prejudice. Salas timely appealed.

## STANDARD OF REVIEW

"We review de novo the dismissal of a complaint for failure to state a claim." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).

## DISCUSSION

The issue in this case is whether the district court properly dismissed Salas's complaint because the federal cockfighting prohibition, set forth in 7 U.S.C. § 2156 and its 2018 Amendment, applies to the CNMI. To address this question, we must first determine whether Covenant § 105

or § 502 governs. For the reasons below, we hold that
Covenant § 502 governs. However, under either section of
the Covenant, 7 U.S.C. § 2156 and its 2018 Amendment
apply to the CNMI.

## I. The Covenant's plain language establishes that § 502 governs.

The applicability of a federal law to the CNMI is guided
by whether § 502 or § 105 of the Covenant governs. *See
Richards*, 4 F.3d at 756. "When interpreting the meaning of
[a] statute, we look first to its plain language." *Infuturia
Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1137 (9th
Cir. 2011) (internal quotation marks omitted). According to
its terms, Covenant § 502 determines the applicability of
"laws of the United States in existence on [January 9, 1978]
and subsequent amendments to such laws." Covenant
§ 502(a). "Section 105 governs the application of federal
laws enacted after that date." *Richards*, 4 F.3d at 754. We
have held that the language of the Covenant "is clear and
unambiguous." *Micronesian Telecomms. Corp.*, 820 F.2d at
1101. "If the statutory language is plain, we must enforce the
statute according to its terms." *Rainero v. Archon Corp.*, 844
F.3d 832, 837 (9th Cir. 2016) (citing *Jimenez v. Quarterman*,
555 U.S. 113, 118 (2009)). Here, § 2156 existed on January
9, 1978. *See* Pub. L. No. 94-279, 90 Stat. 421 (1976).
Covenant § 502 thus governs whether § 2156 and its 2018
Amendment apply to the CNMI.

## II. Under Covenant § 502, 7 U.S.C. § 2156 and its 2018 Amendment apply to the CNMI.

Because § 502 of the Covenant governs, the test to
determine whether 7 U.S.C. § 2156 and its 2018 Amendment
apply to the CNMI is whether that law was "applicable to
Guam" and was "of general application to the several States"

prior to January 9, 1978. Covenant § 502(a)(2). Under this framework, we hold that § 2156 and its 2018 Amendment apply to the CNMI for the reasons below.

Salas argues that § 2156 was not "applicable to Guam" under the first prong of § 502 because cockfighting was legal under Guam's laws in 1978. In other words, because § 2156(d) exempted Guam from § 2156's animal fighting prohibition, the cockfighting prohibition did not "apply to Guam." As the district court noted, however, Salas appears to misconstrue what it means for a law to be "applicable to Guam." According to Salas, "[t]he plain meaning of 'apply' is to have some practical effect, and a law imposing a ban that bans nothing in a given place has no more practical effect in that place than a law that is never enacted in the first place." Salas's theory, however, contradicts the language of § 2156 and Ninth Circuit precedent.

First, the language of § 2156 clearly states that the law was meant to apply in every state and territory, including the CNMI. When interpreting a statute, we "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc*., 486 U.S. 281, 291 (1988); *see JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props. Inc.* (*In re Transwest Resport Props., Inc.*), 881 F.3d 724, 727 (9th Cir. 2018). Section 2156 made it a federal offense to sponsor or exhibit an animal in any "animal fighting venture" in which an animal was moved in interstate commerce, 7 U.S.C. §§ 2156(a), (e) (1976), including "live bird[s]," *id*. §§ 2156(g)(1), (4). Interstate commerce was defined as "any movement between any place in a State to any place in another State or between places in the same State through another State." *Id*. § 2156(g)(2). In turn, State meant "any State of the United States . . . and any territory

or possession of the United States." *Id*. § 2156(g)(4). Salas acknowledges that Guam falls under the definition of "State" because it is a U.S. territory. Thus, Salas concedes that § 2156 writ large was the law in Guam. Even without this concession, a statute that references the United States and its territories and possessions is a strong indication that it is meant to apply in the CNMI. *Misch ex rel. Est. of Misch v. Zee Enters., Inc*., 879 F.2d 628, 631 (9th Cir. 1989) ("[T]he Act itself strongly indicates that it is meant to apply in the CNMI by expressly barring relief to those seamen who [worked] . . . 'in the territorial waters or waters overlaying the continental shelf of a nation other than the United States, *its territories, or possessions*.'" (quoting 46 U.S.C. App. § 688(b)(1))).

Second, we rejected a theory like the one Salas advances in *Northern Mariana Islands v. United States*. There, the government argued that amendments to the federal Quiet Title Act that exempted the States, but not Guam, from the act's statute of limitations were not "applicable to Guam" under Covenant § 502. 279 F.3d at 1072–74. We rejected the government's theory, explaining that "[t]he Covenant's framers considered the term 'applicable to Guam' to mean not only 'applicable with respect to' Guam, but also to mean 'applicable within' Guam." *Id*. at 1073. As a result, that "the amendments themselves did not exempt Guam from [the act's] statute of limitations" did not mean the amendments were not applicable to Guam within the meaning of Covenant § 502(a)(2). *Id.* at 1073–74. "That is, the amendments, regardless of their treatment of Guam, are law within Guam." *Id*. at 1073. We thus rejected understanding "applicable to Guam" in Covenant § 502 to mean that a federal law must have a practical effect in Guam for the law to apply. Therefore, § 2156(d) was applicable to Guam in

1978, satisfying the first prong ("applicable to Guam") of § 502's two-part test.

For the second prong ("of general application to the several States"), Salas asserts the same theory. Specifically, Salas argues that § 2156 was not of "general application to the several states" because it was applicable to the states "only variably and selectively," "depending on whether cockfighting was or was not already prohibited by their own laws," In interpreting statutes, "the same words or phrases are presumed to have the same meaning when used in different parts of a statute." *Prieto-Romero v. Clark*, 534 F.3d 1053, 1061 n.7 (9th Cir. 2008) (internal quotation marks omitted). Thus, the meaning of "application to Guam" should be consistent with the meaning of "application to the several States." Because application to Guam is understood to mean "applicable with respect to" and "applicable within" Guam, it follows that "application to the several States" likewise means "applicable with respect to" and "applicable within" the several States. *See N. Mariana Islands*, 279 F.3d at 1073. Therefore, § 2156 "was of general application to the several states" for the same reasons that § 2156 was "applicable to Guam," as discussed above.

Because § 2156 was in existence on January 9, 1978, and was applicable to Guam and to the States generally, § 2156 and its 2018 Amendment prohibiting cockfighting are applicable to the CNMI under Covenant § 502.[1] *United*

---

[1] Our conclusion is consistent with the Commission on Federal Laws's own determination that Title 7 of the U.S. Code, which includes § 2156, is applicable to the CNMI. Second Interim Report 299. This factor "point[s] unequivocally in favor of [the law at issue] applying in the Commonwealth." *Misch*, 879 F.2d at 630 (holding that the Jones Act applied to the CNMI based, in part, on the Commission on Federal Laws's conclusion that the act applied to the CNMI).

*States v. Dela Cruz*, 358 F.3d 623, 625 (9th Cir. 2004) (where other conditions of § 502 were met, "[t]he only inquiry for this court is therefore whether [the challenged law] was in existence on [January 9, 1978]").

### III. Covenant § 105 does not govern the applicability of amendments to statutes in existence on January 9, 1978.

In the district court, Salas argued that either (1) both § 2156 and its 2018 Amendment were governed by Covenant § 502, or (2) the 2018 Amendment was "a new law enacted in 2018" that was instead governed by Covenant § 105. As we have explained, § 2156 and its 2018 Amendment are governed by § 502; Salas's argument in the alternative is incorrect. Now on appeal, however, Salas contends that Covenant § 105 must also govern the applicability of the 2018 Amendment—indeed, all amendments to statutes in existence on January 9, 1978— notwithstanding the applicability of § 502. We disagree.

First, "in the absence of strong evidence that Congress intended a different meaning," "we must interpret statutory terms by their plain meaning." *N. Mariana Islands*, 279 F.3d at 1072 (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 548 (1987)). The language of the Covenant, which is "clear and unambiguous," *Micronesian Telecomms. Corp.*, 820 F.2d at 1101, states that § 502 governs the applicability to the CNMI of "laws of the United States in existence on [January 9, 1978] and subsequent amendments to such laws." Salas offers no evidence, let alone "strong evidence," that Congress intended § 502 to possess a meaning different from its plain meaning. At oral argument, Salas could point to no case, nor does our research reveal any, in which the applicability of a federal law was governed

by both § 105 and § 502. We thus interpret § 502 consistent with its plain meaning.

Second, consistent with the statutory language, Ninth Circuit precedent also holds that § 502 governs the applicability of amendments to laws that existed on January 9, 1978, even if the amendments were enacted after that date. In holding the 1986 Quiet Title Act amendments applicable to the CNMI under Covenant § 502 in *Northern Mariana Islands*, as noted above, we explained that "the 1986 amendments became part of the Quiet Title Act." 279 F.3d at 1073. As a result, because the Quiet Title Act itself was applicable to the CNMI under § 502, so too were the 1986 amendments. *Id*. at 1073–74.[2]

---

[2] The concurrence asserts that *Northern Mariana Islands* does not control the resolution of this issue because the court in that case was not presented with the argument that both § 105 and § 502 governed. In other words, the concurrence would have us disregard *Northern Mariana Islands*'s interpretation and application of § 502 because the court did not consider § 105 when it analyzed § 502. We respectfully disagree. In determining that the amendments at issue met § 502's requirements, the *Northern Mariana Islands* court reasoned that § 502 encompasses amendments of laws that are applicable to the CNMI as amendments become part of the original law. We remain bound by this well-reasoned analysis. *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense."); *Marshall Naify Revocable Tr. v. United States*, 672 F.3d 620, 627 (9th Cir. 2012) ("[W]e treat reasoning central to a panel's decision as binding later panels."). In other words, *Northern Mariana Islands* "squarely address[ed]" the issue whether § 502 encompasses amendments, even if it did not consider a potential counterargument. *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).

Third, we note that the Commission on Federal Laws, tasked with assisting Congress in determining the applicability of federal laws to the CNMI, also understood § 105 to govern only those laws enacted after January 9, 1978, that are not amendments to statutes enacted prior to that date. Second Interim Report 30–31 (noting that "[d]etermining the applicability to the Northern Mariana Islands of statutes enacted after January 9, 1978, that are not amendments of statutes enacted prior to that date is relatively simple" and is accomplished by applying the "rule of statutory construction" in § 105).[3]

Finally, Salas's argument overlooks the purpose of § 502 and § 105. Section 502 was designed to establish a "workable body of law" for the CNMI upon its inception as a self-governing commonwealth on January 9, 1978. *To Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands," and for Other Purposes: Hearing on H.J. Res. 549, 550 and 547 Before the Subcomm.*

---

[3] The concurrence makes much of the fact that a portion of the Second Interim Report was superseded by the Commission on Federal Laws's Final Report. As an initial matter, our court has continued to rely on the Second Interim Report's recommendations, which in turn necessarily rely on the analysis contained in the portions of the report that were superseded, even after the publication of the Final Report. *See, e.g.*, *Fang Lin Ai v. United States*, 809 F.3d 503, 513–14 (9th Cir. 2015). At least one other court of appeals, too, has found the Second Interim Report to be a helpful tool in interpreting the Covenant notwithstanding the existence of the Final Report. *See Xianli Zhang v. United States*, 640 F.3d 1358, 1373–74 (Fed. Cir. 2011). In any event, we need not resort to this history because, as explained above, the Covenant's language is clear. *See Church of Scientology of Cal. v. U.S. Dep't of Just.*, 612 F.2d 417, 421 (9th Cir. 1979) ("[I]f the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the language by resorting to the legislative history or other extrinsic aids.").

*on Territorial & Insular Affs. of the H. Comm. on Interior & Insular Affs.*, 94th Cong. 388 (1975). On the other hand, § 105 granted Congress the right to enact laws applicable to the CNMI post-inception so long as the laws also applied to the several States or otherwise named the CNMI specifically. *Id*. at 630–32. To hold that both § 105 and § 502 govern the applicability of amendments to pre-existing federal laws would eliminate this distinction. *Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1005 (9th Cir. 2011) ("[W]e may not read a statute's plain language to produce a result contrary to the statute's purpose or lead to unreasonable results." (internal quotation marks omitted)).

Against this evidence, Salas and the concurrence point to § 502(a)'s preamble stating that laws and subsequent amendments to those laws apply to the Northern Mariana Islands "except as otherwise provided in this Covenant." Under Salas's interpretation, § 502 is subordinate to § 105, notwithstanding § 502's clear instruction to treat amendments to laws that existed on the Covenant's effective date the same as those laws themselves. We find this contention unpersuasive. Salas's argument hinges on the premise that "subsequent amendments" to laws in effect on the Covenant's effective date do not automatically apply to the Northern Mariana Islands but rather must meet § 105's requirements, just like entirely new legislation. Section 502(a)'s vague reference to "except as otherwise provided in this Covenant" is insufficient evidence in favor of Salas's position.

Moreover, if subsequent amendments were treated like new legislation for purposes of applying § 105's requirements, then we would expect to see some textual evidence distinguishing between laws in effect on the Covenant's effective date and subsequent amendments to

those laws. We see no such evidence. Indeed, the one provision that does *not* treat "subsequent amendments" identically to existing laws is § 502(a)(3), which exempts "subsequent amendments" to certain laws "unless specifically made applicable to the Northern Mariana Islands." In our view, the absence of similar language from the remainder of § 502(a) evinces an intent to treat other laws in effect on the Covenant's effective date and their subsequent amendments the same. *See, e.g.*, *United States v. Lopez*, 998 F.3d 431, 440 (9th Cir. 2021) (discussing canon against surplusage), *abrogated in part on other grounds by Pulsifer v. United States*, 601 U.S. 124 (2024).

At bottom, Salas's (and the concurrence's) position is that there is no conflict between treating laws in effect on the Covenant's effective date and their subsequent amendments the same on the one hand, and yet subjecting subsequent amendments to laws in effect on the Covenant's effective date to § 105's requirements as though they are new laws on the other. For all the reasons discussed above, we respectfully disagree. Accordingly, we hold that § 502 alone governs whether § 2156 and its 2018 Amendment apply to the CNMI.

## IV. Even if Covenant § 105 governs, 7 U.S.C. § 2156 and its 2018 Amendment would still apply to the CNMI.

Even if Covenant § 105 governs, which requires laws to be applicable to the several States or otherwise name the CNMI, § 2156 and its 2018 Amendment would still apply to the CNMI because they are "applicable to the several States." Moreover, the federal interests advanced by § 2156 and its 2018 Amendment are significant, outweighing any intrusion into the internal affairs of the CNMI.

### A. 7 U.S.C. § 2156 and its 2018 Amendment are "applicable to the several States."

Under Covenant § 105, "the United States may legislate with respect to the CNMI, 'but if such legislation cannot also be made applicable to the several States[,] the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands.'" *Richards*, 4 F.3d at 754 (quoting Covenant § 105). Salas argues that the federal cockfighting prohibition cannot apply to the several States because state law in all fifty States already prohibited cockfighting. However, as explained above, under the Covenant the applicability of a federal law to the States is not based on the law's practical effect in the States. Section 2156 and its 2018 Amendment are thus "applicable to the several States" under § 105 and need not name the CNMI to apply.

### B. 7 U.S.C. § 2156 and its 2018 Amendment do not intrude impermissibly upon the internal affairs of the CNMI under Covenant § 103 and § 105.

Finally, Salas argues that § 2156 and its 2018 Amendment do not apply to the CNMI because they intrude upon the CNMI's right to local self-government as guaranteed by § 103 and § 105 of the Covenant. We disagree.

Covenant § 103 guarantees the people of the CNMI the ability to "govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption." Covenant § 103. In turn, Covenant § 105 "prevent[s] any inadvertent interference by Congress with the internal affairs of the Northern Mariana Islands to a greater extent than with those of the several States." *Richards*, 4 F.3d at 754 (citation omitted). As a result, the United States must "have an

identifiable federal interest that will be served by" the legislation it seeks to apply to the CNMI. *Id.* Congress is not precluded from passing legislation affecting the internal affairs of the CNMI. *Id*. at 755. Rather, a court must "balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI." *Id*.

This balancing test, however, is unnecessary for statutes enacted before January 9, 1978, and thus governed by Covenant § 502. *United States v. Chang Da Liu*, 538 F.3d 1078, 1084 (9th Cir. 2008) ("For legislation enacted after [January 9, 1978], we balance the federal interests served by the legislation against the degree of intrusion into local affairs.").[4] Because Covenant § 502 alone governs, as discussed above, we need not conduct the *Richards* balancing test. Nonetheless, even if § 105 governed, the federal interests served by § 2156 and its 2018 Amendment would outweigh any intrusion into the CNMI's current internal affairs.

## 1.  We presume the regulation of cockfighting to be an internal affair of the CNMI.

At the motion to dismiss stage, we must accept all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, and material allegations, even if doubtful in fact, are assumed to be true. *See Cedars–Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The district court

---

[4] Indeed, although the government cited *Chang Da Liu* in its answering brief for the proposition that the *Richards* balancing test is unnecessary for statutes governed by § 502, Salas's reply failed to respond to this point.

presumed the regulation of cockfighting to be an internal affair of the CNMI,[5] and we do the same.[6]

## 2. 7 U.S.C. § 2156 and its 2018 Amendment serve significant federal interests.

We next balance the federal interests to be served by § 2156 and its 2018 Amendment against the degree of intrusion into this presumed internal affair of the CNMI. The

---

[5] At the hearing below, Salas requested leave to amend the complaint to plead more facts regarding the importance of cockfighting in the CNMI. The district court found additional facts to be unnecessary as it had presumed cockfighting to be an internal of affair of the CNMI. Moreover, as the district court correctly noted, additional facts about how deeply entrenched cockfighting is in the CNMI would be futile. *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) ("[Leave to amend] is properly denied . . . if amendment would be futile."). First, weighing the federal interest against the degree of intrusion into the CNMI's local affairs per the *Richards* test is unnecessary for statutes enacted before January 9, 1978. *See Chang Da Liu*, 538 F.3d at 1084 (citing *Richards*, 4 F.3d at 755). Second, as we explain below, even if we employ the *Richards* balancing test, the federal interests in regulating interstate commerce, ensuring the humane treatment of animals, and preventing the spread of avian flu outweigh any intrusion into the CNMI's internal affairs.

[6] Despite this presumption, we note that Salas may not have established that the interstate regulation of cockfighting concerns an internal affair of the CNMI. Salas presents evidence indicating that Guamanian men enjoyed cockfighting in the 1700s and 1800s, as well as evidence that cockfighting has taken place in Bali, Cuba, Puerto Rico, and the Philippines. None are relevant to whether the regulation of cockfighting is an internal affair of the CNMI. Regarding the CNMI, Salas cites a book excerpt stating that cockfighting occurred there, without context or time period, and points to an essay from the 1900s, when the islands were under German rule, noting the occurrence of cockfighting to be an activity from "Spanish times." Such evidence, however, does not resolve whether cockfighting is integral to and thus an internal affair of the CNMI today.

government asserts that the United States has an interest in regulating animal fighting, including cockfighting, because of its significant effect on interstate commerce and potential to spread avian flu. Salas, on the other hand, challenges these asserted interests, arguing that the animal fighting prohibition is instead motivated only by Congress's subjective, "moral distaste" for the sport. To the contrary, as discussed below, in regulating animal fighting under the AWA, Congress sought to relieve the burden of animal fighting on interstate commerce, ensure the humane treatment of animals, and prevent the spread of avian flu, all of which are significant federal interests.

When determining legislative intent, we look to specific expressions of legislative intent in the statute itself. *See Cal. Tow Truck Ass'n v. City & County of San Francisco*, 693 F.3d 847, 859 (9th Cir. 2012); *see also Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023) ("A preamble, purpose clause, or recital is a permissible indicator of meaning." (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 217 (2012))). We may also look to the legislative history, including congressional committee findings. *See Garcia v. United States*, 469 U.S. 70, 76 (1984) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." (alteration and internal quotation marks omitted)).

Here, the statement of findings contained in the AWA expressly states that Congress sought to eliminate the burden

of animal fighting ventures on interstate commerce and assure the humane treatment of animals in such commerce:

> The Congress finds that animals and activities which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof, and that regulation of animals and activities as provided in this chapter is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce, in order . . . to assure the humane treatment of animals during transportation in commerce . . . .

7 U.S.C. § 2131.

The AWA's congressional committee findings show the same. *See* H.R. Rep. No. 94-801, at 10 (1976) ("[The AWA] is necessary to prevent and eliminate burden upon [interstate or foreign] commerce, to effectively regulate such commerce, to protect the human values of this great Nation from the subversion of dehumanizing activities, and to carry out the objectives of the Act.").

The government also asserts, and the district court agreed, that the cockfighting prohibition serves to prevent the spread of avian flu, offering statements made by members of Congress to that effect. *E.g.*, 153 Cong. Rec. S451 (daily ed. Jan. 11, 2007) (statement of Sen. Cantwell) ("Interstate and international transport of birds for cockfighting is known to have contributed to the spread of avian influenza in Asia and poses a threat to poultry and public health in the United States."); 153 Cong. Rec. E2

SALAS V. USA                27

(daily ed. Jan. 5, 2007) (statement of Rep. Gallegly) ("There is the additional concern that cockfighters spread diseases that jeopardize poultry flocks and even public health."). Although "comments by legislators are generally less authoritative than official committee reports, they nonetheless may be persuasive authority" as to statutory intent. *U.S. Aviation Underwriters Inc. v. Nabtesco Corp*., 697 F.3d 1092, 1099 n.3 (9th Cir. 2012) (citations omitted). Evidence that Congress may have also sought to prevent the spread of avian flu by restricting, and ultimately prohibiting, cockfighting reinforces the conclusion that the prohibition serves significant federal interests.

Thus, Congress's interests in regulating animal fighting to relieve its burden on interstate commerce, ensure the humane treatment of animals, and prevent the spread of avian flu are significant, not illusory, as Salas suggests.[7] Because these federal interests outweigh any intrusion into the CNMI's internal affairs, neither § 103 nor § 105 preclude § 2156 and its 2018 Amendment's application to the CNMI.[8]

---

[7] Salas does not challenge Congress's ability to regulate interstate commerce through the AWA. Nor could he. "The authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained and is no longer open to question." *United States v. Lopez*, 514 U.S. 549, 558 (1995) (cleaned up).

[8] Salas can point to no case, nor does our research reveal any, in which we have held a federal law inapplicable to the CNMI under § 105. We do not foreclose the possibility that a federal law can impermissibly intrude upon the CNMI's internal affairs, which would preclude its application under Covenant § 103 and § 105. Our decision holds only that § 2156 and its 2018 Amendment do not.

## **CONCLUSION**

For the foregoing reasons, we affirm the district court's judgment.

**AFFIRMED**.

---

PAEZ, Circuit Judge, concurring in the result:

I concur in the court's judgment. Respectfully, however, I disagree that "§ 502 alone governs whether § 2156 and its 2018 Amendment apply to the [Commonwealth of the Northern Mariana Islands ("CNMI")]."[1] Maj. Op. at 21. In my view, the majority's analysis with respect to this point is incomplete, overlooking that the Covenant must be interpreted as a whole. Following this approach, I would hold that, based on the Covenant's plain text and "every other interpretive tool," § 105 also applies to amendments to

---

[1] The pertinent language of § 502 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant") provides:

> The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant: . . . (2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States[.]

laws in existence on January 9, 1978.**2** *Saipan Stevedore Co. Inc. v. Dir., Off. of Workers' Comp. Programs*, 133 F.3d 717, 723 (9th Cir. 1998). As I explain below, such amendments constitute "legislation" as set out in § 105 and therefore must comply with that provision. Even so, however, Salas has failed to demonstrate that § 2156 and its 2018 Amendment "impermissibly intrude[] on the internal affairs of the CNMI." *U.S. ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 755 (9th Cir. 1993). I would thus affirm the district court for the reasons discussed by the majority in Part IV of its opinion. *See* Maj. Op. at 21–27.

## I.

This case involves a question of first impression: whether § 105 of the Covenant applies to amendments to laws in existence on January 9, 1978. To be sure, we have previously held that "Section 502 governs the application to the CNMI of federal laws existing prior to January 9, 1978, and that Section 105 governs the application of federal laws

---

[2] Section 105 of the Covenant provides:

> The United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands, but if such legislation cannot also be made applicable to the several States the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands. In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles, I II and III and Section 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

enacted after that date." *Richards*, 4 F.3d at 756. But *Richards* and later cases, which discuss the applicability of *laws* in existence on January 9, 1978, to the CNMI, do not shed light on the question of "subsequent amendments to such laws." Covenant § 502. That question is squarely presented in this case.

Importantly, *Northern Mariana Islands v. United States*, 279 F.3d 1070 (9th Cir. 2002)—one of the only Ninth Circuit opinions to address amendments to laws in existence on January 9, 1978—does not settle the matter. In *Northern Mariana Islands*, we considered whether amendments to the Quiet Title Act were applicable to the CNMI under the terms of the Covenant. We ultimately determined that they were, concluding:

> Because the Quiet Title Act was in existence on January 9, 1978, and because the Quiet Title Act is applicable to Guam and to the States generally, the Quiet Title Act and its amendments are applicable to the CNMI "as they are applicable to the several States," under the terms of section 502(a)(2).

*Id.* at 1073 (footnotes omitted).

The majority understandably relies on *Northern Mariana Islands* as evidence that only "§ 502 governs the applicability of amendments to laws that existed on January 9, 1978, even if the amendments were enacted after that date." Maj. Op. at 18. Yet the parties in that case never presented the court with the argument that *both* § 105 and

§ 502 applied.  Indeed, the parties did not brief the issue,[3] and § 105 appears nowhere in the opinion.  *Northern Mariana Islands* thus does not control how we should resolve this important question of territorial law.  *See United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("Prior precedent that does not 'squarely address' a particular issue does not bind later panels on the question." (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993))); *United States v. Marin*, 90 F.4th 1235, 1240 (9th Cir. 2024) (observing that "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents" (cleaned up) (internal quotation marks omitted) (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004))).[4]

---

[3] In *Northern Mariana Islands*, the parties did not argue over which sections of the Covenant applied to the amendments to the Quiet Title Act.  Rather, both parties agreed that § 502 applied, and the key dispute was whether the amendments met § 502's requirements.  *See* Opening Brief, *N. Mariana Islands v. United States*, 279 F.3d 1070, 2000 WL 33982882, at *7; Answering Brief, *N. Mariana Islands v. United States*, 279 F.3d 1070, 2000 WL 33984520, at *13–14 & n.9, *31; Reply Brief, *N. Mariana Islands v. United States*, 279 F.3d 1070, 2000 WL 33982268, at *7–11.  Notably, however, the CNMI nonetheless assumed that both provisions applied, even though that issue was not litigated.  *See* Reply Brief, *N. Mariana Islands v. United States*, 279 F.3d 1070, 2000 WL 33982268, at *8–*9 & n.18.

[4] The majority suggests that I mean to "disregard *Northern Mariana Islands*'s interpretation and application of § 502 because the court did not consider other evidence (that is, § 105) when it analyzed § 502." Maj. Op. at 18 n.2.  Not at all.  Indeed, I do not dispute that "§ 502 encompasses amendments of laws that are applicable to the CNMI as amendments become part of the original law."  Maj. Op. at 18 n.2.

As this case demonstrates, an amendment to a law can be just as far-reaching as the original law itself. The question of whether § 105 also applies to an amendment of a law in existence on January 9, 1978, is thus an important one. We should not imply an answer from *Northern Mariana Islands* to dispose of the matter. *See Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 938 (9th Cir. 2007) ("We are not required to follow what amounts to, at most, an implicit assumption, because '[s]uch unstated assumptions on non-litigated issues are not precedential holdings binding future decisions.'" (alteration in original) (quoting *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985))).

## II.

Turning to the merits, we must ascertain the statute's plain meaning by "look[ing] to the particular statutory language at issue, as well as the particular language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).[5] In my view, given the Covenant's plain text, § 105 applies to all federal "legislation" enacted after January 9, 1978, including original "laws" not in existence on January 9, 1978, and "subsequent amendments to [existing] laws." Covenant

---

Rather, and as I explained above, the panel in *Northern Mariana Islands* was never presented with the argument that both § 105 and § 502 could apply. We are thus not bound by *Northern Mariana Islands* as to this separate issue.

[5] We have interpreted the Covenant to be "a congressionally approved compact that is both a contract and a statute such that resort to extrinsic evidence of the Covenant's negotiations is entirely appropriate." *Fang Lin Ai v. United States*, 809 F.3d 503, 507 n.4 (9th Cir. 2015) (cleaned up) (quoting *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991)).

§ 502. In addition, and to the extent there is any remaining ambiguity, the Covenant's structure and purpose, practical effects, and legislative history further support this interpretation.

## A.

I begin with *Richards*, where we interpreted § 105. In that case, we first acknowledged that "Congress' legislative authority over the Commonwealth derives from Section 105." 4 F.3d at 754. We then held:

> To give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105, we think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI.

*Id.* at 755.

Importantly, our analysis in *Richards* adhered to the plain text of the Covenant, referring consistently to "legislation." *Id.* at 754–55. And though we did not define the term in that case, the proper analysis for doing so is straightforward. The ordinary plain meaning of "legislation" is "the enactments of a legislator or a legislative body." Merriam-Webster Dictionary, "legislation," https://www.merriam-webster.com/dictionary/legislation (last accessed Aug. 15, 2024); *see also* LEGISLATION, Black's Law Dictionary (12th ed. 2024) ("The law so enacted; collectively, the formal utterances of the legislative organs of government."). Given these definitions, there can be no question that both original "laws" and "subsequent

amendments to [existing] laws," Covenant § 502, constitute "legislation" that "[t]he United States may enact" as contemplated by § 105.

Unsurprisingly, the majority does not refute this point. In fact, the majority does not construe § 105 at all, even though we must examine both "the particular statutory language at issue, *as well as* the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291 (emphasis added). Instead, the majority focuses only on § 502, reasoning that this provision controls the immediate case because it references the applicability of "laws of the United States in existence on [January 9, 1978] and subsequent amendments to such laws." Maj. Op. at 13 (alteration in original) (quoting Covenant § 502). This uncontroversial proposition, however, in no way suggests that § 105 cannot also apply. In circumstances where two provisions may be applicable, we do not merely disregard one or the other. Rather, we apply the "elementary canon of construction that an interpretation which gives effect to all sections of a statute is preferred." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1175 (9th Cir. 2002).

In this case, giving effect to all sections of the Covenant requires that § 105 encompass all "legislation," even amendments to laws in existence on January 9, 1978. A narrower interpretation—for example, that "legislation" refers only to *laws* not in existence on January 9, 1978— would create an exception to § 105 not found in the Covenant. This, in turn, would also run afoul of the canon against surplusage. *See United States v. Lopez*, 998 F.3d 431, 440 (9th Cir. 2021) ("This canon of construction requires a court, if possible, to give effect to each word and clause in a statute.").

Moreover, reading the Covenant to apply both provisions to such amendments is further supported by examining § 502.  As Salas argues, § 502(a) (emphasis added) provides that:

> The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, *except as otherwise provided in this Covenant*[.]

Section 502(a) thus appears to contemplate that its own requirements operate subordinately to or in conjunction with those of other provisions, including § 105.[6]  *Cf. Arizona All. for Cmty. Health Centers v. Arizona Health Care Cost Containment Sys.*, 47 F.4th 992, 999 (9th Cir. 2022) (observing that "[p]articular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme" (alteration in original) (quoting *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015))).  There is no textual reason to read these provisions as being in conflict

---

[6] The majority confusingly responds that "if subsequent amendments were treated like new legislation for purposes of applying § 105's requirements, then we would expect to see some textual evidence distinguishing between laws in effect on the Covenant's effective date and subsequent amendments to those laws." Maj. Op. at 20–21. But if the drafters of the Covenant believed that the document would be examined as a whole and that § 105 applied to all "legislation" subsequently enacted by Congress—as is evident from, *inter alia*, their inclusion of the language "except as otherwise provided in this Covenant" in § 502—there is no reason why they would need to specify anything more.

with one another, and we should correspondingly interpret the Covenant to give effect to both.

**B.**

If the plain text were to leave any ambiguity,[7] the Covenant's structure and purpose, practical effects, and legislative history leave no doubt that both provisions apply.

First, a reading of § 105 that encompasses amendments to laws in existence on January 9, 1978, conforms with the document's structure and purpose. With respect to structure, the Covenant makes clear that certain provisions of the document are "fundamental," "namely Articles I, II and III and Section 501 and 805." Covenant § 105. It therefore makes sense that § 502 (and the analysis that the provision requires) is subordinate to § 105, which is found in Article I.

With respect to purpose, it is evident that at least one of the guiding principles of the Covenant is self-government. *See* Covenant Preamble (recognizing the CNMI's right to "express their wishes for self-government or independence" and "desire . . . to exercise their inalienable right of self–determination"); Covenant § 103 ("The people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their

---

[7] The majority repeatedly cites *Micronesian Telecommunications Corp. v. N.L.R.B.*, 820 F.2d 1097, 1101 (9th Cir. 1987), *amended*, (9th Cir. Sept. 2, 1987), for the proposition that § 502 is "clear and unambiguous." Maj. Op. at 13, 17 (citing *Micronesian Telecommunications Corp.*, 820 F.2d at 1101). But *Micronesian Telecommunications Corp.* exclusively interpreted § 502 and dealt only with *laws* in existence on January 9, 1978, not "subsequent amendments to such laws." Covenant § 502. Thus, for the reasons already discussed, the cited language from *Micronesian Telecommunications Corp.* is of limited utility here.

own adoption."); Covenant § 105 ("In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of [its legislative] authority . . . .").[8] To allow some "legislation" to escape the reach of § 105—which we have interpreted to incorporate the right of self-government enshrined in § 103, *see Richards*, 4 F.3d at 755—would consequently undermine one of the Covenant's guiding principles.[9, 10]

---

[8] Further evidence that self-government is one of the Covenant's guiding principles is that the Covenant was ratified with the goals of the antecedent trusteeship in mind. *See Micronesian Telecommunications Corp.*, 820 F.2d at 1101 ("The 1976 Covenant was designed so the Commission [on Federal Laws] could take into consideration those laws that might defeat the goals of the trustee agreement."). And as we have recognized, two of the "purposes of the trusteeship agreement" were "self-government and economic self-sufficiency." *Id.*; *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1461 (9th Cir. 1990) ("And we must be mindful also that the preservation of local culture and land is more than mere desideratum—it is a solemn and binding undertaking memorialized in the Trusteeship Agreement.").

[9] The majority suggests that this interpretation "overlooks the purpose of § 502 and § 105." Maj. Op. at 19. As the majority points out, the purpose of § 502 was to "establish a 'workable body of law' for the CNMI upon its inception as a self-governing commonwealth on January 9, 1978." Maj. Op. at 19 (citation omitted). "On the other hand, § 105 granted Congress the right to enact laws applicable to the CNMI post-inception so long as the laws also applied to the several States or otherwise named the CNMI specifically." Maj. Op. at 20. It is far from clear, however, how the purposes of these provisions, even if distinct, are in conflict.

[10] In fact, when determining whether application of a statute to the CNMI is "inconsistent with the purposes of the trusteeship agreement or the Covenant," our caselaw has examined whether application of that statute would be "incompatible with the history or culture of the

Second, the practical results of the majority's interpretation also counsel in favor of construing § 105 to reach all legislation, including "subsequent amendments to [existing] laws." Covenant § 502. Indeed, not only would the majority's interpretation allow amendments to laws in existence on January 9, 1978, to escape the reach of § 105, it would allow them to do so on the arbitrary basis of whether those enactments are classified as original "laws" or "subsequent amendments to [existing] laws." Covenant § 502. As Salas argues, "[t]he history of the Animal Welfare Act illustrates the folly lurking in such formalism."[11] *Cf. E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 670 (9th Cir. 2021) ("We avoid absurd results when interpreting statutes." (citing *Rowland v. Cal. Men's Colony, Unit II Men's Adv. Council*, 506 U.S. 194, 200–01 (1993))).

Nor would Salas's interpretation impose novel constraints on the federal government. The primary requirement of § 105—that federal legislation specifically name the CNMI—only becomes effective when legislation is not applicable to the several states. Yet amendments to laws in existence on January 9, 1978, must already meet this requirement to be applicable to the CNMI under § 502(a)(2) as well. *See N. Mariana Islands*, 279 F.3d at 1073–75. The

---

Commonwealth," even under § 502. *Saipan Stevedore*, 133 F.3d at 722; *see also id.* at 725 (concluding that the Longshore and Harbor Workers' Compensation Act was "conceptually consistent with the goals of United States involvement in the Commonwealth" where there was "nothing in the Act itself or that we can foresee in its application that conflicts with the Commonwealth's right of self-government over local and internal matters").

[11] Opening Br. 13 n.20 (explaining how the Act's evolution "show[s] clearly that the choice of whether or not to formally characterize a given piece of legislation an 'amendment' to an earlier law is often arbitrary").

only additional requirement for such amendments would be *Richards*'s interest-balancing test, which already applies to all other legislation enacted after January 9, 1978. Interpreting § 105 to reach subsequent amendments to laws in existence on January 9, 1978, would thus only harmonize implementation of the Covenant's scheme.

Third, the Covenant's legislative history supports this reading as well.**[12]** First, the Marianas Political Status

---

[12] In previous cases involving the Covenant, we have relied upon the section-by-section analyses produced by representatives of the CNMI and the United States, *see, e.g., Richards*, 4 F.3d at 754, even calling them "authoritative," *N. Mariana Islands v. United States*, 399 F.3d 1057, 1065 (9th Cir. 2005). These include section-by-section analyses produced by the Marianas Political Status Commission and the Department of Interior. *See, e.g.*, *Richards*, 4 F.3d at 754 (first citing Marianas Political Status Commission, *Section-by-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* 15 (1975) [hereinafter *Marianas Commission Section Analysis*]; and then citing Department of Interior, *Section-by-Section Analysis of the Covenant, reprinted in To Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands," and for Other Purposes: Hearing Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 1st Sess. 385 (1975) [hereinafter *Administration Section Analysis*]. We have likewise relied upon the congressional reports "produced in connection with Congress's approval of the Covenant." *Fang*, 809 F.3d at 513 (citing H.R. Rep. No. 94–364, at 11 (1975); S. Rep. No. 94–433, at 83 (1975)). Finally, we have also relied upon the final report produced by the Northern Mariana Islands Commission on Federal Laws established pursuant to Covenant § 504. *See, e.g.*, *Saipan Stevedore*, 133 F.3d at 725 & n.14 (citing The Final Report for the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States, CNMI Reports Vol. I, p. 1G (1991) [hereinafter *Final Report* (as paginated in Opposition to Motion to Dismiss, Ex. 4, *Salas v. United States*, No. 1:22-CV-00008, 2022 WL 16964141 (D. N. Mar. I. Nov. 17, 2022), ECF No. 8)]).

Commission's Section-by-Section Analysis confirms that § 105 affects Congress's "legislative authority," not merely its ability to enact laws *rather than* amendments. *Marianas Commission Section Analysis*, at 630; *see also id.* ("It is the view of the [Marianas Political Status Commission] that as a practical matter this wording of Section 105, combined with the recognition of the right of local self-government in Section 103 and the other provisions of Article I, provide adequate assurances that *federal legislation* will not be made applicable unless it is appropriate." (emphasis added)); *id.* at 631 ("The United States has made clear on many occasions its intent to exercise *its powers* with respect to the Northern Marianas *with strict regard for the right of local self-government*, as it must in view of Section 103." (emphases added)). The Administration's Section-by-Section Analysis and the House and Senate Reports are not to the contrary. *See Administration Section Analysis*, at 384 ("The main point of this section is that the United States may enact legislation applicable to the Northern Mariana Islands in accordance with its Constitutional processes."); H.R. Rep. No. 94–364, at 5 ("Section 105 provides that laws which Congress could not also make applicable to a state cannot be made applicable to the Northern Marianas unless the Northern Marianas is specifically named in the legislation, so as to insure that legislation is not unintentionally applied to the Northern Marianas."); S. Rep. No. 94–433, at 67 ("This section provides that the United States may enact legislation applicable to the Northern Mariana Islands in accordance with its Constitutional processes."); *see also Final Report*, at 22 ("Section 105 grants the United States the power to legislate with respect to the Commonwealth according to its Constitutional process.").

Second, the legislative history strongly suggests that § 502 is subordinate to the demands of § 105.  For example, the Senate Report expressly provides that § 502 "does not relate to the power of Congress to legislate with respect to the Northern Mariana Islands; that issue is dealt with in section 105."   S. Rep. No. 94–433, at 76 ; *see also Administration Section Analysis*, at 388 (same).**13**   More broadly, the Final Report, at 22 (emphasis added), notes that "Section 502 makes applicable . . . federal laws existing on January 9, 1978, and amendments to those laws *provided that they are not inconsistent with the Covenant*."  *See also id.* ("The most important limitation on the applicability of these laws is Section 103 of the Covenant."); *id.* at 34 n.4 (emphasizing that, unlike § 503, § 502 has the "limitation 'except as provided by this Covenant'").  In combination, this legislative history supports concluding that (1) § 105 sweeps broadly, and (2) § 105 reaches § 502.

By contrast, the only legislative history cited by the majority is the Northern Mariana Islands Commission on Federal Laws's Second Interim Report, which predated the Commission's Final Report.  To be sure, we have cited this specific report in prior cases involving the CNMI, *see, e.g.*, *Fang*, 809 F.3d at 513–14 (quoting Second Interim Report

---

[13] The Senate and Department of the Interior observed that this was the case even though they also noted that the "purpose of [§ 502] is to provide a workable body of law." S. Rep. No. 94–433, at 76; *Administration Section Analysis*, at 388.  These two facts—that is, that § 105 applies to Congress's power to legislate and that § 502's purpose is to provide a workable body of law to the CNMI following ratification of the Covenant—thus do not inherently conflict.  Again, the majority does not explain how holding "that both § 105 and § 502 govern the applicability of amendments to pre-existing federal laws would eliminate this distinction," or why this would matter.  Maj. Op. at 20.

of the N. Mariana Islands Comm'n on Fed. Laws to the Congress of the United States 415 (1985) [hereinafter *Second Interim Report*]), and the approach described there does in fact support the majority's interpretation, *see Second Interim Report*, at 23–33. However, that approach was *explicitly* repudiated by the Commission's Final Report, which in turn sanctioned an entirely different approach.[14] *See Final Report*, at 24 ("[T]his final report specifically supplants those General Recommendations and other materials set forth in the Second Interim Report at pages 22 through 52."). And we have approvingly cited that superseding approach. *See, e.g.*, *Saipan Stevedore*, 133 F.3d at 725 (citing *Final Report*).[15]

---

[14] As laid out in the Final Report, at 24:

> In deciding whether or not to apply a federal law to the Commonwealth we should initially ask two questions: (1) Is the law necessary and proper for carrying out the Covenant, and (2) Is the law inconsistent with the right of self-government over local and internal matters reserved to the people of the Commonwealth in Section 103. Only if a Federal Law is both necessary and proper in carrying out the Covenant and not inconsistent with the right of self-government is it applicable within the Commonwealth.

[15] The majority responds that we have continued to rely on the Second Interim Report in other cases. I never suggested otherwise. The difference here, of course, is that each of the cases cited by the majority relied on portions of the Second Interim Report that examined the applicability of specific statutes. *See Fang*, 809 F.3d at 513–14; *Xianli Zhang v. United States*, 640 F.3d 1358, 1373–74 (Fed. Cir. 2011). These portions of the Second Interim Report were not "specifically supplant[ed]." *Final Report*, at 24; *see also id.* ("Some of those laws that the Commission found applicable [in the Second Interim Report] *may*

Finally, to the extent the above interpretive tools do not settle the matter, I would read any remaining ambiguity in favor of the CNMI and its people for at least two reasons. First, as Salas argues, this aligns with the intent of the Covenant's drafters. Indeed, Representative Phillip Burton, who served as Chairman of the House Subcommittee on Territorial and Insular Affairs,[16] expressed as much. *See* 122 Cong. Rec. 727 (statement of Rep. Burton) ("Our committee's and my own intent is that all possible ambiguities should be resolved in favor of and to the benefit of the people and Government of the Northern Mariana Islands.").

Second, in similar circumstances, both the Supreme Court and our court have read statutory ambiguities in favor of self-governing parties with whom the United States has ratified agreements. *See Antoine v. Washington*, 420 U.S. 194, 199 (1975) ("The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice."); *Swim v. Bergland*, 696 F.2d 712, 716 (9th Cir. 1983) ("Agreements between the United States and Indian tribes are to be construed according

---

not be applicable to the extent they conflict with the test adopted in this final report. . . . We leave to Covenant Section 902 consultations this methodology for reassessing some of the specific recommendations made in the Second Interim Report." (emphasis added)).

[16] *See* Howard P. Willens & Deanne C. Siemer, *An Honorable Accord: The Covenant Between the Northern Mariana Islands and the United States* 296–99 (2002). In fact, according to Willens and Siemer, Representative Burton "[d]eliver[ed] the House [of Representatives]" as part of Congress's approval of the Covenant. *Id.* He also served as a member of the Northern Mariana Islands Commission on Federal Laws until his death in 1983. *See Final Report*, at 5.

to the probable understanding of the original tribal signatories."); *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 687 (9th Cir. 1976) ("[S]tatutes enacted for the protection of Indians must be broadly construed in the Indians' favor."); *see also James T. Campbell,* Aurelius*'s Article III Revisionism: Reimagining Judicial Engagement with the* Insular Cases *and "The Law of the Territories*,*"* 131 Yale L.J. 2542, 2637 (2022) ("There are many potentially relevant doctrinal threads with which to link the notion of promise keeping in the territorial and Indian law contexts. For instance, the Supreme Court's Indian-law jurisprudence . . . has declined to distinguish between treaty and nontreaty agreements with the federal government, subjecting both to interpretive rules that are designed to vindicate those promises and prevent diminishment of reservation borders."). Given the Covenant's consistent emphasis on self-government, I would likewise view any remaining ambiguity in the Covenant's language in favor of the CNMI and its people.

In this case, reading ambiguity in the Covenant in favor of the CNMI and its people means ensuring that § 105 reaches all federal "legislation," including subsequent amendments to laws in existence on January 9, 1978. This reading would further protect § 103's right to self-government. I would therefore hold that § 105 also applies to amendments to laws in existence on January 9, 1978. This, in turn, requires that the *Richards* balancing test apply to our review of § 2156 and its 2018 Amendment.

### III.

Applying the *Richards* balancing test to the immediate case, I agree with the majority that Salas has failed to demonstrate § 2156 and its 2018 Amendment

"impermissibly intrude[] on the internal affairs of the CNMI." *Richards*, 4 F.3d at 755. I thus concur in the majority's thorough analysis concluding that "the federal interests advanced by § 2156 and its 2018 Amendment are significant, outweighing any intrusion into the internal affairs of the CNMI." Maj. Op. at 21.

\* \* \*

To close, when the United States and the people of the Northern Mariana Islands came together to ratify the Covenant, they enshrined in that document the CNMI's fundamental right to self-government. *See* Covenant §§ 103, 105; *see also "The Covenant to Establish a Commonwealth of the Northern Mariana Islands," and for Other Purposes: Hearing Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 1st Sess. 625 (1975) ("We look forward to the day when the people of the Marianas can control their own destiny."). As part of that momentous process, the United States expressly agreed to limit the exercise of its authority to "enact legislation . . . [i]n order to respect the right of self-government guaranteed by this Covenant." Covenant § 105; *see also Richards*, 4 F.3d at 755. We are faced here with the question of just how committed we are to upholding that promise. Because I believe that we are bound to do so based on the Covenant's plain text and "every other interpretive tool," *Saipan Stevedore*, 133 F.3d at 723, I would hold that § 105 applies to all federal "legislation," including "laws" and "subsequent amendments to [existing] laws." Covenant § 502. Notwithstanding this application, Salas has failed to demonstrate that § 2156 and its 2018 Amendment "impermissibly intrude[] on the internal affairs of the

CNMI." *Richards*, 4 F.3d at 755. I therefore respectfully concur in the court's judgment.